**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NORTHERN ILLINOIS GAS COMPANY, d/b/a NICOR GAS COMPANY, | ) ) ) | |
| | ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CITY OF EVANSTON, ILLINOIS, | ) ) | |
| Defendant. | ) ) | |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

Plaintiff Northern Illinois Gas Company, doing business as Nicor Gas Company

("Nicor"), brings this action for declaratory, injunctive, and other relief and alleges as follows:

**INTRODUCTION**

1.      This lawsuit arises from the City of Evanston's unlawful efforts to hold hostage

work that Nicor needs to perform on its natural gas pipeline system to comply with federal and

state safety regulations and to protect the public.  The City is holding this work hostage in an

apparent effort to obtain leverage to force Nicor to address stray methane gas from a source other

than Nicor's pipeline system that the City and the neighboring Metropolitan Water Reclamation

District ("MWRD") have found under and in the area of James Park, a former municipal landfill.

To that end, the City has also served a 90-day notice letter on Nicor stating that the City will sue

Nicor (and others) under environmental laws with respect to the methane.  However, the facts—

as confirmed by an extensive study by the MWRD in 2012, by an initial study by the City in

2013, and by a leak survey conducted by Nicor in 2014—all clearly demonstrate that the

methane detected in the area of James Park is not, and cannot be, from Nicor's system.  The City

has ignored these facts and has inappropriately put its own citizens at risk by refusing to allow

- 1 -

Nicor to perform necessary safety work on its system. This action seeks to enable Nicor to perform that necessary work to ensure the public's safety and remain in compliance with federal and state law.

2.　　Nicor operates and maintains a natural gas distribution system in the City. Nicor is entitled to do so under a franchise agreement with the City. Nicor is also required by pipeline safety regulations to manage the integrity of its system, including by implementing measures to reduce the risk of pipeline failure, removing unsafe pipelines from service, and phasing out pipeline segments that are in unsatisfactory condition or that pose a risk of failure.

3.　　Nicor is attempting to complete one such project in the City. The project involves replacing approximately 10,000 feet of low-pressure cast-iron main with new high-pressure plastic in an approximately 36-square-block total area. Cast-iron mains are being phased out nationwide, and this cast-iron main currently has a number of active leaks. Earlier this year, the City granted Nicor excavation permits to do the work. Pursuant to those permits, Nicor was able to install the new high-pressure plastic main and individual residential service lines. After installing the new high-pressure plastic main and service lines and switching its customers over from the old system, Nicor must retire the old cast-iron main and associated service lines, which involves cutting and capping the main at various points to prevent the flow of gas into or through the cast-iron system and removing existing gas from the system.

4.　　Before Nicor could retire the old cast-iron main and associated service lines, however, the City revoked Nicor's permits and declared a moratorium on further underground work. At present, the cast-iron main and associated service lines—which no longer serve customers or any useful purpose—are still an active part of Nicor's system, contain gas under pressure, and, for safety and regulatory compliance reasons, must be retired. The particular cast-

iron main presents a heightened risk because the ground around it has been disturbed in the course of Nicor installing the new plastic main and the City performing water main repair work. In addition, winter is fast approaching. Freezing temperatures bring frost heave, which causes soils to shift and can threaten the integrity of previously-disturbed cast-iron mains.

5.     Before revoking Nicor's permits and declaring a moratorium on further work, the City did not provide Nicor with notice or an opportunity to be heard. Although the City has alleged that its actions were justified based on public safety concerns and inferences about possible spoliation of evidence, the facts belie the City's contention.

6.     In particular, the City faces potential liability for stray methane gas that has been detected under and in the area of James Park. In 2012, the MWRD discovered stray methane, conducted a detailed analysis, and concluded that the City's former landfill was the likely source. In 2013, the City conducted its own analysis and concluded that the stray methane was naturally occurring. Under either scenario, the City—as the owner of James Park—would likely bear the legal and financial responsibility for remediating the methane gas.

7.     Facing this prospect, the City—without any basis in fact—now claims that Nicor's distribution system is the source of the stray methane. The City makes these claims despite the fact that the stray methane gas has been detected at depths of 40 feet or more below the ground, whereas Nicor's mains, none of which are located beneath James Park itself, are at an approximate depth of 3-4 feet. Further, the stray methane gas has reportedly been detected at pressure exceeding 300 inches of water column, whereas the gas in Nicor's cast-iron main is under pressure of only approximately 7 inches of water column. The City's suggestion that methane gas, which is lighter than air, migrated 40 feet or more downward, as well as

horizontally to beneath James Park and accumulated at pressure exceeding the pressure in Nicor's cast-iron main, is illogical and defies the laws of physics.

8.      Nonetheless, the City sent to Nicor a 90-day notice letter threatening to sue in federal court on the theory that Nicor is the cause of the stray methane, which, according to the City, presents an imminent and substantial endangerment.  *See* Oct. 20, 2014 Notice of Intent to Sue (Exhibit A).  The City makes this claim despite its repeated assurances to the public, as recently as May 2014, that the stray methane at James Park does not present any imminent threat to public safety.  *See, e.g., Tests at Evanston parks reveal methane gas levels are 'negligible,'* Daily Northwestern, May 28, 2014 (Exhibit B); *Evanston chief: James Park methane poses 'no imminent public threat,'* Evanston Review, May 28, 2014 (Exhibit C).

9.      Simply put, the City's permit revocation and moratorium prevents Nicor from complying with, and frustrates the purpose of, federal and state pipeline safety laws.  The City is depriving Nicor of its procedural and substantive due process rights, and breaching the terms of its franchise agreement with Nicor.  The permit revocation and moratorium are also arbitrary and capricious.  Nicor brings this action for declaratory, injunctive, and other relief so that it may safely retire its cast-iron pipelines to protect the public and remain in compliance with federal and state pipeline safety regulations.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Nicor's claims arise under the Constitution and the laws of the United States, including the Pipeline Safety Act, 49 U.S.C. § 60101, *et seq.*  This Court has supplemental jurisdiction over Nicor's state law claims pursuant to 28 U.S.C. § 1367(a).  The Court's authority to grant declaratory and other appropriate relief is founded upon 28 U.S.C. §§ 2201 and 2202.

11.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b).  The City resides in this district, a substantial part of the events giving rise to the claims occurred in this district, and the property that is the subject of the action is situated in this district.

## PARTIES

12.     Nicor is a corporation organized under the laws of the State of Illinois.

13.     The City of Evanston is a municipal corporation organized and constituted under the Constitution and laws of the State of Illinois.

## FACTUAL ALLEGATIONS

**A.      Nicor has a right to operate and maintain a natural gas distribution system in Evanston.**

14.     In August 1982, the City and Nicor entered into a franchise agreement.  *See* Ordinance 76-0-82 and Acceptance (the "Franchise Agreement") (Exhibit D).  The Franchise Agreement went into effect on September 9, 1982, and has a term of 50 years.

15.     The Franchise Agreement grants Nicor the right to "construct, operate, and maintain" a gas distribution system in the City, including the right "to construct, lay, maintain and operate such gas pipes, mains, conductors and other devices, apparatus and equipment as may be necessary or convenient for such system in, under, along and across each and all of the streets, alleys, avenues and other public places in the [City]."

16.     The Franchise Agreement provides that Nicor "shall be subject to all reasonable regulations which may now or hereafter be prescribed by general ordinance of the [City] with respect to the use of the public streets, alleys, avenues and other public places. . . ."

17.     In exchange for the right to construct, operate, and maintain a gas distribution system, Nicor makes an annual payment to the City.  From 2010 through 2014, Nicor has paid the City a total of $349,100.98 under the Franchise Agreement.

18.     The City, through Ordinance 8-O-12, adopted the Evanston City Code, 2012.

19.     Title VII of the City Code, which governs public ways, contains certain permitting requirements. The City Manager, the Director of Public Works, or his/her designee is generally responsible for issuing permits. *See* Evanston City Code § 7-1-2-1.

20.     Chapter 4-5 of Title VII governs excavations for installation of gas mains, and provides that "[g]as companies shall not make any excavation in any public right-of-way without first having procured a permit for that purpose from the Department of Public Works." Evanston City Code § 7-4-5-1(B). Chapter 4-5 does not purport to allow the City to revoke a gas company's excavation permits without cause and without any process.

**B.      Federal and state pipeline safety laws require Nicor to maintain its natural gas distribution system in Evanston.**

21.     Congress enacted the Pipeline Safety Act, which has been updated from time to time, "to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline transportation facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1).

22.     The Pipeline Safety Act requires, among other things, that "[e]ach person owning or operating a gas pipeline facility . . . shall carry out a current written plan . . . for inspection and maintenance of each facility used in the transportation and owned or operated by the person." 49 U.S.C. § 60108(a)(1); *see also id.* § 60118(a)(2).

23.     The Pipeline Safety Act also acknowledges the importance of replacing cast-iron gas pipelines and requires the Secretary of Transportation to monitor "the extent to which each operator has adopted a plan for the safe management and replacement of cast iron," "the elements of the plan, including the anticipated rate of replacement," and "the progress that has been made." 49 U.S.C. § 60108(d)(1)(A)-(C).

24.     Regulations promulgated by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), which is part of the U.S. Department of Transportation, address gas distribution pipeline integrity management. *See* 49 C.F.R. §§ 192.1001-.1015. The regulations require that "a gas distribution operator must develop and implement an integrity management program that includes a written integrity management plan." *Id.* § 192.1005.

25.     As part of the written integrity management plan, an operator must (i) identify threats to each gas distribution pipeline, including from corrosion, natural forces, excavation damage, other outside force damage, material or welds, equipment failure, incorrect operations, and other concerns, and (ii) evaluate and rank the risks associated with the distribution pipeline. 49 C.F.R. § 192.1007(b)-(c). An operator then must "[d]etermine and implement measures designed to reduce the risks from failure of its gas distribution pipeline. These measures must include an effective leak management program. . . ." *Id.* § 192.1007(d).

26.     PHMSA regulations also require that:

(a)     "[e]ach segment of pipeline that becomes unsafe must be replaced, repaired, or removed from service," and that "[n]o person may operate a segment of pipeline, unless it is maintained in accordance with this subpart." 49 C.F.R. § 192.703(a)-(b).

(b)     "[i]f a segment of pipeline is determined to be in unsatisfactory condition but no immediate hazard exists, the operator shall initiate a program to recondition or phase out the segment involved. . . ." *Id.* § 192.613.

(c)     "[w]hen an operator has knowledge that the support for a segment of cast-iron pipeline is disturbed," "[t]hat segment of pipeline [must] be protected, as necessary, against damage during the disturbance." *Id.* § 192.755(a).

27.     The Illinois Gas Pipeline Safety Act similarly requires that each person who

transports gas or owns or operates pipeline facilities shall file with the Illinois Commerce Commission ("ICC") "a plan for inspection and maintenance of each pipeline facility owned or operated by such person as well as any changes in such plan." 220 ILCS 20/5.

28.     The Illinois Gas Pipeline Safety Act directs the ICC to adopt rules establishing minimum safety standards that are at least as inclusive, as stringent, and compatible with, the minimum safety standards adopted by PHMSA. *See* 220 ILCS 20/3(a).

29.     The ICC, in turn, expressly adopted the PHMSA regulations as its own minimum safety standards. *See* 83 Ill. Admin. Code § 590.10.

**C.     Nicor's Distribution Integrity Management Plan requires Nicor to identify and implement measures to mitigate the highest risks in its system.**

30.     As part of complying with the Pipeline Safety Act and PHMSA regulations, Nicor maintains a Distribution Integrity Management Plan ("DIMP"). Nicor's DIMP is used to manage the integrity of the distribution mains and service lines within Nicor's natural gas distribution system in the State of Illinois.

31.     As required by PHMSA regulations, Nicor's DIMP establishes processes for, among other things, identifying threats in Nicor's distribution system, evaluating and ranking risks, and then identifying and implementing measures to mitigate the highest risks.

32.     Pursuant to the DIMP, Nicor identifies, scores, and ranks gas main replacement projects within its distribution system. Certain gas main materials, including cast iron, bare steel and ineffectively coated steel, and vintage plastic tend to rank higher. In scoring and ranking projects, Nicor considers leak history and other main integrity issues.

33.     Through this process, Nicor generates a list of gas main replacement projects, ranked in order of risk. Nicor then advances the projects into the engineering design, permitting, and construction process. Every year, Nicor implements projects that, if left alone, would pose

the highest risk. As a result, if a project is selected for completion in a given year, it addresses one of the highest risk pipeline segments in Nicor's distribution system.

> **D.      The City is preventing Nicor from completing Project 66 by retiring cast-iron main and associated service lines that need to be removed from service.**

34.      One of the projects that Nicor identified as requiring attention in 2014 was "Project 66," within Evanston. Project 66 covers an approximately 36-square block total area, and is bordered by Dodge Avenue on the west, Oakton Street on the north, Ridge Avenue on the east, and Dobson Street on the south. Project 66 involves the replacement of approximately 10,000 feet of low-pressure cast-iron main and associated individual residential service lines with new high-pressure plastic.

35.      The cast-iron main was originally installed in the first half of the twentieth century. As PHMSA has explained, cast-iron pipelines "are among the oldest energy pipelines constructed in the United States. Many of these pipelines were installed over 60 years ago and still deliver natural gas to homes and businesses today. However, the degrading nature of iron alloys, the age of the pipelines, and pipe joints design have greatly increased the risk involved with continued use of such pipelines." *See* PHMSA, Pipeline Replacement Updates, http://opsweb.phmsa.dot.gov/pipeline_replacement (last accessed Nov. 18, 2014). Cast-iron distribution pipelines have already been eliminated in at least 16 states. *Id.*

36.      Cast-iron mains that have been disturbed are particularly at risk in the winter months. When the ground freezes or thaws, soil can move. This process is known as frost heave. Frost heave can damage and rupture previously-disturbed cast-iron mains, which are particularly susceptible to earth movement. Several sites along the cast-iron main have been exposed by Nicor and the City during gas main replacement and water main repair work. Disturbed soil allows more movement during frost heave.

37. The cast-iron main within Project 66 is currently known to contain at least six Grade 2 leaks and five Grade 3 leaks. Under Nicor's Leak Manual, which complies with PHMSA regulations, a Grade 2 leak is a leak that is recognized as non-hazardous at the time of detection, but requires scheduled repair because of a probable future hazard. A Grade 2 leak must be repaired within fifteen months of discovery. A Grade 3 leak is a leak that is non-hazardous at the time of detection and can reasonably be expected to remain non-hazardous. A Grade 3 leak must be re-evaluated every twelve to fifteen months until it is repaired. Grade 2 and Grade 3 leaks can each develop into Grade 1 leaks, but a leak may be classified as a Grade 1 leak at the time of discovery. A Grade 1 leak is a leak that presents an existing or probable hazard to persons or property, and requires immediate repair or continuous action until the leak is no longer hazardous.

38. Taking into account the gas main material (cast iron), leak history, and other main integrity issues, Nicor determined through its DIMP process that the cast-iron main within Project 66 was one of the riskiest pipeline segments in its distribution system.

39. On April 17, 2014, Nicor submitted an excavation permit application to the City for much of the gas main and service line work covered by Project 66, which the City promptly granted (Permit #14TROW-0120). Thereafter, pursuant to the permit, Nicor commenced work installing the new high-pressure plastic main and service lines.

40. On July 23, 2014, Nicor submitted a second permit application to the City, covering additional work for Project 66. The City promptly granted the permit (#14TROW-0368). The second permit covered the replacement of service lines along Dodge Avenue. After receiving the permit, Nicor began work replacing the service lines.

41. On August 6, 2014, the City contacted Nicor, stating that it had come to the City's

attention that Nicor was performing work near methane gas probes that the City had installed on the west side of Dodge Avenue, around James Park. The City "urge[d] Nicor to immediately cease all Work in the vicinity of the probes."

42. Nicor responded to the City the next day, explaining that (i) Nicor had already finished the work along that section of Dodge Avenue, (ii) Nicor did not observe any probes during its work, (iii) the work had been permitted by the City, and (iv) at no time in the permitting process did the City inform Nicor of any issues or concerns.

43. On September 30, 2014, Nicor submitted a third permit application to the City, covering the retirement of the old cast-iron main and associated service lines. When a main is retired, the main is cut and capped, gas is removed from the main, and once removed from the distribution system, the main is left in place. The City granted the permit the same day (Permit #14TROW-0551).

44. On October 9, 2014, before Nicor was able to retire the old cast-iron main and associated service lines, the City informed Nicor, without notice or explanation, that the permit was revoked at the direction of the City's Corporation Counsel.

45. Over the next week, Nicor repeatedly requested a meeting with the City to discuss the revocation and any concerns the City might have had. The City did not respond.

46. Eventually, on October 16, 2014, the City notified Nicor that "[i]n accordance with the City's home rule authority, its police powers, its powers under the Evanston City Code, and all other relevant state and federal statutory authority, the City shall not permit any further work by Nicor in furtherance of its Project 66. The previously issued permit is of no force and effect, and shall remain revoked." The City also indicated that Nicor's work "lends itself to a reasonable inference regarding possible spoliation of evidence" concerning the stray methane gas

at James Park. The City did not explain its spoliation concern or what evidence it was seeking to preserve. *See* Oct. 16, 2014 Grant Farrar e-mail (Exhibit E).

47.     On October 20, 2014, Nicor responded and again asked for a meeting to address any concerns the City may have so that Nicor could complete Project 66 and retire the old cast-iron main and associated service lines, which are still connected to its distribution system and contain gas under pressure. *See* Oct. 20, 2014 Michael Partee e-mail (Exhibit F).

48.     The next day, the City sent Nicor a one-line email, stating "[a]ttached is the City's reply to your correspondence from yesterday." The "reply" was the notice of intent to sue Nicor in federal court under environmental laws. *See* Oct. 21, 2014 Grant Farrar e-mail (Exhibit G). The notice of intent to sue alleged that Nicor was contributing to an imminent and substantial endangerment at James Park. Notably, the notice did not contend that Nicor's specific work on Project 66 was contributing to the alleged endangerment. To the contrary, the notice alleged that "[l]eakage from aged [cast-iron] gas distribution line(s) in the vicinity of James Park presents an imminent and substantial endangerment. . . ." And yet, despite the City's allegation, the City would not allow Nicor to retire the cast-iron main and associated service lines in Project 66.

49.     On November 7, 2014, Nicor submitted a new permit application to the City, proposing an alternative approach to retire the cast-iron main and associated service lines. With its application, Nicor explained that retirement is required for safety and regulatory compliance reasons and therefore requested a response by November 14, 2014. Although excavation permits are usually approved by the City the same day, the City's permitting personnel informed Nicor that the decision on Nicor's application would be up to the City's Corporation Counsel.

50.     The City acknowledged receipt of the permit application on November 11, 2014. The City stated that it was studying the application, but "is not bound by any artificial deadline

set by Nicor regarding this application. Nicor will be notified of the City's decision regarding this application in due course, and only after the City, not Nicor, is satisfied that review of all applicable factors is concluded." Nov. 11, 2014 Grant Farrar e-mail (Exhibit H).

51.     The City responded again on November 12, 2014. The City claimed that Nicor merely "desire[d] to conceal the fact that its leaking infrastructure is the source of the James Park situation" and criticized Nicor's purportedly "bewildering" and "astounding" "course of inaction." The City indicated that it was prepared to enter into an agreement allowing the work to proceed in a manner that does not result in the spoliation of evidence, and asked Nicor to provide a proposal. Again, the City did not explain its spoliation concern or what evidence it was seeking to preserve. *See* Nov. 12, 2014 Grant Farrar e-mail (Exhibit I).

52.     The same day, a Grade 1 leak was reported to Nicor in one of the residential service lines that Nicor is attempting to retire through Project 66—a service line that already would be retired if not for the City's permit revocation and moratorium. The homeowner smelled gas in the home's basement and contacted Nicor. As described above, a Grade 1 leak presents an existing or probable hazard to persons or property and requires immediate attention. Nicor arrived at the home and promptly completed a repair.

53.     Nicor responded to the City the next day. Nicor informed the City of the Grade 1 leak in a service line associated with the old cast-iron system the day before, reiterated its safety concerns and the need to promptly retire the old cast-iron main and associated service lines, explained the work that Nicor would be doing to disconnect the main and service lines and retire them in place, and offered to provide 24-hour notice to allow the City to observe the work. Nicor also reiterated its request for a decision on its permit application by November 14, 2014. *See* Nov. 13, 2014 Michael Partee e-mail (Exhibit J).

54. The City ultimately continued to delay. On November 14, 2014, the City notified Nicor that it would "enter and continue" Nicor's permit application. In the meantime, the City added new pre-conditions to its further consideration of Nicor's application. The City asked Nicor to produce records related to the City's threatened lawsuit against Nicor, including for "work already completed." The City also requested a meeting nearly a week later, on November 20, 2014, to address Nicor's purported admissions regarding its "leaking infrastructure" and "all other outstanding issues." In addition, the City made various demands of Nicor with respect to its spoliation concerns, including "unconditionally cooperat[ing] with the City during the pendency of the work." *See* Nov. 14, 2014 Grant Farrar e-mail (Exhibit K).

**E.      The City is preventing Nicor from completing Project 66 in an attempt to obtain leverage to force Nicor to address stray methane gas at James Park.**

55. James Park is a 55-acre recreational park bordered by Oakton Street on the north and Dodge Avenue on the east, located west of the area covered by Project 66. To the west of James Park is the North Shore Channel sanitary canal.

56. From the late 1800s until the early 1940s, the James Park site was used as a clay pit by the Illinois Brick Company, and had been excavated to depths of up to 80 feet.

57. The City purchased the James Park site in 1943 and used it as a landfill. The City rented the landfill to private parties to dump waste until 1953, when the City began using the landfill for its own waste disposal. The landfill was constructed prior to landfill regulations and therefore does not have modern environmental protections that would be required today, including an impermeable liner or landfill gas or leachate collection systems.

58. In 1965, the City closed the landfill and opened James Park. In addition to various athletic fields and courts, James Park has a sledding hill known colloquially as "Mount Trashmore"—a reference to the former municipal landfill beneath it.

59.     In November 2012, the MWRD notified the City and the Illinois Environmental Protection Agency that it had detected stray methane gas and oily material at its water reclamation plant, which is located southwest of James Park.  The MWRD concluded that "[t]he location and historical use of the James Park property, the historical photographs, along with our independent chemical analysis and finger printing, suggests that the former landfill is the likely source of the observed methane gas and oily material. . . ."  *See* Nov. 29, 2012 MWRD letter and Nov. 2012 Tetra Tech EM Inc. Phase II Environmental Assessment (Exhibit L).

60.     The City responded to the MWRD in March 2013, after retaining a consultant to review the MWRD's analysis.  The City's consultant concluded that the methane gas and oily material was naturally occurring and "consistent with more than 100 years of observations of highly biodegraded petroleum occurring in the Niagaran Dolomite throughout the Chicagoland area."  The City's consultant further concluded that the compounds identified by the MWRD "are precisely the constituents that introductory organic geochemistry textbooks predict would remain from a highly weathered and biodegraded naturally occurring crude oil sources."  *See* Mar. 28, 2013 City letter and CS GeoLogic LLC report (Exhibit M).

61.     In May 2014—after Nicor had already commenced work on Project 66—the City notified Nicor that it had detected stray methane gas at depths of 40 feet or more in monitoring wells at James Park with pressure exceeding 300 inches of water column.  The City indicated that it did "not know the source of the gas" and was trying "to get to the bottom of this problem." *See* May 13, 2014 Jeff Jeep e-mail (Exhibit N).

62.     Also in May 2014, the City's Fire Chief reported to the City Council on the results of the City's testing for stray methane gas in and around James Park, including at various facilities in the area.  According to the Fire Chief, "What we have found were zero or negligible

levels of methane gas inside the facilities, as well as outside," and "I believe there's no imminent threat to public safety in and around James Park and the facilities." (Exhibits B-C.)

63.     After Nicor was notified of the stray methane gas, it promptly investigated the location of any of its pipelines in the area of James Park. Nicor confirmed that its distribution system does not contain any pipelines running beneath James Park itself, but does have pipelines running adjacent to James Park. The mains are at an approximate depth of 3-4 feet, with individual residential service lines lying shallower than the mains, whereas the stray methane gas was reportedly detected at depths of 40 feet or more.

64.     On May 23, 2014, Nicor conducted a leak survey on its pipelines adjacent to James Park. Specifically, Nicor used a vehicle-mounted detection instrument to identify leaks on mains and service lines on streets surrounding James Park, including north of the park on Oakton Street from Darrow Avenue to the North Shore Channel, east of the park on Dodge Avenue from Keeney Street to Brummel Street, on Kirk Street from Dodge Avenue to Darrow Avenue, and on Darrow Avenue from Mulford Street to Kirk Street, and south of the park on Mulford Street from Darrow Avenue to its dead-end in the park. The vehicle-mounted instrument can detect methane gas at levels between 10 parts per million and 10,000 parts per million, which is between 1/1000 of a percent and one percent natural gas in the ambient air. The leak survey did not identify any leaks in the mains and service lines surrounding James Park that could have been contributing to the stray methane issues identified by the City.

65.     Nonetheless, the City continued to press ahead in attempting to attribute the stray methane gas beneath James Park to Nicor, as opposed to its former municipal landfill or to the naturally-occurring sources identified by the City's consultant.

66.     On July 3, 2014, the City's Fire Chief sent Nicor an Order requesting various

documents and additional evaluations. On July 10, 2014, Nicor informed the Fire Chief that it was reviewing the requests and would respond by the end of July. Nicor provided that substantive response on July 29, 2014. Nicor referred to certain documents it had already provided to the City, provided additional information, asked for the technical basis for some of the City's requests, and offered to address any questions or concerns the City might have. *See* July 29, 2014 letter (Exhibit O).

67.     Not long thereafter, as described above, the City then (i) urged Nicor to stop any work in the vicinity of James Park, (ii) revoked the permit allowing Nicor to retire its cast-iron main and associated service lines, (iii) declared a moratorium on all work in furtherance of Project 66, citing "possible spoliation," (iv) sent Nicor the "Notice of Intent to Sue," and (v) failed to approve Nicor's revised permit application to retire its cast-iron main and associated service lines.

68.     As a result, Nicor is currently unable to retire the cast-iron main and associated service lines that are still connected to its distribution system and contain gas under pressure—pipelines which the City itself alleges "present[] an imminent and substantial endangerment."

## COUNT I
### (Declaratory Judgment – Federal Preemption)

69.     Nicor restates and realleges paragraphs 1-68 as if fully set forth herein.

70.     The City is preventing Nicor from complying with the Pipeline Safety Act and PHMSA regulations by revoking Nicor's excavation permits and declaring a moratorium on all work related to Project 66, including the retirement of the cast-iron main and associated service lines.

71.     The Pipeline Safety Act requires owners and operators of gas pipeline facilities to "carry out a current written plan . . . for inspection and maintenance of each facility." 49 U.S.C.

§ 60108(a)(1); *see also id.* § 60118(a)(2). As part of the written plan, the owner or operator must identify threats, evaluate and rank risks, and "[d]etermine and implement measures designed to reduce the risks from failure of its gas distribution pipeline." 49 C.F.R. § 1007(d).

72. Through its DIMP process, Nicor identified the cast-iron main that is the focus of Project 66 as one of the highest risk pipelines in its system. The City is preventing Nicor from "carrying out" and "implementing" its integrity management plan, as federal law requires.

73. PHMSA regulations also require that "[e]ach segment of pipeline that becomes unsafe must be replaced, repaired, or removed from service," 49 C.F.R. § 192.703(a), and that "[i]f a segment of pipeline is determined to be in unsatisfactory condition. . ., the operator shall initiate a program to recondition or phase out the segment involved. . . ." *Id.* § 192.613.

74. For safety reasons and due to their disturbed condition, the cast-iron main and associated service lines in Project 66 should be promptly retired as anticipated. The cast-iron system (i) recently experienced a Grade 1 leak, (ii) is surrounded by ground that has been disturbed in the course of both Nicor installing the new plastic main and service lines and the City performing water main repair work, and (iii) is vulnerable to frost heave as temperatures drop. The City is preventing Nicor from removing unsafe pipelines from service and phasing out pipelines in unsatisfactory condition, as federal law requires.

75. Further, PHMSA regulations require that "when an operator has knowledge that the support for a segment of cast-iron pipeline is disturbed," "[t]hat segment of pipeline [must] be protected, as necessary, against damage during the disturbance." 49 C.F.R. § 192.755(a).

76. The support for segments of cast-iron pipeline in Project 66 was disturbed in the course of both Nicor installing the new plastic main and service lines and the City performing

water main repair work. The City is preventing Nicor from protecting the cast-iron main and associated service lines against damage, as federal law requires.

77. In addition to preventing Nicor from complying with federal law, the City, through its permit revocation and moratorium, is also standing as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

78. There is an actual and immediate controversy between Nicor and the City regarding Nicor's ability to retire the cast-iron main and associated service lines. A declaration of the rights of the parties would resolve all or a substantial part of this controversy.

WHEREFORE, Nicor prays for the entry of an order declaring that the City's revocation of Nicor's excavation permits and moratorium on all work related to Project 66 conflicts with federal law, and allowing Nicor to retire the cast-iron main and associated service lines.

## COUNT II
### (Section 1983 – Procedural Due Process)

79. Nicor restates and realleges paragraphs 1-78 as if fully set forth herein.

80. Under the 14th Amendment to the U.S. Constitution, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."

81. Nicor has a protected property interest in its excavation permits, which under the Evanston City Code and the Franchise Agreement, cannot be revoked without cause. The excavation permits allow Nicor to maintain its gas distribution system in the City, as it is entitled to do under the Franchise Agreement and required to do by the Pipeline Safety Act and PHMSA regulations. The Evanston City Code does not allow the City unrestricted discretion to revoke a gas company's permits because Nicor has rights under the Franchise Agreement and obligations under federal and state law that require Nicor to be able to maintain its gas distribution system.

82.     The City deprived Nicor of its property interest by revoking the excavation permits and declaring a moratorium on all work related to Project 66.

83.     The deprivation occurred without due process. Nicor was not given prior notice of the permit revocation or moratorium, nor was it given any opportunity to be heard.

84.     Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

85.     On information and belief, the decision to revoke Nicor's excavation permits and impose a moratorium on all work related to Project 66 was made under color of law by a person with final policymaking authority—the City's Corporation Counsel. The City is therefore liable under Section 1983 for the violation of Nicor's due process rights.

WHEREFORE, Nicor prays for the entry of an order declaring that the City's revocation of Nicor's excavation permits and moratorium on all work related to Project 66 violates Nicor's procedural due process rights, allowing Nicor to retire the cast-iron main and associated service lines, and allowing Nicor, as a prevailing party, a reasonable attorney's fee.

## COUNT III
### (Section 1983 – Substantive Due Process)

86.     Nicor restates and realleges paragraphs 1-85 as if fully set forth herein.

87.     The City's revocation of Nicor's excavation permits and moratorium on all work related to Project 66 is arbitrary and irrational. The City does not claim that Nicor's work on Project 66 poses a safety risk or is contributing to the stray methane gas at James Park. Rather, the City is prohibiting Nicor from retiring a cast-iron main and service lines that the City itself

alleges "present[] an imminent and substantial endangerment." Further, the City's allegation that Nicor is responsible for the stray methane gas at James Park has no basis in fact.

88.     There is also no rational basis for the City's apparent belief that retiring the cast-iron main and associated service lines "lends itself to a reasonable inference regarding possible spoliation of evidence." Nicor simply seeks to disconnect the main and service lines from its distribution system, empty them of gas, and leave them in place. Nicor has offered to allow the City to observe the work. Yet, the City still has not allowed the retirement work to proceed.

89.     Moreover, there is no rational basis for the City, on November 14, 2014, adding new pre-conditions to its consideration of Nicor's permit application that relate to its threatened lawsuit against Nicor, rather than the completion of the Project 66 work.

90.     On information and belief, the decisions to revoke Nicor's excavation permits, impose a moratorium on all work related to Project 66, and add new pre-conditions to the City's consideration of Nicor's permit application were made under color of law by a person with final policymaking authority—the City's Corporation Counsel. The City is therefore liable under Section 1983 for the violation of Nicor's due process rights.

WHEREFORE, Nicor prays for the entry of an order declaring that the City's revocation of Nicor's excavation permits, moratorium on all work related to Project 66, and adding new pre-conditions to the City's consideration of Nicor's permit application violates Nicor's substantive due process rights, allowing Nicor to retire the cast-iron main and associated service lines, and allowing Nicor, as a prevailing party, a reasonable attorney's fee.

## COUNT IV
### (Declaratory Judgment – Procedural and Substantive Due Process)

91.     Nicor restates and realleges paragraphs 1-90 as if fully set forth herein, including the allegations concerning violations of Nicor's procedural and substantive due process rights.

92. As an alternative to Counts II and III under Section 1983, Nicor is also entitled to a declaratory judgment that the City violated its procedural and substantive due process rights.

93. There is an actual and immediate controversy between Nicor and the City regarding Nicor's ability to retire the cast-iron main and associated service lines. A declaration of the rights of the parties would resolve all or a substantial part of this controversy.

WHEREFORE, Nicor prays for the entry of an order declaring that the City's revocation of Nicor's excavation permits, moratorium on all work related to Project 66, and adding new pre-conditions to the City's consideration of Nicor's permit application violates Nicor's due process rights, and allowing Nicor to retire the cast-iron main and associated service lines.

## COUNT V
### (Declaratory Judgment – Breach of Franchise Agreement)

94. Nicor restates and realleges paragraphs 1-93 as if fully set forth herein.

95. The Franchise Agreement grants Nicor the right to "construct, operate, and maintain" a gas distribution system in the City, including the right "to construct, lay, maintain and operate . . . gas pipes, mains, conductors, and other devices, apparatus and equipment as may be necessary or convenient for [its gas distribution] system in, under, along and across each and all of the streets, alleys, avenues and other public places in the [City]." Nicor's rights are subject to the City's ability to enact "reasonable regulations" by general ordinance with respect to Nicor's use of the public streets, alleys, avenues, and other public places of the City.

96. Nicor provided consideration for the right to construct, operate, and maintain a gas distribution system by making annual payments to the City under the Franchise Agreement. Nicor has also performed all conditions required under the Franchise Agreement.

97. The City breached the Franchise Agreement because its revocation of Nicor's excavation permits and moratorium on all work related to Project 66 prevent Nicor from

maintaining its gas distribution system in the City. The City's revocation of Nicor's excavation permits and moratorium on future work related to Project 66, without due process of law, are also not "reasonable regulation" allowed under the Franchise Agreement.

98.     As described above, the City does not claim that Nicor's work on Project 66 poses a safety risk or is contributing to the stray methane gas at James Park. Rather, the City is prohibiting Nicor from retiring a cast-iron main and associated service lines that the City itself alleges "present[] an imminent and substantial endangerment." Further, the City's allegation that Nicor is responsible for the stray methane gas at James Park has no basis in fact. There is also no rational basis for the City's belief that retiring a cast-iron main and associated service lines "lends itself to a reasonable inference regarding possible spoliation of evidence."

99.     There is an actual and immediate controversy between Nicor and the City regarding Nicor's ability to retire the cast-iron main and associated service lines. A declaration of the rights of the parties would resolve all or a substantial part of this controversy.

WHEREFORE, Nicor prays for the entry of an order declaring that the City's revocation of Nicor's excavation permits and moratorium on all work related to Project 66 violates the Franchise Agreement, and allowing Nicor to retire the cast-iron main and associated service lines.

## COUNT VI
### (Declaratory Judgment – State Preemption)

100.    Nicor restates and realleges paragraphs 1-99 as if fully set forth herein.

101.    As described above, the ICC has adopted the PHMSA regulations as its own minimum safety standards for gas pipeline facilities. *See* 83 Ill. Admin. Code § 590.10. As a result, it is also state law that (i) an owner or operator must "[d]etermine and implement measures designed to reduce the risks from failure of its gas distribution pipeline," 49 C.F.R. §

1007(d), (ii) "[e]ach segment of pipeline that becomes unsafe must be replaced, repaired, or removed from service," *id.* § 192.703(a), (iii) "[i]f a segment of pipeline is determined to be in unsatisfactory condition. . ., the operator shall initiate a program to recondition or phase out the segment involved. . . .," *id.* § 192.613, and (iv) "when an operator has knowledge that the support for a segment of cast-iron pipeline is disturbed," "[t]hat segment of pipeline [must] be protected, as necessary, against damage during the disturbance." *Id.* § 192.755(a).

102.    By revoking Nicor's excavation permits and declaring a moratorium on all work related to Project 66, the City is preventing Nicor from complying with state law.

103.    The City's actions are also preempted because they exceed the scope of the City's home rule authority under Article VII, Section 6(a) of the Illinois Constitution.  The City is not exercising power "pertaining to its government and affairs."  Rather, the City is impinging on state authority over matters of statewide concern—utility and pipeline safety regulation.

104.    There is an actual and immediate controversy between Nicor and the City regarding Nicor's ability to retire the cast-iron main and associated service lines.  A declaration of the rights of the parties would resolve all or a substantial part of this controversy.

WHEREFORE, Nicor prays for the entry of an order declaring that the City's revocation of Nicor's excavation permits and moratorium on all work related to Project 66 is preempted by state law, and allowing Nicor to retire the cast-iron main and associated service lines.

### COUNT VII
### (Writ of Certiorari)

105.    Nicor restates and realleges paragraphs 1-104 as if fully set forth herein.

106.    By revoking Nicor's excavation permits and declaring a moratorium on all work related to Project 66, the City exercised a quasi-judicial function because the decision affected Nicor on individual grounds based on a particular set of disputed facts.

107.     The City's revocation of Nicor's excavation permits and moratorium on all work related to Project 66 is arbitrary and capricious.  As described above, the City does not claim that Nicor's work on Project 66 poses a safety risk or is contributing to the stray methane gas at James Park.  Rather, the City is prohibiting Nicor from retiring a cast-iron main and associated service lines that the City itself alleges "present[] an imminent and substantial endangerment." Further, the City's allegation that Nicor is responsible for the stray methane gas at James Park has no basis in fact.  There is also no rational basis for the City's belief that retiring a cast-iron main and associated service lines "lends itself to a reasonable inference regarding possible spoliation of evidence."

WHEREFORE, Nicor prays for the entry of an order declaring that the City's revocation of Nicor's excavation permits and moratorium on all work related to Project 66 is invalid, and further prays for the entry of an injunction allowing Nicor to retire the cast-iron main and associated service lines.


Dated:  November 18, 2014                      Respectfully submitted,

                                               NORTHERN ILLINOIS GAS COMPANY,
                                               d/b/a NICOR GAS COMPANY

Mark R. Ter Molen                              By: /s/  Mark R. Ter Molen
J. Gregory Deis                                       One of its Attorneys
Matthew C. Sostrin
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711

*Counsel to Northern Illinois Gas Company,*
*d/b/a Nicor Gas Company*

**Exhibit Index**

| Exhibit | Description of Exhibit | Citation to Complaint |
|---|---|---|
| Exhibit A | Oct. 20, 214 Notice of Intent to Sue | ¶ 8 |
| Exhibit B | "Tests at Evanston parks reveal methane gas levels are 'negligible,'" Daily Northwestern, May 28, 2014 | ¶¶ 8, 63 |
| Exhibit C | "Evanston chief: James Park methane poses 'no imminent public threat,' Evanston Review, May 28, 2014 | ¶¶ 8, 63 |
| Exhibit D | Ordinance 76-0-82 and Acceptance (the "Franchise Agreement") | ¶ 15 |
| Exhibit E | Oct. 16, 2014 Grant Farrar e-mail | ¶ 47 |
| Exhibit F | Oc. 20, 2014 Michael Partee e-mail | ¶ 48 |
| Exhibit G | Oct. 21, 2014 Grant Farrar e-mail | ¶ 49 |
| Exhibit H | Nov. 11, 2014 Grant Farrar e-mail | ¶ 51 |
| Exhibit I | Nov. 12, 2014 Grant Farrar e-mail | ¶ 52 |
| Exhibit J | Nov. 13, 2014 Michael Partee e-mail | ¶ 54 |
| Exhibit K | Nov. 14, 2014 Grant Farrar e-mail | ¶ 55 |
| Exhibit L | Nov. 29, 2012 MWRD letter and Nov. 2012 Tetra Tech EM Inc. Phase II Environmental Assessment | ¶ 60 |
| Exhibit M | Mar. 28, 2013 City letter and CS Geologic LLC report | ¶ 61 |
| Exhibit N | May 13, 2014 Jeff Jeep e-mail | ¶ 62 |
| Exhibit O | July 29, 2014 letter | ¶ 68 |

# Exhibit A

*Jeep & Blazer, L.L.C.*

Jeffery D. Jeep*
Michael S. Blazer**

\* Also admitted in Massachusetts
\*\* Also Admitted in New York and Washington

24 N. Hillside Avenue
Suite A
Hillside, Illinois 60162
(708) 236-0830
(708) 236-0828 Fax

Jeffery D. Jeep
email: jdjeep@enviroatty.com

Web Site:
www.jeepandblazer.com

October 20, 2014

### *DELIVERY VIA REGISTERED MAIL, RETURN RECEIPT REQUESTED*

To:

Commonwealth Edison Company
c/o Corporate Creations Network Inc.
Registered Agent
350 S Northwest Highway 300
Park Ridge, IL 60068
Phone:  (773) 649-9240

Northern Illinois Gas Company doing
business as Nicor Gas
c/o Illinois Corporation Service Company
Registered Agent
801 Adlai Stevenson Drive
Springfield, Il 62703-4261
Phone:  (217) 492-2700

Exelon Corporation
c/o Corporate Creations Network Inc.
Registered Agent
350 S Northwest Highway 300
Park Ridge, IL 60068
Phone:  (773) 649-9240

AGL Resources Inc.
c/o Paul R. Shlanta
Registered Agent
General Counsel
Ten Peachtree Place, N.E.
Atlanta, GA 30309
Phone:  (302) 636-5401

Re:         **Notice of Intent to Sue under RCRA, CERCLA, et al.**

THIS IS TO NOTIFY YOU THAT:

1.     The undersigned is counsel for, and serves this notice on behalf of:

City of Evanston
2100 Ridge Avenue
Evanston, IL 60201
(the "City" or "Evanston")

2.     This Notice is issued to:

Commonwealth Edison Company, an Illinois corporation, Illinois
Secretary of State File No. 07636466 ("**ComEd**");

Exelon Corporation, a Pennsylvania Corporation, Pennsylvania
Secretary of State File Number 2859390 ("**Exelon**");

Northern Illinois Gas Company, an Illinois corporation, Illinois Secretary of State File No. 50814173 ("**Nicor**"); and

AGL Resources Inc., a Georgia corporation, Georgia Secretary of State File Number 961422 ("**AGL**").

3. **ComEd** and **Exelon** are hereafter referred to collectively as the "**ComEd Companies.**"

4. **Nicor** and **AGL** are hereafter referred to collectively as the "**Nicor Companies.**"

## I.    INTRODUCTION

5. On information and belief, one or more of the ComEd Companies and Nicor Companies are the corporate successor to Northwestern Gas Light & Coke Company ("**NGLC**"). The corporate history of NGLC is described in **Attachment 1**[1].

6. This Notice pertains to the following waste disposal sites:

   a. The presence of methane gas at high concentrations and pressure around the perimeter of James Park in Evanston, as described in the Order issued on July 3, 2014 (the "Order") by Evanston's Fire Chief to ComEd and AGL, enclosed as **Attachment 2**; and

   b. Coal tar present at various locations, including coating a potable water line running along Dodge Avenue in Evanston.

## II.   FIRST ENDANGERMENT – DISPOSAL OF METHANE GAS

7. James Park is owned by the City and is located at Oakton Street and Dodge Avenue. James Park has a playground for children, eight baseball fields, five soccer/football fields, toboggan hill, six tennis courts, a basketball court, field house and public gardens. For the location of James Park, see Order, Attachment 10, Boring Locations. See also http://cityofevanston.org/parks-recreation/parks/

8. Dawes Elementary School is located at 440 Dodge Avenue in Evanston, operated by Evanston/Skokie School District 65, and enrolls approximately 375 students in kindergarten through the fifth grade. For the location of the Dawes Elementary School, see Order, Attachment 10, Boring Locations. See also http://dawes.district65.net

9. The Levy Senior Center is located at 300 Dodge Avenue, operated by the City, and offers social services and programs for seniors, including exercise classes and lunch programs. For the location of the Levy Senior Center, see Order, Attachment 10, Boring Locations. See also http://cityofevanston.org/parks-recreation/levy-senior-center/

---

[1]    The enclosed CD-ROM contains this letter and the referenced Attachments as an Acrobat PDF file. The PDF file is bookmarked for ease of navigation.

10.    From approximately the 1890's until the early 1940's clay was mined from the area now known as James Park. From approximately the 1940's until 1965 the clay mining excavation was filled with what is believed to be non-putrescible solid waste (the "James Park Landfill" or "JPL").

11.    In November 2012, the Metropolitan Water Reclamation District of Greater Chicago ("MWRDGC") detected methane gas in high concentration (86%) in boring B-11, located to the southwest of the JPL.  For the location of boring B-11 in relationship to the JPL, see Order, Attachment 10, Boring Locations. See also August 12, 2014 Memorandum from Thomas Rivera, Illinois Environmental Protection Agency ("IEPA"), enclosed as **Attachment 3** (methane gas encountered in boring B-11 at a concentration of 100% and at pressure that filled a black garbage bag in less than one minute).  On November 29, 2012, the MWRDGC advised the City that the James Park Landfill was purportedly the likely source of the methane gas detected in boring B-11.  A copy of the November 29, 2012 letter is enclosed as **Attachment 4**.

12.    On May 14, 2014, the City informed Nicor that methane gas has been detected at high concentrations and pressure at James Park and that a natural gas transmission line may be the source. Nicor was informed that methane gas was detected at a static pressure of 300 inches in GMP10, a pressure much higher than typically found inside a landfill. GMP10 is located directly east of Dawes School. See Order, Chronology, May 13, 2014, and Attachment 10 for the location of GMP10.

13.    The City continues to measure methane gas in high concentrations and pressure in four gas monitoring wells located around the perimeter of James Park, in GMP1 (87%), GMP10 (87%), GMP 19 (85%) and GMP11 (82%). See Boring Map for James Park dated August 18, 2014, Figure 2, enclosed as **Attachment 5**.  GMP1 is located at the southwest corner of James Park. GMP10, GMP19 and GMP11 are all located in close proximity to Dawes School. GMP19 is located less than 20 feet from the entrance to the School.

14.    Methane gas at the concentrations and pressures detected around the perimeter of James Park and in close proximity to the Dawes Elementary School and Levy Senior Center may present an imminent and substantial endangerment to human health or the environment, within the meaning of 42 U.S.C. § 6972(a)(1)(B). For current references on some of the hazards resulting from leaking natural gas conveyance lines, see:

a.    Combined NBC News and USA Today Investigation, "Hidden Danger" that aired on September 22, 2014, on the risk of explosion presented by deteriorating cast iron gas distribution lines.
b.    September 22, 2014 USA Today report, "Look out below: Danger Lurks Underground From Aging Gas Pipes," enclosed as **Attachment 6.**
c.    September 29, 2010 New York Times article, "California: Death Toll Rises To 8 In Pipeline Explosion [San Bruno, Calif.]", enclosed as **Attachment 7.**
d.    April 2, 2014 New York Times article, "California Utility Indicted on 12 Federal Criminal Charges in 2010 Gas Pipeline Explosion", enclosed as **Attachment 8**.

15. On May 28, 2014, the City advised Nicor that, according to the United States Environmental Protection Agency ("USEPA"), the typical concentration of methane in landfill gas is in the range of 45% - 60%, which means a natural gas pipeline, not the James Park Landfill, is the more likely source of the methane gas detected at concentrations in excess of 85% around the perimeter of James Park. See Order, Chronology, May 28, 2014 and attachments, and USEPA website referenced therein.

16. The Order directed Nicor, to *inter alia* (1) provide the City with documentation with respect to natural gas distribution pipelines that Nicor historically operated, or presently operates, in the vicinity of James Park, and (2) undertake an assessment of whether those structures are the source of the methane gas at issue.

17. On July 29, 2014, Nicor advised the City that it would not comply with the Order, claiming that the James Park Landfill, not its gas distribution lines, is the source of the methane gas detected at high concentrations and pressure around the perimeter of James Park. See July 29, 2014 letter from Nicor to the City, enclosed as **Attachment 9**.

18. Since May 2014, the City's Fire and Life Safety Services has been monitoring methane gas as a percentage of its lower explosive limit in the basements of Dawes Elementary School, the Levy Senior Center and other locations.

## A. CONTRIBUTOR TO THE ENDANGERMENT PRESENTED BY DISPOSAL OF METHANE GAS

19. On information and belief, the documentation with respect to natural gas distribution pipelines that Nicor historically operated, or presently operates, in the vicinity of James Park reflects that they were installed in the early part of the twentieth century, or earlier, and were constructed of cast iron. See Order, Chronology, February 16, 1910, April 22, 1910, January 23, 1911, August 20, 1969 and December 17, 1969, and attachments referenced therein (describing cast iron gas distribution pipes installed in the vicinity of James Park by NGLC or Nicor under the North Shore Channel and along Oakton Street).

20. Nicor has publicly acknowledged that its cast iron gas distribution pipes are prone to leakage, endanger public safety, and must be replaced within the next four years. Nicor has developed a "Qualified Infrastructure Plan" and "Distribution Integrity Management Program" which, according to Nicor, are "designed to, among other things, identify threats, evaluate and rank risks, and to identify and implement measures to address risks." See Northern Illinois Gas Company d/b/a Nicor Gas Company, Application for Approval of a Tariff pursuant to Section 9-220.3 of the Public Utilities Act, April 7, 2014, Case Number: 14-0292, enclosed as **Attachment 10**. See also Northern Illinois Gas Company d/b/a Nicor Gas Company, Application for Approval of a Tariff pursuant to Section 9-220.3 of the Public Utilities Act, Illinois Commerce Commission Case No. 14-0292, Final Order (July 30, 2014), p. 4, enclosed as **Attachment 11**.

21. The James Park Landfill, which closed in 1965 and did not receive putrescible waste, is not the cause of the methane gas at issue, which is detected at (a) concentrations in excess of 85%, (b) at a static pressure of up to 300 inches, and (c) in the vicinity of Nicor's aged cast iron gas distribution pipelines, which (d) Nicor admits are prone to leakage, endanger public safety and must be replaced.

22.     On information and belief, as of July 29, 2014 when it refused to comply with the Order, Nicor knew or should have known that the source of the methane gas at issue is leakage from its aged gas distribution line(s) in the vicinity of James Park, not the James Park Landfill.

23.     Leakage from aged gas distribution line(s) in the vicinity of James Park presents an imminent and substantial endangerment to public safety, specifically occupants, visitors, guests, teachers, parents, students and seniors at James Park, Dawes Elementary School and Levy Senior Center.

24.     The City's retained geotechnical engineer has conducted an analysis to confirm the source of the methane gas at issue. That analysis evaluated the following three sets of data:

a.      Comparison of pressure and concentrations of methane taken from wells around the perimeter of James Park with the pressure and concentrations of methane in monitor wells installed in the JPL;

b.      Comparison of the detailed chemistry from samples taken from wells around the perimeter of James Park with the detailed chemistry of samples taken from wells in the JPL, to determine whether the chemistry of the perimeter samples is consistent with landfill gas; and

c.      Comparison of the relative age of samples taken from wells around the perimeter of James Park with the relative age of samples taken from wells in the JPL, to determine whether the age of the gas in the perimeter wells is similar to the age of the gas taken from the wells in the JPL.

25.     All three data sets confirm that leakage from gas pipeline(s), and not the JPL, is the source of the methane gas at issue.

**1.      Comparison of Methane Concentrations and Pressure**

26.     Methane gas is found in high concentrations and pressure in wells installed around the JPL. Additional wells were installed around the perimeter of James Park near wells exhibiting methane at high concentrations and pressure. Two wells were installed in waste, GMP18 and GMP17, as close as possible to those perimeter wells exhibiting methane at high concentrations and pressure, GMP10 and GMP1.

27.     If the JPL were the source of the methane gas at issue, methane should be present at comparatively high concentrations and pressure in GMP17 and GMP18. The concentrations and pressures measured in the wells installed in the JPL are in fact *several orders of magnitude less* than those measured in the wells installed around the perimeter of James Park. The methane concentration and pressure data confirms that the methane gas at issue is caused by leakage from gas pipeline(s), and not the JPL.

**2.      Detailed Chemistry**

28.     Chemistry tests were performed on samples taken from wells around the perimeter of James Park and from the two wells installed in the JPL. If the JPL were the source of the

methane gas at issue, the "chemical fingerprint" of gasses found in the two sets of chemistry data should be consistent with each other.

29.     Instead, the concentrations and pressures measured in the wells installed in the JPL are *several orders of magnitude less* than those measured in the perimeter wells installed around James Park. The chemistry data further confirms that the methane gas at issue is caused by leakage from gas pipeline(s), and not the JPL.

**3.      Relative Age Dating of Methane Gas Using Carbon 14 Testing**

30.     In addition to the detailed chemistry testing of gasses from wells installed on the perimeter of James Park and in the waste in JPL, isotopic and Carbon 14 ("C14") testing was performed on separate samples from these wells.

31.     The C14 testing confirms that gasses collected from the wells installed around the perimeter of James Park *are orders of magnitude older* than gasses collected from waste within the James Park Landfill. The analysis of the age data also confirms that the methane gas at issue is caused by leakage from gas pipeline(s), and not the JPL.

**B.      Gas Pipelines in the Vicinity of James Park**

32.     At a meeting on June 2, 2014, the City provided Nicor with an overview of data relating to the JPL. The City requested that Nicor produce documents describing the tunnel constructed under the North Shore Channel in 1910 and other gas pipelines in the vicinity of the JPL, which Nicor agreed to do.

33.     Since the June 2, 2014 meeting with Nicor, the City has identified the location of other gas lines in the vicinity of the JPL, apart from the 1910 Tunnel:

> a.      A 24-inch gas main 5 feet below the surface of the Channel, *circa* 1968. See November 11, 1968, Drawing 2 of 4, prepared by the Northern Illinois Gas Company, enclosed as **Attachment 12**.

> b.      A 48" abandoned gas main located approximately 300 feet west of GMP1 and GMP1A.  See Mulford Street Sewer Plan and Profile, Drawing No. 5221D-RS26 R1, dated February 1991.  See **Attachment 13** hereto depicting location of "48" Exist. Gas Main (Abandoned)" and **Attachment 14** hereto depicting the location of the abandoned gas main in relation to GMP1.

> c.      Another channel/tunnel crossing due west of the 48" abandoned gas main at Mulford Street.  See **Attachment 14** hereto, depicting the location of the tunnel/channel going to the MWRDGC system.  On information and belief, the 48" main is of the type that would have been used in the early twentieth century to convey methane gas at low pressure, such as the methane produced by the Skokie Manufactured Gas Plant ("MGP") located west of the channel and the crossing at Mulford Street. The City is informed and believes that NGLC, and its successors, owned and operated the Skokie MGP from approximately 1910 to 1950.

      d.    Evanston's Water Division has observed a pipeline along Dodge Avenue. See **Attachment 15** hereto, depicting a length of pipe as a <u>blue line</u>, running north and south along Dodge Avenue.

34.    Since June 2, 2014, Nicor has refused to comply with the Order and has refused to provide documents to the City with respect to historic or operating gas lines in the vicinity of James Park.

## II.    SECOND ENDANGERMENT – DISPOSAL OF COAL TAR

35.    In August 2014, the City's consultant observed work that was being performed by the City's Water Division on the west side of Dodge Avenue at Kirk Street to repair a water line break that had occurred at the intersection of Mulford Avenue, in the vicinity of Dawes Elementary School and Levy Senior Center (the "Dodge Avenue Water Line"). See **Attachment 15** hereto, depicting, in blue shading, the location of the August 12, 2014 excavation. The Dodge Avenue Water Line conveys potable water to residents of the City.

36.    The Dodge Avenue Water Line is approximately 5 feet below the location of a 12-inch diameter gas pipeline. The Water Division has had to repair numerous breaks in the Dodge Avenue Water Line. The Dodge Avenue Water Line beneath the gas pipeline has become coated with a black crust. This condition is present at multiple locations along Dodge Avenue. See **Attachments 15** and **16** hereto, depicting the locations where the gas pipeline has been encountered since at least 2004. See also **Attachment 15** hereto, depicting, in purple shading, the location where the gas pipeline was observed during an excavation in August 2014. Photographs of the August 2014 excavation, black water in the bottom of the excavation, the water pipe and the black crust are enclosed as **Attachment 17**.

37.    Testing of a sample of the crust material reveals that the material matches identically with the chemical make-up of coal tar produced by MGPs.

38.    The following facts demonstrate that that the pipeline at Dodge Avenue is the source of the black coal tar crust:

    a.    There is a perfect match between the compounds detected in the black crust and compounds known to be present in coal tar;

    b.    The gas pipeline at Dodge Avenue is located approximately five feet above the Dodge Avenue Water Line;

    c.    The soil between the black crust and the gas pipeline at Dodge Avenue is stained black, similar in appearance to the color of the black crust;

    d.    The Water Division has encountered the black crust at other locations when performing repairs on the Dodge Avenue Water Line; and

    e.    Black groundwater was observed oozing into GMP10, which is located immediately west of the August 2014 excavation. Laboratory analysis of the groundwater revealed the same compounds found in the analysis of the black crust.

III.   **CONLUSION**

39.   On information and belief, the handling, storage, treatment or disposal of solid or hazardous waste, namely natural gas, has caused hazardous substances to be present in soil and groundwater in James Park and Dodge Avenue.

40.   On information and belief, methane gas is present in concentrations and pressure (greater than 85% methane and at static pressure as high as 300 inches) that present a risk of a catastrophic explosion, and may present an imminent and substantial endangerment to human health and the environment.

41.   On information and belief, hazardous substances are present in the black coal tar crust at levels in excess of soil saturation levels (abundant levels of free product) and in excess of soil remediation objectives established by the IEPA, and may present an imminent and substantial endangerment to human health and the environment.

42.   On information and belief, the black coal tar crust has caused levels of hazardous substances to be present (a) in groundwater in excess of groundwater remediation objectives established by IEPA and (b) above construction worker exposure standards established by IEPA, and may present an imminent and substantial endangerment to human health and the environment.

43.   On one or more occasions, the particulars of which are not presently known to the City, but occurring as early as 1910 and as recently as the present, one or more of the persons or entities to whom this Notice is directed has caused or allowed the release of a solid or hazardous waste or hazardous substances within the meaning of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.* ("RCRA") and the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA"), respectively, into the soil and groundwater of James Park, Dodge Avenue and other locations in Evanston.

44.   As a result of such releases, soils and groundwater at James Park, Dodge Avenue and other locations in Evanston have become contaminated by, or are threatened to be contaminated by, solid or hazardous wastes or hazardous substances.

45.   The parties to whom this Notice is directed have contributed or are contributing to the past or present handling, storage or disposal of substances which are solid waste or hazardous waste, within the meaning of RCRA.

46.   The parties to whom this notice is directed have disposed of solid or hazardous waste through leaks of methane gas into soil and groundwater from gas distribution pipelines that the ComEd Companies or Nicor Companies have historically operated, or presently operate, in the vicinity of James Park.

47.   The parties to whom this notice is directed have disposed of solid or hazardous waste through leaks of coal tar from gas distribution pipelines that the ComEd Companies or Nicor Companies have historically operated, or presently operate, in the vicinity of James Park and in Dodge Avenue.

48. The presence of the described unconfined waste disposal sites, and the contamination of the soils and groundwater at James Park, Dodge Avenue and other locations in Evanston, may present an imminent and substantial endangerment to human health or the environment, within the meaning of 42 U.S.C. § 6972(a)(1)(B).

49. The City intends to file suit against each of the persons and entities to whom this Notice of Intent to Sue is directed pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), as well as under applicable common law and equity.

50. The City has incurred necessary response costs, within the meaning of CERCLA, including, but not limited to (a) the cost of investigation of the release or threat of release of hazardous substances at James Park, Dodge Avenue and other locations in Evanston, and (b) the cost of the City's Fire & Life Safety Services monitoring of methane gas in the basements of Dawes Elementary School, the Levy Senior Center and other locations in Evanston.

City of Evanston

By: _____

Jeffery D. Jeep
One of Its Attorneys

Jeffery D. Jeep
Jeep & Blazer, L.L.C.
24 N. Hillside Avenue
Suite A
Hillside, IL 60162
(708) 236-0830
jdjeep@enviroatty.com

9

cc: **REGISTERED MAIL, RETURN RECEIPT REQUESTED**

Gina McCarthy
Administrator
United States Environmental Protection Agency
USEPA Headquarters
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, DC 20460

Susan Hedman
Regional Administrator
USEPA Region 5
Mail Code: R-19J
77 West Jackson Boulevard
Chicago, IL 60604-3507

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Lisa Bonnett
Director
Illinois Environmental Protection Agency
1021 N. Grand Avenue East
P.O. Box 19276
Springfield, IL 62794-9276

# Exhibit B

11/17/2014                    The Daily Northwestern : Tests at Evanston parks reveal methane gas levels are 'negligible'



**DONATE**
to The Daily
Northwestern

# The Daily Northwestern

NORTHWESTERN AND EVANSTON'S ONLY DAILY NEWS SOURCE SINCE 1881

- Home
- Campus »
- City
- Sports »
- Opinion »
- Features »
- Ads »
- About »
- Join Us
- Donate



Monday, November 17, 2014

Search Search          Search

## Tests at Evanston parks reveal methane gas levels are 'negligible'

Paige Leskin, Assistant City Editor
May 28, 2014 •

Testing of the ground underneath a south Evanston park where a landfill once stood revealed methane levels were minimal and harmless, Evanston fire department Chief Greg Klaiber said in a presentation to City Council on Tuesday night.

After testing of the area around James Park revealed high concentrations of methane gas, the city hired a firm to conduct tests in March 2014 at sites 50 feet below the surface at indoor and outdoor locations around the parks, including Dawes Elementary School, 440 Dodge Ave., the Levy Senior Center, 300 Dodge Ave., and some businesses on Howard Street. Klaiber told council the testing found methane levels to be minimal.

"What we have found were zero or negligible levels of methane gas inside the facilities, as well as outside," he said. "We're nowhere near (explosive levels). I believe there's no imminent threat to public safety in or around James Park and the facilities."

The city began monitoring the park and its surrounding neighborhood after testing of the Metropolitan Water Reclamation District of Greater Chicago site at 3500 Howard St. in Skokie showed the presence of methane gas.

"When I found out that there was high levels of methane gas below the surface in this area, my number one concern, of course, is public safety," Klaiber told the council. "Methane gas is a compressed gas. It is an asphyxiant, it's colorless and odorless. So problems can occur in a confined space."

He also updated the council on Evanston's Lovelace Park, where testing showed similar low levels to James Park of methane gas.

"Dependent upon what we find and the source of the methane at James Park, will kind of determine what action we're going to take moving forward at Lovelace Park," he said.

Klaiber said he met on Monday with users of James Park, including sports teams, to deliver the same report on methane levels.

The city will continue to ensure that the community is well informed on the matter, city manager Wally Bobkiewicz said. However, Ald. Ann Rainey (8th), whose ward contains James Park, voiced her displeasure with the public outreach thus far and said she wasn't aware of a meeting on the issue that Bobkiewicz said was scheduled for Thursday.

Bobkiewicz also updated council on a meeting with members of Community Animal Rescue Effort to talk about the funds they raised when operating out of the Evanston Animal Shelter. Although the meeting with CARE didn't result in a definite answer on what to do with the money, Bobkiewicz said he was hopeful the dialogue would continue in the future.

"I really bring no firm decisions or firm commitments from CARE," he said. "However, I think the atmosphere of the meeting indicated that there was

some willingness on their part to have additional discussions."

CARE's relationship with Evanston ended following a vote by aldermen at an April 8 council meeting.

**(City Council votes to cut ties with CARE)**

The decision followed a series of negotiations between CARE and the city, in which aldermen put forward revised policies that CARE would have to follow in order to stay in Evanston. When those failed, City Council ordered the organization to stop its work at the shelter and vacate the premises by early May.

**Email:** paigeleskin2017@u.northwestern.edu
**Twitter:** @paigeleskin

# Exhibit C

NEWS

*Share:*

# Evanston chief: James Park methane poses 'no imminent public threat'



The sledding hill at James Park in Evanston is one of the reasons city officials called for additional testing of facilities at and near the park after methane was found 47 feet below the surface at one corner of the park. | File

**Bob Seidenberg**
bseidenberg@pioneerlocal.com | @evanstonscribe
May 28 10:23 a.m.

SPONSORED

A high methane reading detected in the soil below Evanston's James Park poses no imminent threat, Fire Chief Greg Klaiber told aldermen Tuesday night.

With his "number one concern, public safety," Klaiber said fire department inspectors conducted studies after a company hired by the city found high concentrations of methane at a depth of 49.7 feet in a southwest corner of the park, which is a former landfill.

Klaiber told aldermen that after learning the results, inspectors conducted tests both outside and inside facilities around the park, including at Dawes School, and the Levy Senior Center. They also conducted tests at several businesses on Howard Street, including Best Buy and Target, he said.

The tests showed negligible levels of methane gas inside the facilities, as well as outside, and monitor readings registered 95 to 96 percent below the lowest explosive limit of methane gas, he said.

"I believe there is no imminent threat to any public safety in and around James Park and any of the facilities located within or around James Park," Klaiber said.

Following the chief's report, aldermen approved an amendment of their contract with Libertyville-based Cs Geologic LLC to conduct additional gas probes for roughly $58,000.

The tests are to better define where the methane is located, and what precautions should be taken to prevent it from migrating.

The high methane levels were found in a sand seam at a depth of 49.7 feet below ground surface, according to Craig S. Rawlinson, principal hydrogeologist for Cs Geologic, in a 14-page report to the city dated April 11.

"To date, soil borings completed in the landfilled areas of James Park have not indicated similarly elevated methane concentrations and pressures," he wrote.

At present, the potential risks for explosion "appear to be mitigated by the fact that the gas is trapped beneath nearly 50 feet of predominately clay soil deposits," he wrote.

He said additional gas probes are necessary to define the site geology, particularly the sand seams which could act as migration pathways.

Park also recommended the city evaluate whether any deep utilities exist in the vicinity of the southwest portion of James Park that might serve as a migration pathway for the trapped gas. The company also recommended the city periodically monitor catch basins and other access paths in the James Park area for the presence of combustible gas.

In addition, the city should contact surviving workers of the landfill operation, which operated at the site until the early 1960s, to determine whether large quantities of materials were placed when the then method of open burning was not feasible.

City officials recommended the city contract with Cs Geologic in February, citing the need for due diligence in a more in-depth analysis of soil conditions at the former landfill.

No tests had been conducted at the site since 1986, Corporation Counsel Grant Farrar told aldermen.

He said the thinking was "Gee, its been a while. Let's drop three soil borings see what's going on."

He also mentioned sledding activity in the area in support of the tests.

City Manager Wally Bobkiewicz also said the city's actions fell in the category of due diligence, and said that the city was being "pro-active" in engaging the firm. "That's what this is about," he told aldermen.

At the time, community activist Junad Rizki challenged the lack of information officials were providing and speculated that James, as a former landfill, was "probably emitting methane gas."

After Klaiber's report, officials said they are considering a similar evaluation of Lovelace Park, on the city's northwest side, to see whether there are any problems arising from its former use as a landfill.

**Like** Sign Up to see what your friends like.

Tags: James Park

## RELATED ARTICLES

4 free Evanston events in next 2 weeks
June 3 12:02 p.m.                                                                      >

City to update public on James Park methane test results
May 29 1:30 p.m.                                                                       >

Evanston officials want to triple spending on environmental testing at James Park
May 27 1:55 p.m.                                                                       >

SPONSORED                                                                              >

0 Comments

| Name | |

| Email | |

Comment

# Exhibit D

7/9/82
7/23/82

76-0-82

AN ORDINANCE

Authorizing Northern Illinois Gas Company,
Its Successors and Assigns, To Construct, Operate
and Maintain a Gas Distributing System In and Through the
City of Evanston


BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF EVANSTON, ILLINOIS:


SECTION 1:  That the right, permission and authority be and the same are hereby granted to NORTHERN ILLINOIS GAS COMPANY, an Illinois corporation, its successors and assigns (hereinafter referred to as the "Grantee"), to construct, operate and maintain in and through the CITY OF EVANSTON (hereinafter referred to as the "Municipality"), in the State of Illinois, for a term of Fifty (50) Years, a system for the production, distribution and sale of gas for fuel, heating, power, processing and any other purposes within and outside the corporate limits of the Municipality, and to construct, lay, maintain and operate such gas pipes, mains, conductors and other devices, apparatus and equipment as may be necessary or convenient for such system in, under, along and across each and all of the streets, alleys, avenues and other public places in the Municipality, subject to the conditions and regulations hereinafter set forth.


SECTION 2:  All pipes, mains, conductors and other appliances, including connections with service pipes, hereafter laid in streets, alleys, avenues or other public places, shall be laid under the supervision of the Director of Public Works or such other duly authorized agent of the Municipality as the City Council may from time to time designate.  All pipes, mains, conductors and other appliances shall be so located as not to injure unnecessarily any drains, sewers, catch basins, water pipes, pavements or other like public improvements, but should any drain, sewer, catch basin, water pipe, pavement or other like public improvement be injured by such location, the Grantee shall

7/9/82
7/23/82

forthwith repair the damage caused by such injury to the satisfaction of
the Committee on Streets and Alleys, or such other duly authorized
agent, as the case may be, and in default thereof the Municipality may
repair such damage and charge the cost thereof to, and collect the same
from, the Grantee.  The Grantee shall be subject to all reasonable
regulations which may now or hereafter be prescribed by general
ordinance of the Municipality with respect to the use of the public
streets, alleys, avenues and other public places of the Municipality.

SECTION 3:  The Grantee shall indemnify, become responsible
for and forever save harmless the Municipality from any
and all judgments, damages, decrees, costs and expenses, including
attorneys' fees, which the Municipality may legally suffer or incur, or
which may be legally obtained against the Municipality, for or by reason
of the use and occupation of any street, alley, avenue or other public
place in the Municipality by the Grantee pursuant to the terms of this
ordinance or legally resulting from the exercise by the Grantee of any
of the privileges herein granted.  This indemnity shall extend to and
include judgments, damages, decrees, costs and expenses, including
attorneys' fees which may be obtained or assessed against the
Municipality resulting from the Municipality's right of supervision and
control, whether or not exercised, over the excavation, installation or
construction carried forth by Grantee under Section 2 of this franchise.

SECTION 4:  After the passage of this ordinance, and within
thirty (30) days after passage, this ordinance, if
accepted, shall be accepted by the Grantee by its filing with the City
Clerk of the Municipality an unconditional written acceptance hereof, to be
duly executed according to law, and a failure of the Grantee to so accept this
ordinance within said period of time shall be deemed a rejection hereof by

-2-

the Grantee, and the rights and privileges herein granted shall after the expiration of said period of thirty (30) days, if not so accepted, absolutely cease and determine, unless said period of time shall be extended by the Municipality by ordinance duly passed for that purpose and before the expiration of said period of thirty (30) days.

SECTION 5: All provisions of this ordinance which are obligatory upon, or which inure to the benefit of, said Northern Illinois Gas Company shall also be obligatory upon and shall inure to the benefit of any and all successors and assigns of said Company, and the word "Grantee" wherever appearing in this ordinance shall include and be taken to mean not only said Northern Illinois Gas Company, but also each and all of such successors and assigns.

SECTION 6: This ordinance, if accepted by the Grantee as hereinabove provided, shall be in full force and effect on and after September 9, 1982   , and from and after the effective date shall supersede, cancel, repeal and be in lieu of any and all other existing or prior grants of right, permission and authority by said Municipality to said Grantee or any predecessor companies or assignors of the Grantee to construct, operate and maintain any system for the production, distribution and sale of gas for fuel, heating, power, processing and any other purposes within the corporate limits of this Municipality, and this ordinance shall likewise cancel all of the obligations under said existing or prior grants.

PASSED BY THE CITY COUNCIL OF THE CITY OF EVANSTON, ILLINOIS, THIS

9th DAY OF August , A.D. 19 82

*Sandra H. Gross*
City Clerk

APPROVED BY THE MAYOR OF THE CITY OF EVANSTON, ILLINOIS, THIS

10th DAY OF August , A.D. 1982

*[signature]*
Mayor

ATTEST:

*Sandra H. Gross*
City Clerk

Approved as to form:

*Ellen A. Alexander*
Corporation Counsel

- 3 -

STATE OF ILLINOIS )
)
COUNTY OF COOK ) SS.
)
CITY OF EVANSTON )


    I,   Sandra W. Gross  , City Clerk of the City of
Evanston, Illinois, do hereby certify that the foregoing is a true and
correct copy of an Ordinance duly passed by the City Council of said City
on the  9th  day of  August , A.D. 19 82 , and duly approved
by the Mayor of said City on the  10th  day of  August , A.D. 19 82 ,
the original of which Ordinance is now on file in my office.

    I do further certify that I am the legal custodian of all papers,
contracts, documents and records of said City.

    WITNESS my hand and the official seal of said City this  12th 
day of  August , A.D. 19 82 .

                    _Sandra W. Gross_
                          City Clerk

                    _2100 Ridge Ave_
                          Address


(Seal)

ACCEPTANCE OF GAS ORDINANCE

TO THE MAYOR AND CITY COUNCIL

CITY OF **EVANSTON**

**EVANSTON**             , ILLINOIS


Gentlemen:

The undersigned, NORTHERN ILLINOIS GAS COMPANY, for itself,

its successors and assigns, hereby accepts the Ordinance entitled:

"An Ordinance authorizing Northern Illinois Gas
Company, its successors and assigns, to construct,
operate and maintain a gas distributing system in
and through the City of   **Evanston**           ,
Illinois";

duly passed by the City Council of the City of       **Evanston**     ,

on the   **9th**     day of     **August**       , A.D. 19 **82**   , and

duly approved by the Mayor of said City on the   **10th**      day of

**August**           , A.D. 19 **82** .

IN TESTIMONY WHEREOF, the undersigned has caused these

presents to be signed by its Vice President, and its Corporate Seal to

be hereunto affixed, attested by its **Assistant** Secretary, this   **20th**    day

of _____**August**_____, A.D. 19 **82** .


NORTHERN ILLINOIS GAS COMPANY


By _____L. A. Boldebuck_____
                    Vice President


ATTEST:


J. Peter
_____
**Assistant** Secretary

STATE OF ILLINOIS     )
                          )
COUNTY OF **COOK**      )    SS.
                          )
CITY OF **EVANSTON**     )

I, _____ Sandra W. Gross _____, City Clerk
of the City of _____ **Evanston** _____, Illinois, do hereby certify
that the attached and foregoing is a true and correct copy of an
Acceptance of an Ordinance of said City, duly passed by the City
Council of said City on the **9th** day of **August** ,
A.D. 19 **82** , and duly approved by the Mayor of said City on the
**10th** day of **August** , A.D. 19 **82** , and that said
acceptance was duly filed in my office on the _____ 24th _____ day of
_____ August _____, A.D. 19 82 .

I do further certify that I am the legal custodian of all
papers, contracts, documents and records of the said City.

WITNESS my hand and the official seal of said City this
_____ 24th _____ day of _____ August _____, A.D. 19 _82 .

_____
Sandra W. Gross
City Clerk

_____
2100 Ridge Ave., Evanston
Address

# Exhibit E

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Thursday, October 16, 2014 3:58 PM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; mblazer@enviroatty.com
**Subject:** Nicor Project 66/City of Evanston
**Importance:** High

Mr. Partee:

Mr. Collins requested via voicemail to me this week that Nicor have the opportunity to discuss the status of work Nicor seeks to do in furtherance of Project 66 in the vicinity of James Park in the City of Evanston. Be advised as follows.

Given the intense correspondence related to this matter over the past months, I am initially puzzled as to why Mr. Collins reached out to me, and not you. You must be aware as Nicor's staff attorney that the City and Nicor are, regrettably, at impasse related to this matter. As for myself, I will not run the risk of communicating with a represented party as I can reasonably infer that Nicor plans to identify Mr. Collins in its control group when the City commences litigation in this matter (the fact that I am making that inference does not constitute the City's agreement or admission relative to same). Hence, consonant with the ethical obligations incumbent upon me which may be implicated, I am issuing this direct communication to you, and not Mr. Collins.

In case you were not already aware, I set forth below, email correspondence that the City previously issued to Nicor's external counsel regarding the import and effect of Project 66. To my knowledge, the City never received a response from Nicor, nor even the courtesy of a simple acknowledgement from Nicor that it received this inquiry from the City. Of course, after the City registered its concern in August, Nicor chose instead to devote considerable time and effort in issuing voluminous FOIA requests to the City. Its external counsel also issued lengthy letters to the City which did not meaningfully shed any light on the issues.

Lastly, Nicor subsequently attempted to continue its efforts and work on Project 66 by knowingly circumventing the City's Law Department and directly communicating with City staff.

The City remains gravely concerned over the cause, origin, and extent of methane at the subject site and surrounding areas. In accordance with the City's home rule authority, its police powers, its powers under the Evanston City Code, and all other relevant state and federal statutory authority, the City shall not permit any further work by Nicor in furtherance of its Project 66. The previously issued permit is of no force and effect, and shall remain revoked.

The City views Project 66 as being relevant and connected to the James Park matter. Nicor's work in this area lends itself to a reasonable inference regarding possible spoliation of evidence.

Given Nicor's refusal over many months to engage in a meaningful dialog on this matter, and its ongoing refusal to comply with Chief Klaiber's previously issued order, the City is acting prudently by ensuring all such work remains ceased.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

**From:** Jeff Jeep [mailto:jdjeep@enviroatty.com]
**Sent:** Wednesday, August 06, 2014 5:34 PM
**To:** Mark Ter Molen
**Cc:** Klaiber, Gregory; Masoncup, Michelle; Farrar, Grant; David Hendron; Mike Blazer
**Subject:** City of Evanston
**Importance:** High

https://www.dropbox.com/s/1nf8c8t9hcr9xsq/Nicor%20Drawings.pdf

Mark,

It has come to my attention that Nicor is performing Work in close proximity to gas probes the City has installed on the west side of Dodge Avenue, specifically GMP 10 in front of the Dawes Elementary School. Nicor has previously been provided with the enclosed map, which depicts the location of the probes around James Park. We believe the Work relates to Nicor's "Main Replacement Project 66," described in above Dropbox link (Nicor Drawings). Sheets 4, 7, 14 and 18 of the Nicor Drawings describe the Work along Dodge Avenue.

As you know, methane has been detected at high pressure and concentration in some of the probes around James Park. On July 24, 2014, methane was detected at a concentration of 88.9% and 13 psi in GMP 10. **The disturbance of GMP 10, or any other probe along Dodge Avenue, threatens the public's safety.**

We urge Nicor to immediately cease all Work in the vicinity of the probes. We also recommend that a meeting be held immediately between our engineers to coordinate the Work, which would include a discussion of a Safety Plan to govern Work in the vicinity of the probes.

Regards,

*Jeffery D. Jeep*
**Jeep & Blazer, L.L.C.**
24 N. Hillside Avenue, Suite A
Hillside, IL 60162
Office: (708) 236-0830
Direct: (708) 401-5022
Fax: (708) 236-0828
Cell: (708) 404-9090
Email: jdjeep@enviroatty.com
Web Site: www.jeepandblazer.com

Please consider the environment before printing this e-mail.


External Email - Click here to report this email as spam.


This message has been scanned for malware by Websense. www.websense.com

# Exhibit F

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Monday, October 20, 2014 8:55 AM
**To:** 'Farrar, Grant'
**Cc:** jdjeep@enviroatty.com; mblazer@enviroatty.com; Ter Molen, Mark R.
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar:

The emails from you and your outside counsel are in conflict. Nicor Gas has a number of ongoing and routine projects and activities in the City of Evanston related to Nicor Gas' distribution system. The previous email from your outside counsel raised concerns regarding work performed by Nicor Gas in the specific area of certain probes that Evanston installed around James Park. That email also suggested a meeting between Nicor Gas personnel and City engineers to discuss performing work in the area of the probes, but the work was already completed in the area of the probes. You should be aware that Nicor Gas did not see any of these probes in the vicinity of its work, we are not aware of any damage to the probes, and we obtained a permit from Evanston before performing the work. We did in fact respond to your outside counsel by email along those same lines back in August.

Prior to your October 16 email, Evanston had not suggested any link between its stray gas issue at James Park and ongoing and routine utility projects, such as so-called project 66. Nicor Gas was not at all aware that the parties were represented by counsel when it comes routine utility projects in Evanston. Your October 16 email directed Nicor Gas to cease work on project 66, which is pipeline-related work encompassing a broad geographic area within Evanston, including numerous City blocks that are not contiguous to James Park and that do not, to Nicor Gas' knowledge, contain any probes installed by Evanston. As indicated, Nicor Gas obtained a permit from Evanston for this work. You have now revoked that permit. Moreover, you apparently are forbidding Nicor Gas from engaging in any work whatsoever within this broad geographic area.

When Nicor Gas was advised by Evanston's utility director that the project 66 permit was revoked earlier this week, Nicor Gas tried to schedule a meeting with Evanston personnel, copying you and even using you as the contact person, so that Nicor Gas may continue with this important work. Even prior to that, in our July 29, 2014 response to the Fire Chief's request for information, we expressly included an offer to meet and discuss our responses to that particular request.

With respect to the James Park stray gas issue, your recent email continues a pattern of refusing to acknowledge the significant work Nicor Gas performed to assure Evanston that the methane detected by Evanston in the Park does not come from Nicor Gas' system. That work has included, among other steps, producing documents related to Nicor Gas' current and former operations in the area; conducting an extensive leak investigation; and reviewing with Evanston the pipelines maintained by Nicor Gas and their depth and pressure. All of this work has concluded that there are no ongoing leaks from our system in the area of James Park and that there is no physical or chemical basis to assert that gas from Nicor Gas' system could migrate significantly laterally and downward to the depths and locations at which Evanston has reported detecting methane. Not only does Nicor Gas' investigation demonstrate no basis to assert that gas from Nicor Gas' system is the source of methane detected by Evanston, but information that Nicor Gas independently obtained, which was not disclosed by Evanston in response to Nicor Gas' FOIA request, also identifies different gas sources. The 2012 report prepared by the MWRD concluded that the methane was most likely from the former City landfill that lies beneath what is now James Park. Another follow-up up report prepared by Evanston's own consultant determined that the methane could well be naturally occurring. If you have additional samples that you are open to sharing, please provide them for our review and discussion.

We are not interested in finger-pointing regarding the stray gas issue. We need to perform utility work in Evanston and request a meeting with City engineers to establish reasonable safety procedures for utility work around Evanston's probes around James Park so that utility work may resume. Please contact me regarding Evanston's availability for such a meeting this coming week.

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869 office
630-688-1582 mobile
630-357-7534 fax
mpartee@aglresources.com

 AGL Resources®

---

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Thursday, October 16, 2014 3:58 PM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; mblazer@enviroatty.com
**Subject:** Nicor Project 66/City of Evanston
**Importance:** High

Mr. Partee:

Mr. Collins requested via voicemail to me this week that Nicor have the opportunity to discuss the status of work Nicor seeks to do in furtherance of Project 66 in the vicinity of James Park in the City of Evanston. Be advised as follows.

Given the intense correspondence related to this matter over the past months, I am initially puzzled as to why Mr. Collins reached out to me, and not you. You must be aware as Nicor's staff attorney that the City and Nicor are, regrettably, at impasse related to this matter. As for myself, I will not run the risk of communicating with a represented party as I can reasonably infer that Nicor plans to identify Mr. Collins in its control group when the City commences litigation in this matter (the fact that I am making that inference does not constitute the City's agreement or admission relative to same). Hence, consonant with the ethical obligations incumbent upon me which may be implicated, I am issuing this direct communication to you, and not Mr. Collins.

In case you were not already aware, I set forth below, email correspondence that the City previously issued to Nicor's external counsel regarding the import and effect of Project 66. To my knowledge, the City never received a response from Nicor, nor even the courtesy of a simple acknowledgement from Nicor that it received this inquiry from the City. Of course, after the City registered its concern in August, Nicor chose instead to devote considerable time and effort in issuing voluminous FOIA requests to the City. Its external counsel also issued lengthy letters to the City which did not meaningfully shed any light on the issues.

Lastly, Nicor subsequently attempted to continue its efforts and work on Project 66 by knowingly circumventing the City's Law Department and directly communicating with City staff.

The City remains gravely concerned over the cause, origin, and extent of methane at the subject site and surrounding areas. In accordance with the City's home rule authority, its police powers, its powers under the Evanston City Code, and all other relevant state and federal statutory authority, the City shall not permit any further work by Nicor in furtherance of its Project 66. The previously issued permit is of no force and effect, and shall remain revoked.

The City views Project 66 as being relevant and connected to the James Park matter. Nicor's work in this area lends itself to a reasonable inference regarding possible spoliation of evidence.

Given Nicor's refusal over many months to engage in a meaningful dialog on this matter, and its ongoing refusal to comply with Chief Klaiber's previously issued order, the City is acting prudently by ensuring all such work remains ceased.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

---

**From:** Jeff Jeep [mailto:jdjeep@enviroatty.com]
**Sent:** Wednesday, August 06, 2014 5:34 PM
**To:** Mark Ter Molen
**Cc:** Klaiber, Gregory; Masoncup, Michelle; Farrar, Grant; David Hendron; Mike Blazer
**Subject:** City of Evanston
**Importance:** High

https://www.dropbox.com/s/1nf8c8t9hcr9xsq/Nicor%20Drawings.pdf

Mark,

It has come to my attention that Nicor is performing Work in close proximity to gas probes the City has installed on the west side of Dodge Avenue, specifically GMP 10 in front of the Dawes Elementary School. Nicor has previously been provided with the enclosed map, which depicts the location of the probes around James Park. We believe the Work relates to Nicor's "Main Replacement Project 66," described in above Dropbox link (Nicor Drawings). Sheets 4, 7, 14 and 18 of the Nicor Drawings describe the Work along Dodge Avenue.

As you know, methane has been detected at high pressure and concentration in some of the probes around James Park. On July 24, 2014, methane was detected at a concentration of 88.9% and 13 psi in GMP 10. **The disturbance of GMP 10, or any other probe along Dodge Avenue, threatens the public's safety.**

We urge Nicor to immediately cease all Work in the vicinity of the probes. We also recommend that a meeting be held immediately between our engineers to coordinate the Work, which would include a discussion of a Safety Plan to govern Work in the vicinity of the probes.

Regards,

**Jeffery D. Jeep**
**Jeep & Blazer, L.L.C.**
24 N. Hillside Avenue, Suite A
Hillside, IL 60162
Office: (708) 236-0830
Direct: (708) 401-5022
Fax: (708) 236-0828
Cell: (708) 404-9090
Email: jdjeep@enviroatty.com
Web Site: www.jeepandblazer.com

Please consider the environment before printing this e-mail.

External Email - Click here to report this email as spam.

This message has been scanned for malware by Websense. www.websense.com

# Exhibit G

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Tuesday, October 21, 2014 10:58 AM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; mblazer@enviroatty.com
**Subject:** FW: Notice of intent

Mr. Partee:

Attached is the City's reply to your correspondence from yesterday. The NOITS issued yesterday.

The complete NOITS
document: https://www.dropbox.com/s/sc3hofmuuht1qpw/141020%20James%20Park%20NOITS.pdf?dl=0

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client,or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

External Email - Click here to report this email as spam.

This message has been scanned for malware by Websense. www.websense.com

# Exhibit H

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Tuesday, November 11, 2014 1:05 PM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

I am receipt of the application. Be advised as follows:

1. The City is studying the contents of the application. In the application's attachment, it recites that the purported reason for seeking this permit is that "Retirement of low pressure main and services is required for safety and compliance reasons". Of course, the City notes there is no supporting documentation or other indicia of safety or compliance attached to the application.

2. The City is not bound by any artificial deadline set by Nicor regarding this application. Nicor will be notified of the City's decision regarding this application in due course, and only after the City, not Nicor, is satisfied that review of all applicable factors is concluded. This is particularly appropriate given Nicor's ongoing, months long violation of Fire Chief Klaiber's order.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Friday, November 07, 2014 3:26 PM
**To:** Farrar, Grant
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar,

Please see the attached letter regarding Nicor Gas Project 66 in Evanston.

Sincerely,

**Michael C. Partee**

1

**Senior Environmental Counsel**

630-388-2869 office
630-688-1582 mobile
630-357-7534 fax
mpartee@aglresources.com



This message has been scanned for malware by Websense. www.websense.com

External Email - Click here to report this email as spam.

# Exhibit I

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Wednesday, November 12, 2014 2:00 PM
**To:** Michael Partee; Bobkiewicz, Wally; Tisdahl, Elizabeth; Anthony Mccain; Paul Shlanta; Beth Reese; jsomerhalder@aglresources.com
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com; gorenp@district65.net
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

This serves as the City of Evanston's reply to your inaccurate statements below, and to respond to the letter you sent on November 11, 2014 to Mayor Tisdahl and City Manager Bobkiewicz.

Following the issuance of Chief Klaiber's order in July, Nicor never offered in good faith to meet. Rather, the July 29, 2014 letter authored by Nicor's outside attorney merely restated Nicor's baseless argument that it "did not understand". This purported non-comprehension follows the multiple hour meeting convened with you and other Nicor staff at the Civic Center on June 2, 2014 to discuss issues related to the James Park matter. You may not remember that meeting, which was convened at the City's request, but the City does.

The Record reflects that the July 29th letter requested documents, and was subsequently followed by voluminous Nicor FOIA requests. The Record further indicates that the City **responded to those FOIA requests by producing over 40,000 pages of documents**. More recently, Nicor was served on October 20, 2014 with the hundreds of pages in the NOITS. Instead of engaging in a dialog with the City, Nicor issued yet another FOIA, and redoubled its attempts to spoliate evidence.

For Nicor to still contend it does not understand the context of this issue, the context of the site and its work impacting the site, and to pursue its bewildering course of inaction, is simply astounding at this juncture. Nicor's purported concern over community safety is squarely contradicted by its irreconcilable desire to conceal the fact that its leaking infrastructure is the source of the James Park situation. I again remind you as to the presence of the Dawes Elementary School and the Levy Senior Center at James Park.

The clock is running under applicable Federal law. I suggest yet again that Nicor revisit its posture and improve its approach to this matter. Generating expenses and billable hours to benefit Nicor's outside counsel (and given the City's statutory right to fee shifting) is not well-taken.

If you wish to submit supporting documentation in addition to the conclusory statements made in the November 11, 2014 letter, send it directly to my attention. In the interests of completeness, since Mr. McCain's letter referenced the 1982 franchise agreement, allow this electronic communication to confirm that the City demands that Nicor immediately comply with Section 2 of the agreement.

Finally, with respect to your so-called Project 66, Nicor proposes to perform work in the area the City is finding methane at high concentration and pressure caused by a release from Nicor's distribution lines. Refer to our RCRA Notice. The City is prepared to enter into an agreement to allow the work to proceed in a manner that does not result in the spoliation of evidence. Please provide us with a proposal for doing so.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue

1

Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

---

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Tuesday, November 11, 2014 4:38 PM
**To:** Farrar, Grant
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar,

We appreciate your attention to the Nicor Gas permit application, but your response doesn't indicate what decision you will make in the "due course" or how long it will take. There are safety and compliance reasons for our expedited permit request, so I reiterate our request for a permit within five business days from the submittal of our application. Heretofore, Evanston has granted permits on the same day that Nicor Gas applied for them. Similarly, there are safety and compliance reasons behind all of our permit requests (to varying degrees), yet to my knowledge Nicor Gas has not provided and Evanston has not requested supporting documentation for those safety and compliance reasons with any prior permit application. If you require it here, please let us know when we can meet this week to go over it. The attached letter regarding the permit application was sent to the City today.

Regarding Chief Klaiber's order, we responded to it on July 29, 2014 by providing considerable information. Even before that, Nicor Gas conducted a leak survey and investigation at Evanston's request and reported back to Evanston that Nicor Gas does not have any pipes in James Park or leaking pipes surrounding it. We questioned the technical basis for some of the information requests in the order, but expressly offered to meet and discuss those requests and/or revisit them if the City provided clarification. That offer still stands.

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869  office
630-688-1582  mobile
630-357-7534  fax
mpartee@aglresources.com



**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Tuesday, November 11, 2014 1:05 PM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

I am receipt of the application.  Be advised as follows:

1. The City is studying the contents of the application.  In the application's attachment, it recites that the purported reason for seeking this permit is that "Retirement of low pressure main and services is required for safety and compliance reasons".  Of course, the City notes there is no supporting documentation or other indicia of safety or compliance attached to the application.
2. The City is not bound by any artificial deadline set by Nicor regarding this application.  Nicor will be notified of the City's decision regarding this application in due course, and only after the City, not Nicor, is satisfied that review of all applicable factors is concluded.  This is particularly appropriate given Nicor's ongoing, months long violation of Fire Chief Klaiber's order.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain  attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message.  Thank you.

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Friday, November 07, 2014 3:26 PM
**To:** Farrar, Grant
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar,

Please see the attached letter regarding Nicor Gas Project 66 in Evanston.

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869  office
630-688-1582  mobile
630-357-7534  fax
mpartee@aglresources.com



This message has been scanned for malware by Websense. www.websense.com

External Email - Click here to report this email as spam.

# Exhibit J

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Thursday, November 13, 2014 7:30 PM
**To:** 'Farrar, Grant'
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Dear Mr. Farrar:

We remain puzzled as to why the City continues to misstate the facts of Nicor's extensive cooperation in addressing the City's concerns about the presence of stray methane. To be clear, Nicor met with City representatives and provided them with documentation and evidence which should resolve the concerns that the methane detected may come from Nicor's pipelines. Nicor conducted a leak survey which confirmed that there are no pipeline leaks in the system surrounding the James Park landfill. Further, the gas detected by the City is at depths greater than 40 feet, whereas Nicor's pipes are at depths of only 2 to 4 feet. As a matter of chemistry and physics, gas from Nicor's pipes could not migrate horizontally to the Park and then downward through the soil to the depths at which Evanston has reportedly found methane. Nicor has repeatedly asked for the City to explain its rationale for continuing to assert that the stray methane is natural gas from Nicor's pipelines. To date, the City has failed to provide its theory. You may continue to claim otherwise, but Nicor's cooperation and offers to meet are all documented in written correspondence.

The continued presence of pressurized gas in the cast iron mains within Project 66 presents a risk, as those mains are older and have been disturbed through the recent installation of the new mains that are now in place and serving area residents. This week, a Class 1 leak requiring immediate repair occurred on the older system that requires replacement. There is no reason for the City to delay issuing a permit to Nicor allowing formal retirement of those former mains.

You raise "spoliation of evidence" concerns with this work and ask that Nicor make a proposal. Frankly, your spoliation concerns are unclear to us because you have never identified the "evidence" you are seeking to protect or preserve. In terms of our proposal, the necessary work is clearly set forth in the second set of permit applications that we submitted to Evanston for reconsideration on November 7. The remaining work involves excavations in two areas in order to make separation cuts in the gas mains. The excavations will be approximately eight feet wide by ten feet long. The areas of excavation and separation cuts are clearly identified on Nicor's November 7 permit applications: the first area is on Asbury, approximately four blocks east of James Park; and the second is near the intersection of Dodge and Oakton. In both instances, the work involved will include excavating to expose the gas main. Then, Nicor will make a separation cut in the main and physically remove an approximately three foot segment of the main to prevent further flow of gas into the main that is being retired. The exposed ends of the main will be capped. Nicor will also dig approximately five foot by five foot relief holes to purge the main of natural gas, the location of which holes are also detailed in Nicor's November 7 permit applications. Purging the main involves cutting a hole in it and introducing air in order to displace the natural gas. We will provide 24 hours notice and City personnel may observe the work. The former mains will remain in the ground, save for the two segments involved in the separation cuts.

As stated in our earlier messages, we expect the City's approval of the second permit application no later five business days from its submittal, or by tomorrow, November 14. You may notice buried utility markings in the areas of the necessary excavations; going on good faith that the City will issue the permit tomorrow, we will be prepared to do the work on Monday, November 17. We still need to resolve our other concerns over the scope of your position that Nicor must cease work around the James Park landfill. We will continue pursue a resolution of those broader concerns. We look forward to your quick response

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869 office
630-688-1582 mobile
630-357-7534 fax
mpartee@aglresources.com



---

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Wednesday, November 12, 2014 2:00 PM
**To:** Michael Partee; Bobkiewicz, Wally; Tisdahl, Elizabeth; Anthony Mccain; Paul Shlanta; Beth Reese; jsomerhalder@aglresources.com
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com; gorenp@district65.net
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

This serves as the City of Evanston's reply to your inaccurate statements below, and to respond to the letter you sent on November 11, 2014 to Mayor Tisdahl and City Manager Bobkiewicz.

Following the issuance of Chief Klaiber's order in July, Nicor never offered in good faith to meet. Rather, the July 29, 2014 letter authored by Nicor's outside attorney merely restated Nicor's baseless argument that it "did not understand". This purported non-comprehension follows the multiple hour meeting convened with you and other Nicor staff at the Civic Center on June 2, 2014 to discuss issues related to the James Park matter. You may not remember that meeting, which was convened at the City's request, but the City does.

The Record reflects that the July 29th letter requested documents, and was subsequently followed by voluminous Nicor FOIA requests. The Record further indicates that the City **responded to those FOIA requests by producing over 40,000 pages of documents**. More recently, Nicor was served on October 20, 2014 with the hundreds of pages in the NOITS. Instead of engaging in a dialog with the City, Nicor issued yet another FOIA, and redoubled its attempts to spoliate evidence.

For Nicor to still contend it does not understand the context of this issue, the context of the site and its work impacting the site, and to pursue its bewildering course of inaction, is simply astounding at this juncture. Nicor's purported concern over community safety is squarely contradicted by its irreconcilable desire to conceal the fact that its leaking infrastructure is the source of the James Park situation. I again remind you as to the presence of the Dawes Elementary School and the Levy Senior Center at James Park.

The clock is running under applicable Federal law. I suggest yet again that Nicor revisit its posture and improve its approach to this matter. Generating expenses and billable hours to benefit Nicor's outside counsel (and given the City's statutory right to fee shifting) is not well-taken.

If you wish to submit supporting documentation in addition to the conclusory statements made in the November 11, 2014 letter, send it directly to my attention. In the interests of completeness, since Mr. McCain's letter referenced the

1982 franchise agreement, allow this electronic communication to confirm that the City demands that Nicor immediately comply with Section 2 of the agreement.

Finally, with respect to your so-called Project 66, Nicor proposes to perform work in the area the City is finding methane at high concentration and pressure caused by a release from Nicor's distribution lines. Refer to our RCRA Notice. The City is prepared to enter into an agreement to allow the work to proceed in a manner that does not result in the spoliation of evidence. Please provide us with a proposal for doing so.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Tuesday, November 11, 2014 4:38 PM
**To:** Farrar, Grant
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar,

We appreciate your attention to the Nicor Gas permit application, but your response doesn't indicate what decision you will make in the "due course" or how long it will take. There are safety and compliance reasons for our expedited permit request, so I reiterate our request for a permit within five business days from the submittal of our application. Heretofore, Evanston has granted permits on the same day that Nicor Gas applied for them. Similarly, there are safety and compliance reasons behind all of our permit requests (to varying degrees), yet to my knowledge Nicor Gas has not provided and Evanston has not requested supporting documentation for those safety and compliance reasons with any prior permit application. If you require it here, please let us know when we can meet this week to go over it. The attached letter regarding the permit application was sent to the City today.

Regarding Chief Klaiber's order, we responded to it on July 29, 2014 by providing considerable information. Even before that, Nicor Gas conducted a leak survey and investigation at Evanston's request and reported back to Evanston that Nicor Gas does not have any pipes in James Park or leaking pipes surrounding it. We questioned the technical basis for some of the information requests in the order, but expressly offered to meet and discuss those requests and/or revisit them if the City provided clarification. That offer still stands.

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869 office
630-688-1582 mobile

630-357-7534 fax
mpartee@aglresources.com

 AGL Resources®

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Tuesday, November 11, 2014 1:05 PM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

I am receipt of the application.  Be advised as follows:

1.  The City is studying the contents of the application.  In the application's attachment, it recites that the purported reason for seeking this permit is that "Retirement of low pressure main and services is required for safety and compliance reasons".  Of course, the City notes there is no supporting documentation or other indicia of safety or compliance attached to the application.

2.  The City is not bound by any artificial deadline set by Nicor regarding this application.  Nicor will be notified of the City's decision regarding this application in due course, and only after the City, not Nicor, is satisfied that review of all applicable factors is concluded.  This is particularly appropriate given Nicor's ongoing, months long violation of Fire Chief Klaiber's order.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain  attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client,or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message.  Thank you.

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Friday, November 07, 2014 3:26 PM
**To:** Farrar, Grant
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar,

Please see the attached letter regarding Nicor Gas Project 66 in Evanston.

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869  office
630-688-1582  mobile
630-357-7534  fax
mpartee@aglresources.com



This message has been scanned for malware by Websense. www.websense.com

External Email - Click here to report this email as spam.

# Exhibit K

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Friday, November 14, 2014 3:11 PM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

In this correspondence, the City is setting to the side the multitude of disagreements that exist at this juncture. With that in mind, the City proposes the following:

The City of Evanston will convene a meeting with Nicor next Thursday, November 20th, at 9:00 am here at the Civic Center, 4th floor Law Department conference room. The meeting will address the admissions contained within Mr. McCain's letter regarding Nicor's leaking infrastructure and all other outstanding issues.

I await word from you confirming Nicor's agreement to attend, and the identification of its attendees. I expect you to email me attendance confirmation by 12:00 pm Monday, November 17th.

With respect to spoliation, the NOITS is the best evidence related to that issue. Simply put, leaking infrastructure in the scope of the pending Project 66 permit application is directly related to Nicor's other infrastructure in/around James Park. Expanding upon that point, given Nicor's admission relative to leaks, at minimum, all pipe sections that are removed, as well any other Nicor infrastructure that is to be removed during the work, shall be preserved. Photographic/video documentation of the work Nicor proposes to be done will be necessary. Samples of the pipe, and other materials (including, but not limited to, coal tar as observed on other Nicor infrastructure in the immediate vicinity of James Park) will be necessary to collect for laboratory analysis. All expenses regarding evidence preservation, sampling, and documentation shall be borne by Nicor. Nicor shall agree to the City observing such work, answering the City's questions posed to Nicor during such work , and shall otherwise unconditionally cooperate with the City during the pendency of the work. Work done on Project 66 in the vicinity of the areas depicted in the attached document shall be subject to these evidence preservation obligations. A meeting shall be held between the City and Nicor engineers to coordinate the work, and which would also include a safety plan to be approved by the City to govern the work.

Finally, Nicor shall transmit to me by 12:00 pm Monday the "Assigned Risk Scores" for all infrastructure within a 10 block radius of James Park that is subject to Project 66. This includes work already completed, and shall identify with particularity, every pipe section within the scope of the Project with its related "Risk Score".

We understand these scores are derived from the "Distribution Integrity Management Program", which was referenced in the substantive admissions on leaking infrastructure made by Nicor in its April 4, 2014 ICC Petition.

I look forward to your response, and Nicor finally engaging in an open and constructive discussion. With that meeting in mind, and an anticipated positive outcome  of such meeting, the City will enter and continue its consideration of the Project 66 permit application.

Grant

**W. Grant Farrar**

Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain  attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client,or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message.  Thank you.

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Thursday, November 13, 2014 7:30 PM
**To:** Farrar, Grant
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Dear Mr. Farrar:

We remain puzzled as to why the City continues to misstate the facts of Nicor's extensive cooperation in addressing the City's concerns about the presence of stray methane.  To be clear, Nicor met with City representatives and provided them with documentation and evidence which should resolve the concerns that the methane detected may come from Nicor's pipelines.  Nicor conducted a leak survey which confirmed that there are no pipeline leaks in the system surrounding the James Park landfill.  Further, the gas detected by the City is at depths greater than 40 feet, whereas Nicor's pipes are at depths of only 2 to 4 feet.  As a matter of chemistry and physics, gas from Nicor's pipes could not migrate horizontally to the Park and then downward through the soil to the depths at which Evanston has reportedly found methane.  Nicor has repeatedly asked for the City to explain its rationale for continuing to assert that the stray methane is natural gas from Nicor's pipelines.  To date, the City has failed to provide its theory.  You may continue to claim otherwise, but Nicor's cooperation and offers to meet are all documented in written correspondence.

The continued presence of pressurized gas in the cast iron mains within Project 66 presents a risk, as those mains are older and have been disturbed through the recent installation of the new mains that are now in place and serving area residents.  This week, a Class 1 leak requiring immediate repair occurred on the older system that requires replacement.  There is no reason for the City to delay issuing a permit to Nicor allowing formal retirement of those former mains.

You raise "spoliation of evidence" concerns with this work and ask that Nicor make a proposal.  Frankly, your spoliation concerns are unclear to us because you have never identified the "evidence" you are seeking to protect or preserve.  In terms of our proposal, the necessary work is clearly set forth in the second set of permit applications that we submitted to Evanston for reconsideration on November 7.  The remaining work involves excavations in two areas in order to make separation cuts in the gas mains.  The excavations will be approximately eight feet wide by ten feet long.  The areas of excavation and separation cuts are clearly identified on Nicor's November 7 permit applications: the first area is on Asbury, approximately four blocks east of James Park; and the second is near the intersection of Dodge and Oakton.  In both instances, the work involved will include excavating to expose the gas main.  Then, Nicor will make a separation cut in the main and physically remove an approximately three foot segment of the main to prevent further flow of gas into the main that is being retired.  The exposed ends of the main will be capped.  Nicor will also dig approximately five foot by five foot relief holes to purge the main of natural gas, the location of which holes are also detailed in Nicor's November 7 permit applications.  Purging the main involves cutting a hole in it and introducing air in order to displace the natural gas.  We will provide 24 hours notice and City personnel may observe the work.  The former mains will remain in the ground, save for the two segments involved in the separation cuts.

As stated in our earlier messages, we expect the City's approval of the second permit application no later five business days from its submittal, or by tomorrow, November 14. You may notice buried utility markings in the areas of the necessary excavations; going on good faith that the City will issue the permit tomorrow, we will be prepared to do the work on Monday, November 17. We still need to resolve our other concerns over the scope of your position that Nicor must cease work around the James Park landfill. We will continue pursue a resolution of those broader concerns. We look forward to your quick response

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869  office
630-688-1582  mobile
630-357-7534  fax
mpartee@aglresources.com



---

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Wednesday, November 12, 2014 2:00 PM
**To:** Michael Partee; Bobkiewicz, Wally; Tisdahl, Elizabeth; Anthony Mccain; Paul Shlanta; Beth Reese; jsomerhalder@aglresources.com
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com; gorenp@district65.net
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

This serves as the City of Evanston's reply to your inaccurate statements below, and to respond to the letter you sent on November 11, 2014 to Mayor Tisdahl and City Manager Bobkiewicz.

Following the issuance of Chief Klaiber's order in July, Nicor never offered in good faith to meet. Rather, the July 29, 2014 letter authored by Nicor's outside attorney merely restated Nicor's baseless argument that it "did not understand". This purported non-comprehension follows the multiple hour meeting convened with you and other Nicor staff at the Civic Center on June 2, 2014 to discuss issues related to the James Park matter. You may not remember that meeting, which was convened at the City's request, but the City does.

The Record reflects that the July 29th letter requested documents, and was subsequently followed by voluminous Nicor FOIA requests. The Record further indicates that the City **responded to those FOIA requests by producing over 40,000 pages of documents**. More recently, Nicor was served on October 20, 2014 with the hundreds of pages in the NOITS. Instead of engaging in a dialog with the City, Nicor issued yet another FOIA, and redoubled its attempts to spoliate evidence.

For Nicor to still contend it does not understand the context of this issue, the context of the site and its work impacting the site, and to pursue its bewildering course of inaction, is simply astounding at this juncture. Nicor's purported concern over community safety is squarely contradicted by its irreconcilable desire to conceal the fact that its leaking

infrastructure is the source of the James Park situation. I again remind you as to the presence of the Dawes Elementary School and the Levy Senior Center at James Park.

The clock is running under applicable Federal law. I suggest yet again that Nicor revisit its posture and improve its approach to this matter. Generating expenses and billable hours to benefit Nicor's outside counsel (and given the City's statutory right to fee shifting) is not well-taken.

If you wish to submit supporting documentation in addition to the conclusory statements made in the November 11, 2014 letter, send it directly to my attention. In the interests of completeness, since Mr. McCain's letter referenced the 1982 franchise agreement, allow this electronic communication to confirm that the City demands that Nicor immediately comply with Section 2 of the agreement.

Finally, with respect to your so-called Project 66, Nicor proposes to perform work in the area the City is finding methane at high concentration and pressure caused by a release from Nicor's distribution lines. Refer to our RCRA Notice. The City is prepared to enter into an agreement to allow the work to proceed in a manner that does not result in the spoliation of evidence. Please provide us with a proposal for doing so.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 *et. seq.*

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

---

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Tuesday, November 11, 2014 4:38 PM
**To:** Farrar, Grant
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar,

We appreciate your attention to the Nicor Gas permit application, but your response doesn't indicate what decision you will make in the "due course" or how long it will take. There are safety and compliance reasons for our expedited permit request, so I reiterate our request for a permit within five business days from the submittal of our application. Heretofore, Evanston has granted permits on the same day that Nicor Gas applied for them. Similarly, there are safety and compliance reasons behind all of our permit requests (to varying degrees), yet to my knowledge Nicor Gas has not provided and Evanston has not requested supporting documentation for those safety and compliance reasons with any prior permit application. If you require it here, please let us know when we can meet this week to go over it. The attached letter regarding the permit application was sent to the City today.

Regarding Chief Klaiber's order, we responded to it on July 29, 2014 by providing considerable information. Even before that, Nicor Gas conducted a leak survey and investigation at Evanston's request and reported back to Evanston that Nicor Gas does not have any pipes in James Park or leaking pipes surrounding it. We questioned the technical basis for

some of the information requests in the order, but expressly offered to meet and discuss those requests and/or revisit them if the City provided clarification. That offer still stands.

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869 office
630-688-1582 mobile
630-357-7534 fax
mpartee@aglresources.com

 AGL Resources®

---

**From:** Farrar, Grant [mailto:gfarrar@cityofevanston.org]
**Sent:** Tuesday, November 11, 2014 1:05 PM
**To:** Michael Partee
**Cc:** jdjeep@enviroatty.com; Masoncup, Michelle; mblazer@enviroatty.com
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Partee:

I am receipt of the application. Be advised as follows:

1. The City is studying the contents of the application. In the application's attachment, it recites that the purported reason for seeking this permit is that "Retirement of low pressure main and services is required for safety and compliance reasons". Of course, the City notes there is no supporting documentation or other indicia of safety or compliance attached to the application.
2. The City is not bound by any artificial deadline set by Nicor regarding this application. Nicor will be notified of the City's decision regarding this application in due course, and only after the City, not Nicor, is satisfied that review of all applicable factors is concluded. This is particularly appropriate given Nicor's ongoing, months long violation of Fire Chief Klaiber's order.

**W. Grant Farrar**
Corporation Counsel, City of Evanston
2100 Ridge Avenue
Evanston, Illinois 60201
847.866.2937

The contents of this electronic mail to/from any recipient hereto, any attachments hereto, and any associated metadata pertaining to this electronic mail, may contain attorney-client privileged information, and also be exempt from disclosure for purposes of the Illinois Freedom of Information Act, 5 ILCS 140 et. seq.

If you properly received this e-mail as a client, or retained expert, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

If you believe that it has been sent to you in error, please notify the sender by return e-mail and then delete the message. Thank you.

**From:** Michael Partee [mailto:MPartee@aglresources.com]
**Sent:** Friday, November 07, 2014 3:26 PM
**To:** Farrar, Grant
**Subject:** RE: Nicor Project 66/City of Evanston

Mr. Farrar,

Please see the attached letter regarding Nicor Gas Project 66 in Evanston.

Sincerely,

**Michael C. Partee**
**Senior Environmental Counsel**

630-388-2869  office
630-688-1582  mobile
630-357-7534  fax
mpartee@aglresources.com



This message has been scanned for malware by Websense. www.websense.com

External Email - Click here to report this email as spam.

# Exhibit L

printed 05/19/2014 8:02AM by Elizabeth.Ilowski p. 1/253   02/05/2014   7:00PM   L   170001979679   0310815350   JAMES PARK   02   11/29/2012   2,238,013   L014773   B:6310 F:50497 I:00000043   TOMREUTE   02/03/2014

**Protecting Our Water Environment**

**Metropolitan Water Reclamation District of Greater Chicago**
100 EAST ERIE STREET       CHICAGO, ILLINOIS 60611-3154       312.751.5600

0310815350 - Cook Co
James Park

BOARD OF COMMISSIONERS   General
Terrence J. O'Brien   Correspondence
President   File.
Barbara J. McGowan
Vice President
Cynthia M. Santos
Chairman of Finance
Michael A. Alvarez
Frank Avila
Patricia Horton
Kathleen Therese Meany
Debra Shore
Mariyana T. Spyropoulos

**DAVID ST. PIERRE**
Executive Director

312.751.7900   f: 312.751.7926
david.stpierre@mwrd.org

IEPA - DIVISION OF RECORDS MANAGEMENT
RELEASABLE

JAN 2 4 2014

REVIEWER RDH

November 29, 2012

**Via Fed Ex**

The Honorable Elizabeth B. Tisdahl
Mayor, City of Evanston
2100 Ridge Avenue
Evanston, IL 60201

RE:   Metropolitan Water Reclamation District of Greater Chicago Environmental Concerns
      Identified During Investigation Activities at Terrence J. O'Brien Water Reclamation Plant
      File 12TM034

Dear Mayor Tisdahl:

As part of the Metropolitan Water Reclamation District of Greater Chicago's ("District") ongoing facility improvements, the District recently conducted geotechnical subsurface investigations at its Terrence J. O'Brien Water Reclamation Plant ("O'Brien Plant") located at the northwest intersection of Howard Street and McCormick Boulevard in Skokie. Please note that the O'Brien Plant is referred to as the North Side Water Reclamation Plant throughout the attached report. Upon the discovery of oily material in bedrock at the O'Brien Plant, the District hired an environmental engineering company to investigate the nature of the contamination and, if possible, to determine its source. The District's consultant conducted this investigation in September and October 2012.

That investigation identified the presence of concentrated methane-containing gas under pressure in the bedrock below the O'Brien Plant as well as the presence of oily material in the bedrock. The District commenced an investigation as to the potential sources of the contamination both on the O'Brien Plant property itself and from the former manufactured gas plant ("MGP") area existing to the north of the O'Brien Plant. The nature of the release suggests it is not related to the O'Brien Plant or the properties located to the north of it, including the former MGP site. Independent chemical analysis and fingerprinting of the gas and bedrock indicate that the material is likely related to a landfill source. During further investigation, the District became aware that the City of Evanston ("City") owns a nearby park ("James Park") that was historically a clay borrow pit that was subsequently filled with landfill-type material. (The District requested information on the former landfill from the City through a Freedom of Information Act request.) In addition, the District has evaluated historical photographs of nearby-site areas. The location and historical use of the James Park property, the historical

COE0006423

printed 05/19/2014 8:02AM by Elizabeth Ilowski p. 2/253

The Honorable Elizabeth B. Tisdahl
Mayor, City of Evanston
November 29, 2012
Page 2

photographs, along with our independent chemical analysis and finger printing, suggests that the former landfill is the likely source of the observed methane gas and the oily material detected during the sampling at the O'Brien Plant.

Because the District is concerned that the release of the methane gas to the surface of James Park or other areas could give rise to potentially hazardous conditions, we are notifying both you and the Illinois Environmental Protection Agency of our findings and providing you with a copy of the Phase II Environmental Site Assessment dated November 2012 and prepared by Tetra Tech EM, Incorporated.

If you have any questions, or would like to discuss our findings, please contact the undersigned at 312-751-7902 or our Engineer of Site Remediation, Mark Leibrock, at 708-588-4314.

Very truly yours,

David St. Pierre
Executive Director

DStP:RMH:SM:rg

cc:   Illinois Environmental Protection Agency
      Greg Klaiber, Fire Chief
      Douglas Gaynor, Director of Parks, Recreation & Community Services

Enclosure

COE0006424

# PHASE II ENVIRONMENTAL SITE ASSESSMENT

## NORTH SIDE WATER RECLAMATION PLANT
## SKOKIE, COOK COUNTY, ILLINOIS
## PROJECT NO: 103S2358.002

*Prepared for*

Metropolitan Water Reclamation District of Greater Chicago
Site Remediation Section, General Division, M&O Department
7601 LaGrange Road
Willow Springs, Illinois 60480

*Prepared by*



**TETRA TECH EM INC.**
**1 S. Wacker Drive, 37th Floor**
**Chicago, IL 60606**

November 2012

# CONTENTS

**Section**                                                                                    **Page**

1.0    INTRODUCTION ................................................................................................1
2.0    SAMPLING APPROACH AND DEVIATIONS FROM APPROACH ...........................2
3.0    GEOLOGIC CONDITIONS, FIELD OBSERVATIONS, AND ANALYTICAL
       RESULTS ..........................................................................................................6
4.0    CONCLUSIONS AND RECOMMENDATIONS ...........................................................8
5.0    REFERENCES ....................................................................................................10

# APPENDICES

APPENDIX A       SITE FIGURES AND TABLES

APPENDIX B       PHOTOGRAPHIC LOG

APPENDIX C       WELL AND BORING LOGS

APPENDIX D       ANALYTICAL DATA PACKAGE

APPENDIX E       FINGERPRINT ANALYSIS

APPENDIX F       FOIA INFORMATION AND OTHER INFORMATION

## 1.0   INTRODUCTION

This report presents the findings of the Phase II Environmental Site Assessment that was conducted for the North Side Water Reclamation Plant (NSWRP) site between September 12 and October 8, 2012. This section describes the background and objectives of the investigation. Section 2.0 discusses the sampling approach and any deviations from the approach. Section 3.0 presents the findings and provides sampling results. Section 4.0 presents information related to fingerprint analysis conducted by Friedman & Bruya, Inc. (F&B). Section 5.0 offers conclusions and recommendations.

The site consists of the NSWRP wastewater treatment operations and undeveloped land owned and operated by the Metropolitan Water Reclamation District of Greater Chicago (MWRDGC or "District"). Figure 1 in Appendix A shows the site location and nearby properties.

A subsurface investigation by Greeley and Hanson in June 2012 evaluated geotechnical issues regarding the planned construction of an ultraviolet oxidation disinfection facility in the northeast portion of the property. This area is currently undeveloped. Greeley and Hanson advanced a number of deep soil borings (B-7 to B-18—see Figure 2) in alluvial soils to the approximate soil/bedrock interface at a depth of between 52 and 62 feet below ground surface (bgs). Six of the borings (B-8, B-10, B-11, B-14, B-15, and B-16) were also cored about 10 feet into bedrock. Boring logs indicated presence of oily or asphaltic material in the cored bedrock at all six locations. Boring B-11 was also completed as a bedrock-monitoring well (Greeley and Hanson 2012).

Tetra Tech was contracted by the District in August 2012 to evaluate the previous site investigation , develop an approach to identify (fingerprint) the contamination, and, if possible, to identify potential sources of contamination. Tetra Tech conducted a site visit on August 22, 2012, and also evaluated the following information provided by District representatives: closure investigation activities in 2004 by Consoer Townsend Envirodyne Engineers, Inc. (CTEE, 2004) regarding on-site storage tanks; MWRDGC's as-built diagrams of two large, former, concrete, underground storage tanks (UST) on the eastern portion of the property; and Greeley and Hanson's soil and well boring logs from their prior geotechnical investigation. The concrete USTs were columnar in shape, about 63 feet in diameter, and about 20 feet in depth. The concrete USTs reportedly were used for petroleum heavy oil storage. The age of the concrete USTs rendered them suspect and a target of investigation. While the CTEE report did not identify soil contamination, the former concrete USTs had been investigated as aboveground storage tanks (AST) with only shallow sampling, and thus Tetra Tech considered the investigative results

regarding the concrete USTs inconclusive. The concrete USTs reportedly had been closed in place prior to regulation; and, furthermore, the data regarding this and the method of closure were not available.

In addition to on-site evaluations, the following potential off-site sources of the oily material (in bedrock) were noted: a pipeline corridor (including natural gas and petroleum transmission lines) to the north, the former Skokie manufactured gas plant (MGP) north of the pipeline corridor, CTA train tracks, and ComEd substation north of the site. Moreover, a historical landfill was identified northeast of the site in an area currently used as a City of Evanston Park and a sled hill. No other specific potential sources were noted, except former industrial and petroleum storage facilities operated north of Oakton Street, which is north of the MGP. These features are shown on Figure 1.

Based on the historical site use and potential off-site sources of the oily material, a phased investigation approach was developed. The proposed Phase 1 involved installation of shallow (32-foot-deep) soil borings using a hydraulic push probe near the on-site closed concrete USTs to assess possible presence of an on-site source of the oily material. Proposed Phase 2 activities were specified to evaluate potential off-site source(s) and to fingerprint the oily material in bedrock.

## 2.0 SAMPLING APPROACH AND DEVIATIONS FROM APPROACH

Two general phases of investigation were planned, as noted above: Phase 1 was to focus on potential on-site sources of oil, while Phase 2 was to evaluate potential off-site sources of oil and to investigate the bedrock.

### Phase 1 Sampling Approach

Tetra Tech subcontracted with Raimonde Drilling Corporation (Raimonde), a District-certified, woman-owned minority business enterprise (WBE), to provide drilling services. Tetra Tech also contracted with STAT Analysis of Chicago, Illinois (STAT), a state-certified testing laboratory and Tetra Tech's team minority-owned business enterprise (MBE) contractor for laboratory services. Raimonde contacted the joint utility locating service (JULIE) to locate utilities within the investigation areas.

On September 12, 2012, Raimonde used a hydraulic push probe equipped with a Macropore sampler to collect soil samples from a depth of 0 to 32 feet bgs at five locations (GP-1 through GP-5). Soil samples were collected in clear acetate liners and evaluated for lithology and potential contamination by a Tetra Tech Illinois Professional Geologist or an Illinois Professional Engineer. A photoionization detector

(PID) was also used to evaluate the presence of volatile organic compounds (VOC) in air. Photographs were obtained, and findings were logged. A photographic log is included as Appendix B. Boring logs are included in Appendix C.

Soil samples were collected from at least two depths at each of the five boring locations. Samples were analyzed for benzene, toluene, ethylbenzene, and xylenes (BTEX); and polynuclear aromatic hydrocarbons (PAH). Samples were placed in an iced cooler and transported under strict chain of custody to STAT. The draft data package is included in Appendix D.

The following deviation from the initial Phase 1 sampling approach occurred:

> Five soil borings were advanced instead of the planned six soil borings because of the lack of observed contamination in the initial CTEE borings located in the area near a former UST, north of the service building. Tetra Tech and the District agreed that the UST was not a likely source of the observed contamination, as the contents would have been lighter than water and thus would not have descended to and entered the bedrock as a light non-aqueous phase liquid. Therefore, the sixth boring that would have been located in the area of this former UST was omitted.

**Phase 2 Sampling Approach**

Phase 2 sampling occurred from October 1 through 8, 2012. Phase 2 activities included extensive changes from the planned approach to sampling. The original sampling approach called for soil borings and rock coring followed by installation of bedrock monitoring wells at three locations. As described below, only two soil borings and one bedrock monitoring well were installed; this was largely a result of the discovery of methane gas emissions during installation of the second boring as discussed below.

The same subcontractors conducted Phase 2 sampling activities—Raimonde performed drilling and well installation, and STAT analysis analyzed the samples.

The Phase 2 sampling approach included installation of deeper soil borings and coring of bedrock using a modified hollow stem auger drilling rig with 4.875-inch inner diameter auger flights. Soil sampling occurred at approximate 5-foot intervals using a split-spoon sampler from the ground surface to competent bedrock. Once the bedrock/soil interface had been reached, the bedrock was cored for about 10 feet to evaluate for presence of oily material. After coring of bedrock, each boring was to be completed as a bedrock-monitoring well with an approximate 10-foot well screen at the base of the

boring. Soil and bedrock were evaluated for presence of VOCs using a PID, and samples were logged by a Tetra Tech Illinois Professional Geologist or an Illinois Professional Engineer for soil/bedrock lithology and for evidence of contamination. Soil samples were collected from several depth intervals and submitted for BTEX and PAH analyses. One sample from a depth of 13 feet was also submitted for VOC and semivolatile organic compounds (SVOC) analyses after a strong sweet odor had been detected. A bedrock sample was also collected and sent to Friedman & Bruya, Inc. (F&B) for fingerprint analysis. Fingerprint analysis results are included in Appendix E.

One bedrock monitoring well was installed: MW-1 on October 2, 2012. MW-1 is just north of the former concrete USTs. A boring and well log is included in Appendix C. A second boring was installed to the bedrock interface at MW-2 on October 3, 2012. As soon as the bedrock surface was encountered, the drilling crew noticed a strong odor and pocket of air pressure coming from the top of the open auger assembly. A PID reading of about 85 parts per million (ppm) was noted in the augers, and Tetra Tech notified District representatives of a cessation of work for safety reasons. A multi-gas sampler was used to analyze for methane and potentially explosive conditions; at the open auger, measured conditions exceeded 150 ppm methane and were above the lower explosive limit (LEL).

Work ceased until the methane levels in the area around the auger assembly could be assessed. Methane levels were found at background levels, except for immediately above the auger assembly, where they continued to exceed the LEL alarm level. The drilling rig was then pulled out of the well area, and all drilling equipment except for the augers was removed. Tetra Tech also evaluated for presence of methane at MW-1 and at the well at B-11. Methane was measured at about 15 ppm at MW-1 and above the LEL at B-11; B-11 also exhibited pressurized conditions. When the locking well cap was removed, gas under pressure was released from the well head at B-11. After the measurements of methane, the caps were placed back on the well heads at MW-1 and B-11.

Nicor was initially notified on October 3, 2012 of the presence of a methane release, based on concerns that the methane might possibly be related to a nearby gas pipeline on October 3, 2012. A Nicor representative arrived at the site at about 14:30 on October 3, 2012, and measured methane at 100 percent in B-11 and 75 percent at MW-2. Nicor left the site at about 15:30 after not identifying any potential nearby Nicor source and suggesting that Tetra Tech contact Peoples Gas, which operates a nearby pipeline.

Representatives of Peoples Gas and two pipeline companies (American National Pipeline and Kinder Morgan) arrived at the site on October 4, 2012. Peoples Gas collected gas samples for analysis and provided verbal results later in the day. Peoples Gas verbally indicated that the sampling results did not indicate a mercaptan signature representative of gas conveyed by its nearby pipelines.

Further drilling ceased until a safe method of abandoning the boring could be developed and implemented. Tetra Tech worked with Raimonde to develop a safe method for abandoning MW-2 and removing the auger assembly. On October 5, 2012, Tetra Tech oversaw safe abandonment of MW-2. A thick bentonite slurry was first added to the borehole to suppress release of methane at the base. After the slurry was in place and no evidence of further release (such as bubbling of gas through groundwater or slurry) was noted, the auger assemblies were removed while a cement-bentonite slurry was added until all the augers had been removed and the slurry reached the ground surface. Tetra Tech and the District agreed to forgo further drilling activities at this location and at the other planned locations.

On October 5, 2012, Tetra Tech collected gas samples directly from B-11 and from a background location upwind of B-11. Samples were collected using pre-cleaned SUMA canisters supplied by STAT. Immediately after collection, samples were picked up by STAT for analysis using U.S. Environmental Protection Agency (EPA) Method TO-15.

Tetra Tech developed MW-1 and sampled groundwater from the well on October 8, 2012, using a disposable bailer. The purge water exhibited some entrained oily material and high levels of turbidity even after four to five well volumes of water had been removed. A groundwater sample was collected for VOC, PAH, and ammonia analyses. In addition, three unpreserved volatile organic analysis (VOA) vials were collected for fingerprint analysis (as requested by F&B). The depth to water at MW-1 was noted at 57.5 feet below the top of casing (ground surface).

Groundwater from B-11 was also sampled without purging or development on October 8, 2012. Purging and development were not attempted because of safety concerns and the ongoing presence of methane under pressurized conditions. A grab sample was collected with a disposable bailer, and samples were collected for the same analyses undergone by samples collected from MW-1. Entrained oily material and high turbidity were also observed in this well during sampling, and the water exhibited effervescence when added to the VOC containers with hydrochloric acid preservative. Samples collected from MW-1 and B-11 were submitted to STAT for VOC and PAH analyses. In addition, unpreserved VOA bottles were collected and submitted to FB&I for fingerprint analysis.

## 3.0    GEOLOGIC CONDITIONS, FIELD OBSERVATIONS, AND ANALYTICAL RESULTS

This section discusses local geologic conditions and field observations, as well as results of chemical analyses.

The site is underlain by lake deposits of the Carmi Member of the Equality Formation. These lake deposits are characterized by silts and clays deposited under offshore quiet-water conditions, and generally exceed 50 feet in thickness (Lineback, 1975). The lake deposits are underlain by undifferentiated Silurian Age dolomite, which can have a thickness of over 500 feet (Illinois State Geological Survey, 1967). Specific information on groundwater flow is not available, but based on regional topography, groundwater likely flows east toward Lake Michigan.

Assessments of soil borings available from geotechnical investigations, from the Phase 1 Geoprobe investigation, and from the Phase 2 soil boring and well installation investigation revealed detailed information on the site soil and upper 10 feet of the underlying bedrock. Specifically, the site soils consist of predominantly silt and clay from the ground surface to a depth of about 60 feet. The clay is stiff to soft and gray in appearance, and becomes softer with depth. The silt and clay is underlain by 0 to 5 feet of a weathered residual bedrock, and then competent dolomitic bedrock. The bedrock is fractured and has small solution cavities (vugs) in places, with residual oil in the vugs and fractures. The oil is present in trace quantities, but becomes more apparent when cores have been allowed to sit for some time and the oil weeps to the core surface.

Groundwater was encountered at the bedrock/soil interface, and the water table appears to be present above the top of this interface at a depth of about 57.5 feet bgs.

In general, little or no visual or olfactory evidence of contamination in the alluvial soils was encountered. Some trace amounts of oil and/or petroleum odor were detected near the former concrete USTs in fill material near the USTs. However, no evidence of contamination was noted below a depth of 20 feet in this area, and no contamination was noted in geotechnical logs in the soil horizon.

At SB-1/MW-1 and SB-2, the bedrock/water interface emitted a sulfur odor and included notable gas content. Because bedrock was cored by Tetra Tech only at MW-1, direct observations were limited to this location, where the bedrock appeared to be fractured and vuggy; an oily layer was present on fracture planes and the vug surfaces, which emitted a distinct hydrocarbon odor. Boring logs from geotechnical

borings that had cored bedrock included similar observations. Tetra Tech noted that every boring, which included bedrock coring, exhibited evidence of oily material. This suggests a widespread area of oily material in bedrock. However, no oily material was observed in the weathered bedrock above the competent bedrock, suggesting that oil is not migrating within this more porous layer in the site area. This suggests a non-local source of the oily material.

Gas emissions were also noted in boring SB-1 and in the previously installed B-11 boring. The gas had a sulfur odor and was present under pressure. In B-11, the pressure was sufficient to provide a noticeable flow that made it difficult to reinstall the airtight cap. However, the cap seal was ultimately re-established after completion of sampling.

Analytical results from the Geoprobe investigation are listed in Table 1, and the data packages are also presented in Appendix D. No concentration of a PAH or BTEX was detected above a Tiered Approach to Corrective Action Objectives (TACO) Tier 1 remediation objective (RO) applicable to a residential, construction worker, or soil component of the groundwater ingestion exposure scenario.

Analytical results for soil samples collected from the soil borings during the Phase 1 investigation (see Figure 2) are listed in Table 1. No BTEX was detected. A number of PAHs were detected at low concentrations in boring GP-2 (12 feet bgs), and the PAH fluoranthene was detected in boring GP-1 (20 feet bgs); however, no PAH concentration was found above a TACO Tier 1 RO applicable to a residential, construction worker, or soil component of the groundwater ingestion exposure scenario.

Analytical results of the Phase 2 investigation from the SB-1 and SB-2 borings (see Figure 3) are listed in Table 2. No BTEX compounds were detected. Methylene chloride was found above its TACO RO for the soil component of the groundwater ingestion exposure pathway; however, methylene chloride is commonly associated with laboratory contaminants, and thus this may be a false positive. A number of PAH compounds were detected at low concentrations in SB-1 (7 feet bgs); however, no PAH concentration was detected above a TACO Tier I RO for a residential, construction worker, or soil component of the groundwater ingestion exposure pathway scenario. One SVOC compound, diethyl phthalate, was detected in SB-1 (13 feet bgs); however, its concentration was below potentially applicable TACO Tier I ROs.

Groundwater analytical results from wells SB/MW-1 (MW-1) and B-11 are listed in Table 3. No VOCs were detected. A number of PAHs were detected at low concentrations, including benzo(a)anthracene

(BAA), benzo(a)pyrene (BAP), benzo(b)fluoranthene (BBF), and chrysene (C). The results were above Class I groundwater ROs for BAA in MW-1, BBF in MW-1 and B-11, BAP in B-11, and C in MW-1 and B-11. The results were above Class II groundwater ROs for BBF and C in B-11. Tetra Tech observed that the samples were extremely turbid, and detection of these compounds in groundwater could reflect their presence in the suspended particulates and not in the groundwater; however, it should be noted that oil globules were also observed entrained in the water during purging and sampling.

Gas results from the background sample and from B-11 are listed in Table 4. Methane was the predominant compound, detected at a concentration of 86 percent in B-11. VOCs including benzene and vinyl chloride were detected, as well as a number of light hydrocarbons including propene, heptane, hexane, cyclohexane, and a number of tentatively identified compounds (TIC). The results were compared to EPA Regional Screening Levels (RSL) for the indoor inhalation pathway. Vinyl chloride and benzene were detected above their RSLs. While not the adopted standards in Illinois, the RSLs are assistive in providing a baseline for evaluating potential exposure via the indoor inhalation exposure route.

In addition to Tetra Tech's sampling and laboratory chemical analysis, F&B conducted fingerprint analysis to determine the oil and gas source using bedrock samples from SB-1/MW-1, groundwater from MW-1 and B-11, and independent evaluation of the gas analysis from B-11. F&B's evaluation is included as Appendix E. F&B did not detect contaminants in the groundwater sample, which was analyzed for volatile organic compounds and fingerprinting parameters, as well as PAHs. F&B concluded that the potential source of the observed bedrock and gas contamination is likely not associated with a release of refined petroleum or marketed natural gas, but is consistent with a release from a landfill source. The basis of this determination was presence of a wide spectrum of petroleum and gas compounds and volatile organic compounds (i.e. vinyl chloride) not typically associated with crude oil, refined petroleum products, or marketed natural gas, but which are observed in landfill releases. (F&B, 2012).

## 4.0    CONCLUSIONS AND RECOMMENDATIONS

Tetra Tech conducted two phases of investigation to evaluate potential sources and to characterize oily material discovered in the bedrock at the District's NSWRP. Investigation included evaluating potential on-site and near-site sources of contamination. The site formerly operated two large USTs that were closed in place prior to regulation; no evidence of contamination was found in borings near these USTs. In addition, geotechnical investigations and investigation of the lacustrine soil above the bedrock

identified predominantly clay soils to the depth of bedrock (about 60 feet), and did not find any evidence
of contamination in these lacustrine soils. All geotechnical borings and investigative borings installed
into bedrock identified oily material in the bedrock. In investigative boring SB-2 and two wells
completed in bedrock, methane gas also was found, with the most notable pressure noted in borings and
wells on the extreme northeast side of the NSWRP.

Gas samples collected at B-11 and also collected by utility companies contained high concentrations of
methane, but did not contain marker chemicals associated with marketed natural gas. Groundwater
samples from MW-1 and SB-11 contained low concentrations of PAHs exceeding Class I and Class II
ROs.

Bedrock and gas samples were evaluated for chemical fingerprinting. The results of fingerprinting
suggest that the oily material observed in bedrock is not likely associated with a crude oil or refined
petroleum product. The gas samples did not contain chemical markers and also contained compounds not
typically associated with marketed or stored gas; detected presence of vinyl chloride in the gas suggests a
possible landfill source.

Numerous potential off-site sources of contamination were identified, including pipelines north of the site
and a former MGP north of the site. The MGP site was investigated by Burns and McDonnell in 2010
and is undergoing cleanup under the Site Remediation Program; no indication that contamination extends
into the bedrock has been found. The pipelines are at a relatively shallow depth (less than 15 feet), and
absence of chemical markers suggests that these are not the source of oil or gas. A landfill formerly
operated in the area is currently occupied by James Park. Historical photographs suggest that most of the
park was occupied by a clay borrow pit in 1939 (see Appendix F). The assumption that James Park is
underlain by landfill-type material below a clay cap is further confirmed by limited geotechnical
information included in a larger body of information provided by the City of Evanston in response to a
Freedom of Information Act (FOIA) request (see Appendix F).

Presence of landfill gas on the northeast side of the site could be attributed to landfill-type gas and
leachate that may be mobilized by the gas in a confined groundwater system. Based on samples collected
during this investigation, the gas contains several compounds above EPA RSLs for the indoor inhalation
exposure route, the groundwater contains oily material that contains PAHs above Class I and Class II
drinking water standards, and the bedrock contains possible landfill-derived oil.

Presence of a thick clay layer and a lack of groundwater use on the site or in the site area would limit potential exposure to contaminants. Nonetheless, construction of the disinfection facility should include measures protective against potential exposure via the indoor air inhalation exposure route and protective against potential explosive conditions related to methane-containing soil gas migration/infiltration.

Methane was detected under pressurized conditions in the investigation area of the NSWRP. Potential for a hazardous condition via release of methane gas is a significant safety hazard. Release of methane gas could occur in the area of the NSWRP or nearby area under situations where:

- Geologic conditions do not include a clay layer over the bedrock.
- An interconnection is established between the bedrock and the ground surface.
- The cap overlying the landfill is not present or has been penetrated.

The District can control the potential for releases on its property. For example, any activities that could result in bedrock penetration (such as caissons or borings) should include provisions to prevent releases of gas and to avoid explosive conditions.

The District cannot control potential off-site exposure and does not have any role in activities at the nearby park or other areas that it does not control; however, the District should consider notifying others to prevent occurrence of potential exposure or to address hazardous conditions.

Tetra Tech recommends that the District notify the City of Evanston of its concerns, and also notify the Illinois Environmental Protection Agency of contamination and a potentially hazardous condition in the bedrock that may be associated with the nearby historical landfill.

## 5.0    REFERENCES

Consoer, Townshend, Envirodyne Engineers, 2004. Investigation Summary Report, North Side Water Reclamation Plant. December 13.

Friedman & Bruya, Inc. (F&B), 2012. Letter dated October 30, 2012 addressed from Mr. Jim Bruya, FB&I to Kenneth Funk, Deutsch, Levy, and Engel.

Greeley and Hanson, 2012. Boring logs and figure from Geotechnical Investigation conducted in June 2012.

Illinois State Geological Survey, 1967. Geologic Map of Illinois compiled by H.B. Willman and others.

Lineback, 1975. Quaternary Deposits of Illinois..

# Exhibit M



Legal Department
2100 Ridge Avenue
Evanston, IL 60201-2798
T 847.866.2937
F 847.448.8093
www.cityofevanston.org

March 28, 2013

VIA ELECTRONIC AND REGULAR MAIL

Mr. David St. Pierre
Executive Director
Metropolitan Water Reclamation District
100 E. Erie Street
Chicago, IL 60611
david.stpierre@mwrd.org

RE: Terrence O'Brien Water Reclamation Plant Site Investigation

Dear Mr. St. Pierre:

As previously indicated, the City of Evanston retained a consultant to review the Phase II Environmental Site Assessment of the O'Brien Treatment Plant completed by Tetra Tech EM Inc..  Craig Rawlinson of CS Geologic LLC conducted the analysis of the Phase II Report and prepared the attached letter for the City's consideration and we enclose a copy of the analysis for your consideration.

In an effort to move this conversation forward, we propose a meeting between Mr. Rawlinson, MWRD Site Engineer Mark Leibrock, a professional from Tetra Tech that prepared the report, and me.   If you have any questions, or would like to discuss the City's response, please contact me at (847) 866-2937.

Sincerely,

*Michelle L. Masoncup*

Michelle L. Masoncup
Assistant City Attorney II

cc:    W. Grant Farrar, Corporation Counsel
       Wally Bobkiewicz, City Manager
       Craig Rawlinson, CS Geologic LLC

COE0006426

March 27, 2013

Mr. W. Grant Farrar
Corporation Counsel
City of Evanston
2100 Ridge Avenue
Evanston, IL 60201

RE: Review of the TetraTech Inc. Phase II Environmental Site Assessment of the O'Brien Water
Reclamation Plant in Skokie, Illinois, CS Geologic Project 13011601

Dear Mr. Farrar:

Pursuant to the request of Ms. Michelle Masoncup of your staff, CS Geologic LLC (CSG) has reviewed the
Phase II Environmental Site Assessment (ESA) completed for the proposed UV disinfection project located
at the O'Brien Water Reclamation Plant in Skokie, Illinois. The proposed UV disinfection treatment facility is
located in the northeastern portion of the O'Brien Treatment Plant property. The ESA report prepared by
Tetra Tech EM Inc. (TetraTech) was submitted to the Metropolitan Water Reclamation District of Greater
Chicago (MWRDGC) in November 2012. Pursuant to the recommendations in the report, MWRDGC has
notified the City of Evanston and the Illinois Environmental Protection Agency (IEPA) of potential
contamination alleged to be emanating from historically landfilled areas of James Park, in Evanston. CSG's
review comments are provided in the subsequent paragraphs. These observations assess the potential
likelihood of contaminants migrating from James Park based on review of the conditions reported by
TetraTech. The review has also identified several deficiencies which will require additional investigations
to assess the site conditions.

**General Observations of Site Conditions**
The TetraTech Phase II ESA and/or the Friedman and Bruya Inc. reports identify contamination detected in
four distinct phases or media (soil, dissolved phase aqueous-groundwater, free product and trapped
gaseous samples). However, both the TetraTech and the Friedman and Bruya reports mix the discussions
of some of the contaminant media leaving the reader with the assumption that some of the cross media
impacts are related to a common source. In order to provide a clearer understanding, each of the
contaminant media are discussed separately below:

**Soil Contamination**
TetraTech Tables 1 and 2 provide a summary of the soil analytical results from the storage tank
investigation and from exploration program conducted in the proposed UV treatment system area located in
the northeastern portion of the Water Reclamation Plant. The vast majority of the samples submitted for
analysis were collected from relatively shallow depths (20 ft or less). The GP series (geoprobe
investigation) were conducted in the vicinity of the former concrete fuel tank storage area located on the
east side of the plant. The 10 samples summarized in Table 1 were collected from depths of 20 ft or less
(refer to TetraTech Table 1). Similarly, two of the three samples collected from boring SB-1, and one of the
two samples collected from SB2 were also collected from depths less than 20 ft (Refer to Table 2). The
soil samples were analyzed for volatile (VOC) and semi-volatile (svoc) organic compounds utilizing USEPA
SW846 methods 8260B and 8270C, respectively.

Only two of the 15 samples were collected from depths greater than 20 feet. A sample collected from a
depth of 43 ft at boring SB-1 and a sample collected from a depth of 33 ft at boring SB-2 were also
analyzed for volatile and semi-volatile organic compounds. Tables 1 and 2 tabulated the concentrations of
gasoline related aromatic compounds, referred to as BTEX (benzene, toluene, ethyl benzene, and xylenes)
and polynuclear aromatic hydrocarbons (PNAs) which are indicative of heavier fuel distillates and
incomplete combustion byproducts. As shown by Tables 1 and 2, no BTEX gasoline related compounds
were detected in any of the 15 soil samples. However, PNA compounds were detected in 5 of the 15
borings including both of the deeper samples SB-1 or MW1 at 43 feet and SB-2 or MW-2 at 43 feet.

Photoionization detector (PID) readings at both SB-1 and SB-2 and field geologist olfactory observations indicate that sweet and/or petroleum odors were observed at numerous depths throughout the soil borings. Thus, the analytical data, the PID readings and the field geologist observations suggest vertical migration of petroleum compounds at the site. The pattern of the migration suggests that the vertical migration might not have occurred in the immediate vicinity of the former USTs. Rather, it is possible that a spill or runoff may have entered a ditch and infiltrated in an area north or northeast of the former UST area. It is suggested that the City of Evanston request the UST closure report by Consoer Townsend Envirodyne Engineers, Inc. (CTEE, 2004) in order to determine the specific product that was contained in the tanks, whether the tanks were prone to surface releases (above grade valves etc.) and to determine whether any documented releases were reported from these tanks.

**Groundwater Dissolved Phase Contamination**
TetraTech Table 3 summarizes the results of organic constituent analyses of the dissolved aqueous phase constituents in the groundwater at monitoring wells MW-1 and SB-11. As shown by Table 3, no reportable concentrations of VOC concentrations were reported in the groundwater. However, 4 dissolved PNA constituents were reported in the groundwater. The detected PNA constituents include benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, and chrysene. Comparison of the PNA constituents reported in the groundwater in Table 3 to the constituents detected in the soils (Tables 1 and 2) indicate that each of the PNA constituents detected in the groundwater are also detected in the soil (primarily in sample GP2 at 12 ft.). Because relatively few soil samples have been analyzed from depths greater than 20 feet, it is not possible to track each of the PNA constituents vertically through the entire soil column thickness. However, the presence of the same PNA constituents in the soil and groundwater suggests that the groundwater dissolved phase contamination could be associated with petroleum releases to the site soils. Because each of the PNA compounds are characterized by different organic carbon partitioning coefficients (Koc), they are attenuated at different rates. Thus, the various PNA constituents would migrate through the soil at different rates. Potentially, secondary pathways such as utilities, soil borings, root casts, etc. may have provided vertical migration pathways through the soil.

In any case, the geochemical match of the PNA compounds found in the soil to the PNA's found in the groundwater dissolved phase, does not allow a local source of the dissolved phase contamination to be ruled out. Furthermore, the PID readings and geologist observations of "sweet or petroleum odors" extending thru the soil to the upper portion of the bedrock suggests that vertical migration of contaminants has likely occurred. Finally, the presence of PNA compounds at depths of 33 ft (SB-2) and 43 ft at SB-1 documents that contaminants have migrated to within a few feet of the water table, if not all the way through and into the water table.

Finally, the groundwater dissolved phase analyses did not attempt to characterize any of the inorganic constituents which could be indicative of a possible landfill leachate source. Typically, a release of landfill leachate would result in groundwater contamination possessing elevated concentrations of a wide range of inorganic indicator constituents. None of the most common landfill leachate indicator parameters (specific conductance, Total Dissolved Solids (TDS), ammonia, sodium, chloride, potassium, etc.) have been analyzed. Thus, no groundwater mixing analyses have been conducted which demonstrate an impact from any landfill, let alone fill materials at James Park.

**Bedrock Free Product Phase**
The Friedman and Bruya Inc. report provided in Appendix E of the TetraTech report is purported to represent a fingerprint analysis of the product recovered from 2 soil [sic bedrock] samples (SB-1 at 69 ft) and (SB-1 at 74 ft). CS Geologic maintains that the Friedman and Bruya report provides product characterization analyses which does not constitute a "fingerprint" since it does not compare the product characterization gas chromatogram results to any reference standard (i.e. does not compare the analysis results to either the MWRDGC UST product sample or a sample which was derived from the landfill). As such, the results are far from conclusive in either disproving a local UST source of contamination or proving any potential linkage to a source derived from the landfill. The Friedman and Bruya report statement that:

COE0006428

> *"Landfill actions will produce a leachate that is complex mixture of material that can be similar to that seen in the site sample. This leachate should be devoid of the petroleum markers due to its relatively recent origin."*

is unfounded, and is not supported by any references. If a pre-regulation landfill or a dump did receive liquid petroleum products (and no information suggests such materials were ever placed at James Park) they would also reflect the types of refined products used in the community (fuels, lubrication oils etc.). These materials would also be an unlikely match to the product samples described by Friedman and Bruya.

The Friedman and Bruya report describes the product contained in the soil [sic bedrock] as exhibiting a complex of high boiling point compounds eluding from $n$-$C_{11}$ to beyond $n$-$C_{32}$ with a maximum near $n$-$C_{28}$. This appears to correspond to the sterane and terpane hydrocarbon class biomarkers. These hydrocarbon groups are reported to be among the least susceptible to biodegradation Killops (2005) p141. This suggests that the normal alkane constituents and the biomarkers pristane and phytane referenced by the Friedman and Bruya report have been removed by natural biodegradation. Killops (2005) p 141 indicates that such biodegradation may occur within relatively oxygenated meteoric water (i.e., aerobic or oxygenated conditions) unlike landfills which are typically anaerobic in nature. As such, the petroleum group constituents detected in the bedrock are not deemed unique to a landfill leachate as suggested by the Friedman and Bruya report.

The boiling point of then- $C_{11}$ to n- $C_{32}$ hydrocarbons is reported to correlate with a temperature range of approximately 150°C to beyond 470°C with a maximum near 430°C. The report equates the complex of medium to high boiling point hydrocarbons as being similar to a No. 6 or Bunker C fuel oil. These fuel products which are deemed to be similar to the product detected in the soil [sic bedrock], have a viscosity of approximately 90,000 Saybolt Universal Seconds (SSU) or about 20,000 centipoise (CPS) at 55°F (the average temperature of area groundwater). This viscosity is equivalent to a material with a consistency somewhere between honey and ketchup. As such, it is unreasonable to assume that such a viscous material could migrate approximately ¼ mile in groundwater that averages 55°F. It is also unreasonable to assume that such a viscous material could infiltrate into the micropores of the bedrock as was reported in the field observations of the rock core. Typically, heat or steam is required to allow similar (No 6 Fuel or Bunker C products) to flow.

Finally, the mainstream tunnel system is located beneath the North Shore Channel between James Park and the O'Brien Water Reclamation Plant. Typically, the deep tunnel system, when pumped down (when evacuated) acts as a groundwater drain within the aquifer system. While the tunnel is located much deeper in the Silurian Dolomite, the hydraulic influence likely extends to the top of the aquifer creating a discharge boundary. These boundary conditions make it difficult for groundwater let alone a viscous free product to migrate west of the North Shore Channel.

Similar petroleum materials were found at each rock cored boring at the water reclamation plant (note that in addition to borings SB-1 and B-11, borings B-8 and B-10 also reported similar petroleum materials). In addition ATEC boring B-16 completed in 1974 on behalf of MWRDGC (Main Stream Tunnel and Shaft Project) also reported similar black staining of the rock core obtained from the area of the drop shaft at Mulford St. The fact that so many rock cored borings in the area completed at different times suggest that the petroleum is spread over a wide area and it is likely to have been there for an appreciable time. It should be noted that similar asphaltic type residues have long been reported in the limestone pores at the Thornton Quarry in Southern Cook County (Alden 1902). Similar petroleum residues are also reported to have been detected in closer proximity to the site.

William Alden (1902) writes:

> *"The presence of petroleum, apparently saturating the rock in places, led, in 1864, to an attempt to procure a flow of oil. A well was sunk at the corner of Chicago and Western Avenues. While a small*

C:\Users\owner\Desktop\Old Data\C_\Documents and Settings\CS Geologic LLC\My Documents\Projects\Evanston\TatraTech Report Technical Review.docx

3

COE0006429

*Analysis of the TetraTech Inc.*
*O'Brien Water Reclamation Plant*
*UV Treatment Area Environmental Evaluation*

> *amount of petroleum was found the well failed to disclose the presence of oil in sufficient quantities to be of any value, and the attempt was abandoned."*

Carl Anderson (1919) p. 185 describes similar petroleum materials in the Niagaran Dolomite in the Lake Forest area:

> *"In drilling a 261 ft well on the same property (Armour Estate), the well driller reported finding in the drillings from the Niagaran Limestone gobs of a dark-colored substance resembling crude oil which would burn when thrown on the fire. The Niagaran Limestone in other localities, as in the Chicago area, shows dark colored, bituminous blotches. The presence of this substance may account for the noticeable content of hydrogen sulfide in the Niagaran limestone waters."*

These references indicate that it is not uncommon to find minor amounts of crude petroleum and/or asphaltic petroleum residues in the Niagaran Silurian age bedrock. Because the rock consists largely of a biologic rich reef complex, it is not surprising that the limestone contains petroleum derived from decay of organic matter. Most of the petroleum was likely lost millions of years ago since the reef was not overlain by an impermeable cap rock (necessary for accumulation of an oil reservoir). Most of the petroleum is likely to have either undergone weathering, biodegradation, and was washed away by groundwater flow. However, if groundwater circulation was poor or restricted, it is likely that heavier phase higher carbon chain petroleum compounds would remain in the pores of the limestone. The lighter phase compounds would be more likely removed by biodegradation and by groundwater flow over millions of years.

The naturally occurring biogenic petroleum provides an explanation which is more consistent with the asphaltic type product characterization, the distribution of such a viscous product in widely spaced cored holes (holes where petroleum and/or staining was reported), and the fact that the petroleum is found in the pores of the rock which would be largely inaccessible to an anthropogenic (i.e., man-made) release of a viscous product.

CS Geologic has requested that petroleum geochemist from the Illinois State Geologic Survey Oil and Gas Section search their records for chromatograms of petroleum samples obtained from the Niagaran Dolomite. If possible, these chromatograms should be compared to the Friedman and Bruya product characterization findings to verify that they are consistent with naturally occurring petroleum residues previously described in the Silurian Dolomite in the Chicago area.

**Gaseous Phase Contamination and Pressure**
Wells SB-11 and MW-1 reported encountering methane gas at the top of bedrock. Similarly, boring MW-2 also reportedly encountered methane gas that was under considerable pressure. The method 3C analysis of the gas sample collected from SB11 indicate a methane concentration of 86%. Field combustible gas measurements performed by Nicor Gas on October 3, 2012 indicated methane levels of 100% at B-11 and 75% at MW-2. The combustible gas at MW-2 was reported to be under considerable pressure which resulted in significant gas flow. Boring MW-2 reportedly encountered the methane at the top of the dolomite bedrock, however, the static water level reported at adjacent wells SB-11 and MW-1 were above the top of the top of the dolomite resulting in a few feet of hydrostatic pressure acting on the trapped gas.

These conditions are very similar to those described by Carl Anderson's 1919 account of the previously mentioned Armour Estate well drilled in the Niagaran Dolomite in western Lake Forest.

> *In drilling the new Armour well a small flow of gas was obtained just below the contact of the drift and the bedrock at a depth of about 147 feet. The flow from on July 6, 1915 was 218 cubic feet per hour, and the pressure was 1.5 pounds per square inch.*

C:\Users\owner\Desktop\Old Data\C_\Documents and Settings\CS Geologic LLC\My Documents\Projects\Evanston\TatraTech Report Technical Review.docx

4

COE0006430

*Analysis of the TetraTech Inc.*
*O'Brien Water Reclamation Plant*
*UV Treatment Area Environmental Evaluation*

Analysis of the gas sample obtained from the Armour well indicated an energy content of 910 British Thermal Units (BTU). The composition of the gas was reported as follows:

| | |
|---|---|
| *Methane (swamp gas)* | *81.5%* |
| *Ethane* | *2.5%* |
| *Inert gases* | *16.0%* |
| Total | 100% |

The 1.5 PSI of pressure reported from the Armour well corresponds to approximately 3.5 ft of water column. As in the case of the O'Brien Reclamation Plant, this pressure is believed to have been generated by the force of the groundwater acting on the gas trapped at the top of the Niagaran Dolomite.

The TO-15 gaseous sample analyses reported numerous tentatively identified hydrocarbon compounds. These hydrocarbon compounds encompass a wide range of cycloalkane group hydrocarbons (i.e., cyclohexane, cyclopentane, cyclopropane, unidentified cyclic hydrocarbons, etc). As in the case of the free product analyses of the rock core, the normal (straight chain) alkane hydrocarbons are conspicuously absent from the tentatively identified compounds (TICs) in the gaseous sample or are present at very low concentrations. As noted by Killops and Killops pg 141, the absence of these normal alkane compounds suggests that the gaseous phase is similar to the highly biodegraded hydrocarbons detected in the bedrock. These compositional similarities suggest that the methane and the TIC compounds in the gaseous phase are likely to be associated with byproducts of microbial degradation of the petroleum product detected in the bedrock. Because the Silurian Dolomite aquifer is characterized by relatively low temperatures, the methane and trace TIC compounds are likely to have accumulated due to biogegradation, volatilization etc. over a considerable time period. Unfortunately, the gaseous analyses did not report the ethane or carbon dioxide concentration. Ethane is typically present in biogenic derived natural gas whereas carbon dioxide is a major component of landfill gas. The relative concentrations of these constituents might provide further clues to the origin of the gas.

The discussion in the preceding paragraph addresses the petroleum related constituents detected in the summa canister sample. However, as noted by the Friedman and Bruya Inc. report, natural gas does not contain chlorinated olefin compounds such as vinyl chloride. Vinyl chloride concentrations of 13 ppv were reported in the TO-15 analyses of the gaseous sample obtained from well B-11. However, because the results reflect just one sample they do not constitute a definitive characterization of the gaseous phase. Furthermore, the detection of dichlorodifluoromethane (Freon R-12) in the background sample at a concentration of 0.48 ppv is likely to reflect a cross contamination artifact. Freon R-12 was banned by the USEPA in 1994. Because Freon R12 is lighter than air it is extremely unlikely that the constituent would be detected in the ambient air sample collected at the ground surface. This suggests the possibility that the cleaning process used to purge and inert the summa canisters did not fully remove prior traces of organic chemicals from previous analyses. Potential cross contamination provides one example of why the gaseous phase characterization should not be based on a single summa canister sample. It is recommended that additional gaseous samples be collected to corroborate the results of the initial sampling. Where possible, the gaseous samples should have been collected from multiple locations (SB-11, MW-1, MW-2, etc) to characterize a larger volume of the trapped gas. It is also recommended that air from the probes be purged to minimize the potential for stratification of the gas within the probe and to minimize potential impacts associated with the well materials or equipment used in the wells/probes.

Vinyl Chloride is typically derived from the reductive dehalogenation biodegradation of chlorinated ethene solvents such as perchloroethene (PCE) or trichloroethene (TCE). Reductive dehalogenation (the breakdown of PCE and TCE) occurs under anerobic conditions. Vinyl chloride is sometimes associated with recent landfills because the landfills are characterized by reducing conditions caused by the biodegradation of organic matter in the wastes. These reducing conditions result in the reductive dehalogenation of chlorinated solvents which may have been disposed in the landfill. However, due to the abundant organic matter (biodegraded petroleum) present in the Silurian Dolomite in the area of the O'Brien Water Reclamation Plant, it is likely that anaerobic conditions exist in the aquifer. As such, any chlorinated

C:\Users\owner\Desktop\Old Data\C_\Documents and Settings\CS Geologic LLC\My Documents\Projects\Evanston\TatraTech Report Technical Review.docx

5

COE0006431

*Analysis of the TetraTech Inc.*
*O'Brien Water Reclamation Plant*
*UV Treatment Area Environmental Evaluation*

solvents present in the aquifer would be expected to undergo similar biodegradation which would result in the generation of vinyl chloride. Vinyl chloride has a relatively low boiling point (13.9 ℃). At relatively cool bedrock temperatures, vinyl chloride is likely to exist in a vapor phase. Thus, even if the presence of vinyl chloride is corroborated by verification samples collected from the gaseous phase, it does not mean that the constituent migrated to the site as a gaseous phase. Rather, it is quite plausible that trace halogenated solvents may have been either released in the area or migrated in the groundwater where they would have encountered the abundant petroleum residuals present in the dolomite. In this environment, these solvent constituents would be quickly degraded to form vinyl chloride. Vinyl chloride biodegradation occurs aerobically (in the presence of oxygen). Due to the anaerobic conditions created by the abundant organic matter, it is likely that vinyl chloride would remain long after all the parent compounds (PCE, TCE, etc.) had been consumed.

Appendix F to the TetraTech Report provides an Environmental Site Assessment of James Park. The ESA was prepared by Testing Service Inc. The Environmental Data Report (EDR) searches conducted for this ESA encompass the area of the O'Brien Water Reclamation Plant. Furthermore, the EDR indicates that numerous commercial and industrial businesses are located in the vicinity of the O'Brien Plant. These businesses include 1 facility Rust Oleum which is listed as a Comprehensive Environmental Recovery Compensation Liability Information System Site. Two CORRACTS sites are listed which have completed or are currently undergoing corrective action. Thirty leaking underground storage tanks (LUST) sites were reported and 9 Resource Conservation Recovery Information System sites which store, generate, and/or transport hazardous waste. Thus potential exists that chlorinated compounds could have been released from an adjoining facility, migrated in the groundwater to the site, where they would have degraded to vinyl chloride when they came in contact with the reducing conditions generated by the petroleum encountered in the bedrock.

The groundwater sampling did not record the oxidation reduction potential (ORP) of the groundwater. Nor did the groundwater sampling indicate the concentrations of any ORP sensitive constituents (sulfate, sulfide, iron, manganese, etc.) which could be used to confirm the existence of reducing conditions. However, given the volume of petroleum residues reported in the rock core logs, it is reasonable to assume that conditions in the groundwater beneath the Water Reclamation Plant are just as reducing, if not more so, than an area which was landfilled more than a half century ago. Thus, the reducing conditions alluded to by the Friedman and Bruya report as being necessary to generate vinyl chloride are likely to exist in the groundwater beneath the Water Treatment Plant. Given these conditions, CSG recommends that the City of Evanston request MWRDGC records on the use of chlorinated solvents at the plant.

Finally, typical landfill gas is composed of a nearly equal proportion of methane and carbon dioxide. The gas detected in the bedrock at the site reportedly contains methane concentrations ranging between 75% and 100% methane. If this gas was derived from a landfill it would suggests that the gas has somehow become enriched in methane. This type of enrichment of landfill gas can occur when the carbon dioxide is stripped away by contact or flow through water. Because carbon dioxide is much more soluble than methane it is more likely to be removed (go into solution) thus enriching the gaseous phase in methane. The TetraTech report provides no data which demonstrates that a gaseous migration pathway exists between James Park and the O'Brien Plant. Page 6 of the report indicates that the bedrock is typically encountered at a depth of approximately 60 feet. The groundwater was reportedly encountered at the top of the bedrock (bedrock/soil interface) and that the static water table is reportedly present at a depth of approximately 57.5 ft below ground surface. This suggests that the Niagaran dolomite is fully saturated and under slightly confined aquifer conditions. Because landfill gas transport through groundwater is extremely slow and inefficient, it is unlikely that the gas migrated more than a quarter mile through the groundwater. CSG believes that it is more likely that the gas was generated locally in the Niagaran Dolomite like the Lake Forest Amour Well and simple accumulated at the soil interface with the bedrock.

Because high concentrations of methane occur as natural gas in the Silurian Dolomite due to biogenic sources (anaerobic biogegradation of organic matter in the bedrock), CSG believes that additional analyses would be necessary to prove that the methane is derived from a landfill. Environmental isotopes have

C:\Users\owner\Desktop\Old Data\C_\Documents and Settings\CS Geologic LLC\My Documents\Projects\Evanston\TatraTech Report Technical Review.docx

6

COE0006432

*Analysis of the TetraTech Inc.*
*O'Brien Water Reclamation Plant*
*UV Treatment Area Environmental Evaluation*

been utilized successfully by several investigators to discriminate landfill derived methane sources from naturally occurring formation gases. Several references to technical papers and journal articles detailing these methods are attached.

## Conclusions and Recommendations

CS Geologic has completed a review of the TetraTech and the Friedman and Bruya Reports. Based on the review of the data provided in these reports, it is apparent that a simpler explanation exists for the petroleum and gaseous conditions observed in the dolomite bedrock. Simply, the petroleum and natural gas conditions described in the bedrock at the O'Brien Plant are consistent with more than 100 years of observations of highly biodegraded petroleum occurring in the Niagaran Dolomite throughout the Chicagoland area. The sterane and terpane compounds identified by the Friedman and Bruya report are precisely the constituents that introductory organic geochemistry textbooks predict would remain from a highly weathered and biodegraded naturally occurring crude oil source. CS Geologic has requested that the Illinois State Geologic Survey Oil and Gas Section (Mr. Bryan Huff) research their records for petroleum chromatograms from the Niagaran Dolomite Formation to compare to the product at the site. MWRDGC will need to determine whether the dissolved phase PNA constituents detected in the groundwater are associated with the petroleum product observed in the bedrock or whether these dissolved phase constituents are related to the occurrence of the same compounds detected in the overlying soils at the Water Reclamation Plant site. As such, no offsite sources are needed to explain the existence of any of these constituents.

Based on the observations reported at the site, it is quite likely that the vinyl chloride detected in the gaseous phase may not be associated with the methane. Since only one Summa Canister sample was collected from the formation and underwent analysis, it is possible that the vinyl chloride may reflect an artifact or cross contaminant. This type of cross contaminant could have been introduced to the gas probe, any equipment that entered the probe, the summa canister, or at the laboratory. Verification samples are recommended to confirm the TO-15 analysis results. Similarly, samples should be collected from more than one location so that the potential for well material contamination can be ruled out. As previously mentioned, it is recommended that any verification sampling seek to purge a greater volume of gas from the probes. The purging of the probes is necessary to avoid potential biases which could occur if stagnant gas is sampled or the gas is stratified within the probe (lightest gas present at the top of the probe). If necessary, the gaseous phase samples could also undergo an isotopic fingerprinting which might further delineate the source of the methane in the gaseous phase.

CS Geologic also recommends that MWRDGC records be reviewed to determine whether chlorinated solvent products have been utilized at the site. Because the site is likely characterized by highly reducing conditions it is likely that any solvent release would be quickly degraded resulting in the formation of vinyl chloride. Because vinyl chloride is degraded aerobically, it would remain persistent under the highly anaerobic conditions likely to exist at the site.

Finally, no analyses of the groundwater flow conditions or the inorganic groundwater quality has been provided in the TetraTech report. Analysis of inorganic constituents might help demonstrate whether typical landfill related constituents (chloride TDS, potassium, sodium, etc.) are present in the groundwater. Because these constituents are much more mobile than a viscous petroleum product, they provide a much better indication of potential landfill groundwater impacts. Inorganic constituent analyses will also help demonstrate the likely existence of strongly reducing conditions within the dolomite. As previously mentioned, these ORP conditions could result in relatively rapid biodegradation of chlorinated solvents. Thus, if the vinyl chloride gaseous sample results are confirmed, the potential for this constituent to have developed from on-site reductive dehalogenation due biodegradation of a chlorinated solvent can be assessed.

It the opinion of CS Geologic that no definitive evidence has been presented to suggest that the Water Reclamation Plant Facility has in any way been impacted by a leachate or landfill gas release from

C:\Users\owner\Desktop\Old Data\C_\Documents and Settings\CS Geologic LLC\My Documents\Projects\Evanston\TatraTech Report Technical Review.docx

7

COE0006433

*Analysis of the TetraTech Inc.*
*O'Brien Water Reclamation Plant*
*UV Treatment Area Environmental Evaluation*

landfilled areas of James Park. It is recommended that the preceding review be forwarded to the IEPA so that they are apprised of this alternate explanation for the conditions described in the TetraTech report.

**Closing Remarks**
CS Geologic appreciates the opportunity to assist the City of Evanston with this matter. Please do not hesitate to call if you have any questions or comments on this report review.

Sincerely,

Craig S. Rawlinson P.G.
Principal Hydrogeologist

C:\Users\owner\Desktop\Old Data\C_\Documents and Settings\CS Geologic LLC\My Documents\Projects\Evanston\TatraTech Report Technical Review.docx

8

COE0006434

# Exhibit N

**Subject:** James Park, Evanston, IL

**Date:** Thursday, May 29, 2014 at 2:19:05 PM Central Daylight Time

**From:** Jeff Jeep

**To:** Michael Partee

**BCC:** David Hendron, Michelle L. Masoncup, W. Grant Farrar

https://mapsengine.google.com/map/edit?mid=z-CGI1-m0J_g.kCno5EfHXFoI
https://www.dropbox.com/s/7o57c95rwbwpavs/1211xx%20TetraTech%20MWRD.pdf

Mike,

I will get back to you shortly on a meeting next week. In anticipation of our meeting, I enclose two links:

The first is a link to a Google Map where we have plotted information from various sources on a private google map (first link above). The sources include NIPC, IEPA, topographic maps, Sanborn maps, historic aerial photographs, and NICOR drawings. It will be helpful for you and your engineer to view the map before our meeting. We can discuss the map at the meeting. We will add new information to the map as we receive it.

With the exception of the NICOR drawings, all the information has been obtained from public sources. This map will only be shared with City employees (and its consultants) because it contains confidential NICOR information.

The Map has three "layers". The first, "James Park", identifies current and historic land uses around the Park, including the Nicor lines. The second layer, "NIPC Sites", identifies James Park and other closed landfills in the vicinity of James Park as reported by the Northeastern Illinois Planning Commission in 1982. The third layer, James Park Soil Boring Data, summarizes historic soil borings at James Park, none of which have exhibited methane or pressurized gas.

The second is a Drop Box link to a Phase II Report prepared by Tetra Tech on behalf of the MWRD. Appendix F contains documents obtained by FOIA, including the Soil Boring Data at James Park (referenced above).

Regards,

*Jeffery D. Jeep*
*Jeep & Blazer, L.L.C.*
24 N. Hillside Avenue, Suite A
Hillside, IL 60162
Office: (708) 236-0830
Direct: (708) 401-5022
Fax: (708) 236-0828
Cell: (708) 404-9090
Email: jdjeep@enviroatty.com
Web Site: www.jeepandblazer.com

Please consider the environment before printing this e-mail.

# Exhibit O

MAYER · BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

July 29, 2014

Mark R. Ter Molen
Direct Tel +1 312 701 7307
Direct Fax +1 312 706 9115
mtermolen@mayerbrown.com

**VIA EMAIL AND U.S. MAIL**

W. Grant Farrar
Corporation Counsel
City of Evanston
Law Department
2100 Ridge Avenue
Evanston, IL 60201-2798

Re:     City of Evanston vs. Nicor Gas

Dear Mr. Farrar:

This follows my July 10 letter to Chief Klaiber as the substantive response of Nicor Gas Company ("Nicor") to the "Order" from the City of Evanston ("City"), dated July 3, 2014 (the "Order"). The Order requests documents and certain actions from Nicor that the City states are relevant to the 2012 discovery by the Metropolitan Water Reclamation District ("MWRD") of elevated levels of methane in the area of the James Park landfill site (the "James Park Landfill"). Putting aside questions of the legal significance of the Order, Nicor provides responses to the requests in the Order here in the spirit of continued cooperation with the City.

Nicor values its longstanding working relationship with the City. In that context, Nicor has cooperated with the City and shared information in an open and transparent dialogue. We had understood that the City was committed to the same process.

Nicor has now learned that in November 2012, the MWRD notified the City of the methane concern at the James Park Landfill. In this same communication, the MWRD told the City that the MWRD had investigated the potential sources of the methane, and determined that: (a) the likely source of the methane was the former landfill beneath what is now James Park, which landfill was closed without incorporating the safety and monitoring requirements now required for such landfills; and (b) the former manufactured gas plant ("MGP") across the sanitary canal from the James Park Landfill and neighboring properties was not the source of the methane.

The City has not disclosed the MWRD report to Nicor. Nicor has also learned that the City's legal counsel hosted a June 11, 2014 conference call with the Illinois EPA regarding the issue of the methane gas, during which call the City's counsel specifically pointed a finger at Nicor. Nicor was not invited to or notified of that conference call.

Attached is a chronology of relevant events and all Nicor communications with the City regarding the James Park Landfill, which demonstrates our ongoing cooperation and timeliness.

Mayer Brown LLP operates in combination with other Mayer Brown entities with offices in Europe and Asia
and is associated with Tauil & Chequer Advogados, a Brazilian law partnership.

Mayer Brown LLP

City of Evanston
July 29, 2014
Page 2

### Nicor's Requests for Information

Nicor requests that the City explain why the City disagrees with the conclusions set forth in the 2012 report. As an example, the MWRD's testing of the gas found in the ground indicated that the gas was from a landfill. Specifically, why does the City disagree with this testing, if it disagrees? Understanding the City's reasoning will assist Nicor in responding to the City's concerns in this matter.

Additionally, so that Nicor can better assist the City in this effort, Nicor requests that it be provided the same information as is available to the City regarding this issue. We request electronic copies (or if electronic copies are not available, printed copies) of the following records. Once the City has provided this information Nicor looks forward to discussing potential next steps in the investigation process:

1. Documents containing historical information related to the landfill site located in James Park in the City of Evanston, including but not limited to records indicating the dates of use, the activities conducted, the content and volume of materials deposited, regulatory compliance and inspection records, and any citizen complaints.

2. Documents related to methane testing in James Park and the surrounding areas of the City of Evanston conducted in 2014 or at any other time, including but not limited to the testing protocol used and results collected.

3. Documents and other information that the City believes support a view that methane gas in the area of the James Park Landfill results from current or historic Nicor operations or facilities.

4. Documents and other information relating to the design, construction, operation and monitoring of the gathering system and/or flare to address the methane.

5. All historical aerial photos associated with the James Park and surrounding area.

The foregoing requests are submitted pursuant to the Illinois Freedom of Information Act ("FOIA"), 5 ILCS 140/1 *et seq.*

### City's Additional Requests for Information from Nicor

With respect to the City's additional requests for information contained in the Order, it is important to put the requests in the context of what is known. The relevant facts known to Nicor are as follows:

- The methane detected in the area of the James Park Landfill is at a depth of 40 feet or more.

Mayer Brown LLP

City of Evanston
July 29, 2014
Page 3

- The methane detected at that depth is being measured at a pressure greater than 300 inches of water column or 10.8 PSIG (measured by the City at sample location GMP10 on May 12, 2014).

- The James Park Landfill operated at a depth of 40 feet or more, as a dump site for a number of decades and was closed in the 1960s.

- The former manufactured gas plant facility that was located on the southwest corner of McCormick and Oakton was closed in the early 1950s, more than 60 years ago, and was demolished in the early 1960s. We are unaware of any records indicating transmission lines that traveled from the former MGP beneath the James Park Landfill. Moreover, as discussed in the next bullet point, gas pressures were much lower for MGP facilities and related gas lines than they are currently, and far lower than the pressures detected by the City beneath the James Park Landfill.

- The former tunnel that ran under the Channel, parallel with Oakton, was located at least one quarter mile away from James Park. The tunnel itself did not convey natural gas; rather, it contained a pipeline which conveyed the natural gas, but at an operating pressure of merely 5 PSIG or 138 inches of water column. Most significantly, the pipeline and tunnel were retired in 1969, more than 44 years ago and, therefore, cannot be the source of gas due to constant flow of gas still being emitted in the Park.

- The existing 60 PSIG gas main running parallel with Oakton, and all of other the Nicor gas lines in the area of the James Park Landfill operate at pressures of 0.25 (7 inches water column) and 25 PSIG (692 inches water column), and are at depths of less than five feet, obviously much shallower than 40 feet. The exception is one 60 PSIG line that crosses the channel on the north side of Oakton is at approximately 5 feet below the bottom of the channel.

- It is infeasible for a Nicor pipeline leak, should one occur: (a) to travel downward through the soil to a depth of 40 feet or more, for the reason that natural gas is lighter than air and groundwater; (b) for the leak to generate the methane pressure within the soil that the City has measured at depths of 40 feet or more (or for a gas leak to generate that pressure at that depth) because Nicor's pipeline are not located at that depth; or (c) for a significant leak to go undetected by Nicor's leak surveys.

- The recent leak study that Nicor conducted in response to the City's expressed concerns confirmed that there are no ongoing significant leaks in the vicinity of James Park. Moreover, the City has not provided to Nicor any evidence of a Nicor pipeline leak or even of any methane gas in proximity to Nicor's existing pipeline facilities.

- The MWRD's 2012 report tested methane gas from the ground in the area of the James Park Landfill and confirmed that the profile of the methane gas fit the profile of landfill-created methane, as opposed to pipeline gas.

Mayer Brown LLP

City of Evanston
July 29, 2014
Page 4

- Collecting gas samples and pressure readings from within the Landfill itself is the prudent location to start an investigation into the source of the gas, but to our knowledge, Evanston has not yet done so.

Nicor does not at this stage understand a technical basis for the City to assert that Nicor facilities may be the source of the methane gas beneath the James Park Landfill. Nicor is not aware of any actual or reasonably feasible mechanism by which its current facilities, or the former MGP facility or pipe within the 1910 tunnel, could be the ongoing source of the methane gas identified by the City (and by the MWRD) beneath the James Park Landfill.

Turning to the specific document requests in the Order, Nicor responds as follows:

1. All structures used in the past (1910 tunnel and 1910 24" line) and currently used (1969 24" main) in connection with the conveyance of manufactured or natural gas under the North Shore Channel in the City and Skokie, Illinois, including, but not limited to, Northern Illinois Gas Company Drawing dated June 17, 1967, Sheet 1 of 4, Sheet 3 of 4 and Sheet 4 of 4;

ANSWER: Nicor previously provided a detailed engineering drawing of the 1910 tunnel and pipeline within it, which also documents its retirement more than 44 years ago. Nicor's current pipeline under the North Shore Channel is a 24" diameter pipe constructed at an approximate depth of 35' below ground surface at its lowest point beneath the Channel and rising to a depth of less than five feet on either side of the Channel. The location and operating pressure of the current 24" pipe was shown on confidential system maps and set forth in emails, respectively, that Nicor previously provided to the City.

2. All chemical additives to natural gas transmitted through its system, including the manner, method and location of introduction;

ANSWER: Nicor or upstream gas suppliers inject odorant in the gas stream for people to detect the presence of gas by smell. The odorant is injected and mixed at transmission stations in remote areas of our system. The typical amount of odorant injected is approximately ¾ of a pound per million cubic feet of gas.

3. All constituents, other than methane contained in the natural gas transmitted through its system, including average ranges of concentration;

ANSWER: Nicor's pipeline gas has a minimum heating content or gross calorific value of approximately 1,020 Btu/cubic foot. Once the City explains its basis for disagreeing with the testing conducted by the MWRD, Nicor is willing to revisit this topic.

4. All repairs to its system within a 1 mile radius of James Park within the last 20 years;

710564921

Mayer Brown LLP

City of Evanston
July 29, 2014
Page 5

ANSWER: Nicor does not understand the technical basis for this request for the reasons explained above. In summary, Nicor's pipeline system is not located in proximity to the methane detected at depths of 40 feet and more and a leak from Nicor system would not travel downward through the soil to the depths at which methane is currently being detected, but Nicor will revisit this issue should the City provide a technical basis for doing so.

5.    Any and all subsurface structures at the Skokie Manufactured Gas Plant at a depth below ground surface at or greater than 25 feet; and

ANSWER: Enclosed is a copy of the investigation of environmental issues, including structures, at the former MGP site.

6.    Any and all documents relating to the on-site and off-site disposal of waste from the Skokie Manufactured Gas Plant at locations within a 1 mile radius of the intersection of Oakton Street and McCormick Boulevard.

ANSWER: Nicor does not understand the technical basis for this request for the reasons explained above. Nicor will revisit this issue should the City provide a technical basis for doing so.

Turning to the actions that the Order requests Nicor to undertake:

1.    NICOR undertake an assessment and evaluation of whether subsurface structures owned or operated by Nicor, including, but not limited to, the past (1910 tunnel and 1910 24" line) and currently used (1969 24" main) in connection with the conveyance of manufactured or natural gas under the North Shore Channel in Evanston and Skokie, Illinois, as depicted in the Northern Illinois Gas Company Drawing dated June 17, 1967, Sheet 2 of 4, are a source and means of conveyance of the methane gas detected at high concentrations and pressure in borings B-11, on MWRDGC property, and GMP1 — GMP13 around the parameter of James Park; or

ANSWER: Nicor's leak survey included potential leaks from the existing gas main under the Channel; no leak was detected.

Nicor is not responsible or liable for gas that enters its current or former facilities from the landfill or other third party gas source. It is unclear what can be assessed and evaluated regarding former 1910 tunnel, but we are willing to discuss it with the City.

2.    Whether such subsurface structures are a means of conveyance for manufactured gas, natural gas or methane from another source; and

ANSWER: Please see the response to request #1.

Mayer Brown LLP

City of Evanston
July 29, 2014
Page 6

3.      To provide all documents reviewed and relied upon by Nicor in undertaking these assessments and evaluations, including, but not limited to, the documents specified in Paragraphs 1 - 5 of this Order, above.

ANSWER:  Please see the response to request #1 and the responses to the document requests above.

Please contact me if you have any questions or concerns with our response, or if you wish to meet and discuss any of our respective requests for documents and information.

Regards,

Mark R. Ter Molen

MRT/eb

Encl.

cc:  Mayor Elizabeth Tisdahl
      City Manager Wally Bobkiewicz
      Fire Chief Greg Klaiber
      Jeffery D. Jeep

710564921