IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORTHERN ILLINOIS GAS COMPANY, d/b/a/ NICOR GAS COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | 14-cv-9227 |
| v. | ) ) | Judge John Z. Lee |
| CITY OF EVANSTON, ILLINOIS, | ) ) | |
| Defendant. | ) ) | |
| CITY OF EVANSTON, an Illinois Municipal Corporation, | ) ) ) | |
| Counter-Plaintiff and Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) | |
| NORTHERN ILLINOIS GAS COMPANY d/b/a NICOR, and COMMONWEALTH EDISON COMPANY, | ) ) ) ) ) | |
| Counter-Defendant and Third-Party Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

The City of Evanston notified Northern Illinois Gas Company ("Nicor") and

Commonwealth Edison ("ComEd") in October 2014 of its intent to sue the

companies under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.

§ 6901 *et seq.*, for improper disposal of "solid waste." In response, Nicor

preemptively filed suit, requesting a declaratory judgment that the company has no

liability to the City under RCRA. Not to be outdone, Evanston then filed "a counterclaim and third-party complaint" against Nicor and ComEd, respectively—which the Court will call the "counterclaim" for simplicity's sake—asserting claims under RCRA and state law.

Evanston's RCRA claim centers around two different types of "wastes." First, Evanston alleges Nicor and ComEd are responsible for waste oil that was created years ago as part of a gas production process utilized at the long-defunct Skokie Manufactured Gas Plant (Skokie MGP). Evanston refers to this gas process as the "Lowe Process."

According to the City, the waste oil created by the Lowe Process "is likely to have leaked into the environment from the above ground storage tanks and other infrastructure at the Skokie MGP," as well as from gas pipelines, into the soil and groundwater. Counterclaim ¶¶ 10, 35, 41. The waste oil in the soil, at least according to the City, is leading to the creation of methane gas as the oil biodegrades. *Id.* ¶¶ 40, 112. Evanston also alleges the existence of a "black crust coating" at various parts of the water line along Dodge Avenue, the chemical composition of which is identical to the Lowe Process waste oil. *Id.* at 42-44.

Second, Evanston asserts that Nicor and ComEd are responsible for the leakage of natural gas from active gas pipelines and associated infrastructure into the soil, groundwater, and bedrock in the area of interest. *Id.* ¶ 114. According to the City, this has caused "the presence of methane at high pressure and concentrations" in the area. *Id.* ¶ 114.

Nicor and ComEd have filed a motion to dismiss the RCRA counterclaim under Fed. R. Civ. P. 12(b)(6) and offer two principal arguments. First, the companies contend that methane gas is not a "solid waste" as that term is defined in RCRA. Second, the companies argue that the Evanston's "intent to sue" letter did not satisfy the requirements of RCRA.

For the reasons set forth below, the Court grants the motion and dismisses Evanston's RCRA claim against Nicor and ComEd without prejudice. As a result, the Court also declines to exercise supplemental jurisdiction over Evanston's state claims, and Nicor's complaint seeking declaratory relief is dismissed as moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Methane gas was first detected in and around James Park in Evanston, Illinois, in 2012. *Id.* ¶ 63. If this methane were to reach concentrations at or exceeding the gas's "lower explosive limit" ("LEL"), it could combust when exposed to an ignition source. *Id.* ¶ 7. In light of this danger and on the joint advice of Evanston's Fire Chief and a retained engineer, David Hendron, Evanston began monitoring methane levels at various locations in the James Park area, including around Dawes Elementary School and Levy Senior Center. *Id.* ¶ 69–70. Methane has not yet been detected at or near the LEL, *id.* ¶¶ 70–71, but the Illinois EPA and other organizations agree with Evanston that continued monitoring is necessary, *id.* ¶¶ 92–94.

Hendron also conducted an investigation to determine the source of the methane. *Id.* ¶ 69. Although earlier investigations pointed to the closed landfill,

upon which James Park was constructed, *id.* ¶¶ 63–67, Hendron drew a different conclusion and identified two other "likely sources" of the methane gas: (1) "[l]eakage of petroleum materials (Lowe Process oil waste) from the operational facilities at, and from the maintenance and operation of the pipeline infrastructure systems associated with the former Skokie MGP"; and (2) "[l]eakage of natural gas from existing and abandoned natural gas pipelines in the vicinity of James Park." *Id.* ¶ 73.

The Skokie MGP, Evanston explains, operated from 1910 until sometime in the early 1950s. *Id.* ¶¶ 29–30. The plant manufactured gas using the "Lowe (Williamson)" process. *Id.* ¶ 31. The Lowe Process utilized oil stored in above-ground tanks that eventually became waste oil. *Id.* ¶¶ 32–33. The waste oil likely entered the environment by leaking from the storage tanks and by traveling through the pipelines that transported gas from the Skokie MGP. *Id.* ¶¶ 35-37. At least two of those old distribution lines are located in the vicinity of James Park. *Id.* ¶ 36. Because of its low viscosity, the waste oil would have taken only a matter of years to travel down to bedrock. *Id.* ¶ 34. Once the oil reached bedrock, it would have started to biodegrade into methane gas. *Id.* ¶ 40.

In addition, Evanston also alleges that an active natural gas pipeline running along Dodge Avenue near James Park "contains, or contained, Lowe Process waste oil." *Id.* ¶ 41. Evanston surmises this from a chemical analysis of a "black crust" that coats a municipal water pipeline located five feet below the Dodge Avenue gas pipeline. *Id.* ¶ 44. The analysis of the crust revealed that it "matches identically

with the compounds known to be present in Lowe Process waste oil." *Id.* According to Evanston, this crust threatens to penetrate the water line, which would contaminate Evanston's drinking water. *Id.* ¶ 111. Further supporting the conclusion that the crust on the water line comes from the gas line is that the soil between the two lines "is stained black, similar in appearance to the color of the black crust." *Id.* ¶ 44.

Unrelated to the Lowe Process waste oil, Evanston also alleges that natural gas is leaking from active gas pipelines and associated infrastructure in the vicinity of James Park into soil, groundwater and bedrock. *Id.* ¶ 114. This is causing "the presence of methane in high pressure and concentrations in and around James Park." *Id.* ¶ 115.

Evanston asserts that it repeatedly has sought the cooperation of Nicor and ComEd to investigate the source of the methane. *Id.* ¶¶ 74–107. In Evanston's eyes, the companies were generally evasive and dismissive. *Id.* As a result, Evanston was forced to resort to administrative orders and Freedom of Information Act requests to learn about the location of pipelines and other relevant infrastructure. *Id.*

In the face of Nicor and ComEd's unwillingness to cooperate, the City formally notified the companies of its intent to sue them under RCRA. Compl. ¶¶ 8, 117, 121. Evanston's notice, which is attached to its counterclaim and further detailed below, identified two separate RCRA "endangerments": methane leaking from natural gas pipelines, and "coal tar" in the form of a "black crust" coating the Dodge Avenue municipal water pipeline. The notice stated that "[t]here is a perfect

match between the compounds detected in the black crust and compounds know to be present in coal tar." *Id.*, Ex. B ¶ 38. Evanston's notice made no mention of Lowe Process waste oil, nor did it draw a connection between the "coal tar" and the methane problem.

## II. ANALYSIS

In deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the Court accepts all well-pleaded facts in the complaint (or counterclaim) as true and gives the plaintiff the benefit of all reasonable inferences. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste," *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996), and to state a claim under the citizen-suit provisions of RCRA, a plaintiff must allege either a "violation," *see* 42 U.S.C. § 6972(a)(1)(A), or an "endangerment," *see id.* § 6972(a)(1)(B). The plaintiff must also have notified the defendant of an alleged violation 60 days before filing suit and of an alleged endangerment 90 days before filing suit. 42 U.S.C. § 6972(b)(1)(A), (b)(2)(A). Failure to provide notice requires dismissal of the complaint. *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989).

Evanston brings its RCRA claim under the endangerment provision, *see* Compl. ¶ 108; Resp. Br. at 3 n.2, ECF 36, which allows suits "against any person, … including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage,

treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

As explained above, Evanston identifies in its counterclaim two distinct substances that it contends are RCRA solid wastes that present an imminent threat to public health or the environment. The first is Lowe Process waste oil from the Skokie MGP. Some of that waste oil coats a water pipe, and some of it has biodegraded into methane. The second is methane gas leaking from natural gas pipelines. For reasons that will be apparent, the Court will address them in reverse order.

### A. Pipeline Methane

Nicor and ComEd first argue that methane leaked from pipelines does not meet RCRA's definition of "solid waste." Mem. Supp. at 3–5, ECF 24.[1] That definition, which explicitly includes certain non-solids, reads in relevant part:

> The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities …

42 U.S.C.A. § 6903(27). Nicor and ComEd contend that Congress has unambiguously excluded "uncontained" gaseous material from that definition by including "contained gaseous material." Mem. Supp. at 4. This issue is one of first impression in this Circuit.

---

[1] All "Mem. Supp." references are to Nicor's Memorandum of Law in Support of Its Motion to Dismiss, ECF 24. ComEd has adopted Nicor's RCRA arguments. *See* ComEd's Mem. Supp. at 6–7, ECF 27.

For its part, Evanston concedes that methane gas that leaks from pipelines into soil and water is "uncontained" gaseous material. Resp. Br. at 8 ("The Counterclaim alleges that an uncontained gas (methane) has been discharged … ."). And, although the definition of "solid waste" in Section 6903(26) does not mention "uncontained gaseous material," Evanston points out that the list of examples is preceded by the word "including." Accordingly, the City argues, the list is not exhaustive, and the mere mention of "contained gaseous material" does not necessarily exclude "uncontained" gaseous material. *Id.* at 8–9 (citing 2A Sutherland Statutory Construction, § 47:7 (7th Ed.)).

In interpreting a regulatory statute such as RCRA, the Court first must consider whether Congress "has directly spoken to the precise question at issue." *American Mining Congress v.* EPA, 824 F.2d 1177, 1182 (D.C. Cir. 1987) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). If the statutory language is silent or ambiguous, the Court then considers whether "Congress has authorized [an] agency to interpret the statute through rules carrying the force of law and [whether] the agency's interpretation is both reasonable and promulgated through the exercise of the authority given by Congress." *Brumfield v. City of Chi.*, 735 F.3d 619, 625–26 (7th Cir. 2013) (citing *United States v. Mead Corp.*, 533 U.S. 218, 227–29 (2001)). If the Court answers these questions in the affirmative, the agency's interpretation is entitled to deference under *Chevron*. The purpose of this deference is to respect Congress's decision to leave certain interpretive decisions to agencies rather than courts. *Nat'l*

*Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("*Chevron's* premise is that it is for agencies, not courts, to fill statutory gaps.").

In the Court's view, the definition of solid waste contained in Section 6903(26) is ambiguous as to whether an uncontained gas, such as methane, is a RCRA solid waste. The most natural reading of the provision's language is that a gas cannot be a "solid waste" because it is not a solid at all. *See American Mining*, 824 F.2d at 1183 ("In pursuit of Congress' intent, we start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.") (citation omitted). On the other hand, other non-solid materials are explicitly included within the definition of "solid waste," such as liquids and "contained gaseous material." It does not help matters that the list of what could constitute "discarded materials" appears to be a non-exhaustive one, at least on its face. Accordingly, one cannot discern from the plain language of Section 6903(26) whether an uncontained gas, such as methane, qualifies as a RCRA solid waste.[2]

Fortunately, Congress has authorized the Environmental Protection Agency ("EPA") to oversee the implementation of RCRA and to issue regulations with the force of law in furtherance of this effort. *See* 42 U.S.C. § 6912(a)(1); *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 330 (1994) (noting that RCRA implementing regulations come from the EPA); *Wyckoff Co. v. E.P.A.*, 796 F.2d 1197, 1198 (9th

---

[2]    In contrast, the court in *American Mining* found Section 6903(27) to be unambiguous. *See American Mining*, 824 F.2d at 1190. But it was addressing an altogether different question—whether Congress clearly intended to limit EPA's regulatory jurisdiction to materials disposed of or abandoned, as opposed to materials reused within an ongoing production process. *Id.*, 824 F.2d at 118. The court did not have occasion to consider whether the provision clearly expressed Congress' intent to include (or exclude) uncontained gases from the definition of "solid waste."

Cir. 1986) ("The Act confers on the Administrator of the EPA broad powers to regulate the storage, treatment, transportation, and disposal of potentially hazardous materials. *See* 42 U.S.C. § 6912(a).") And the EPA has concluded in at least two rulemakings that uncontained gases do not fall within RCRA's definition of solid waste. Because these rulemakings were subject to notice and comment and constitute a reasonable interpretation of the statute, they are entitled to *Chevron* deference. *See Sierra Club v. E.P.A.*, 375 F.3d 537, 541 (7th Cir. 2004) (deferring to EPA's reasonable interpretation of Clean Air Act because the agency acted within "the core of *Chevron*'s domain" by engaging in "notice-and-comment rulemaking under explicit statutory delegation"); *Wisconsin v. E.P.A.*, 266 F.3d 741, 746 (7th Cir. 2001) ("[T]he EPA here has interpreted the [Clean Water Act] by promulgating formal regulations, using plenary notice-and-comment procedures … . Its regulations and subsequent decision are therefore entitled to [*Chevron*] deference."); *see also Owen Elec. Steel Co. of S. Carolina v. Browner*, 37 F.3d 146, 148 (4th Cir. 1994) ("[W]e accord the EPA's interpretation of statutory definition of 'solid waste' substantial deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*").

The EPA's clearest statement on the issue was in a 1989 rulemaking that identified various hazardous wastes. As part of this analysis, the Agency considered whether "light ends," such as butane, which are "in the gaseous state but condensable by currently feasible technology to liquids at ambient temperature and

pressure," could be categorized as a hazardous waste. The EPA concluded in the negative explaining:

> Upon reconsideration of this issue (with the benefit of the comments received on the proposed rulemaking), EPA now believes our authority to identify or list a waste as hazardous under RCRA *is limited to containerized or condensed gases* (*i.e.*, section 1004(27) of RCRA excludes all other gases from the definition of solid wastes and thus cannot be considered hazardous wastes).

54 Fed. Reg. 50968, 50972–73 (December 11, 1989) (emphasis added). Although the precise issue there was whether "light ends" could be classified as a "hazardous waste," "hazardous wastes" under RCRA are a subset of "solid wastes," 42 U.S.C. 6903(5), and the Agency's determination was predicated on its position that gases, other than "containerized or condensed gases," could not be classified as RCRA solid wastes.

In response, Evanston cites to a more recent rulemaking where the EPA concluded that streams of $CO_2$ for sequestration qualified as a RCRA solid waste. But in that instance, the Agency was careful to specify that the $CO_2$ in question was a "supercritical fluid," which is neither a gas nor a liquid:

> [C]ommenters argued that these carbon dioxide streams are "uncontained gases" and as such were statutorily excluded from RCRA by Congress … . As EPA noted in the proposed rule, the $CO_2$ streams are delivered by pipeline and injected into UIC Class VI wells for GS [geologic sequestration] in a supercritical state, which EPA stated at proposal was "… rather unique in that it has properties intermediate between a liquid and a gas." The scientific term used to describe or define this supercritical state (i.e., when a substance is at or above its critical temperature and critical pressure) is as a "supercritical fluid." The RCRA statutory definition of solid waste specifically refers to "other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities …" … and does not speak to materials such as supercritical fluids. Like

the listed "solid, liquid, semisolid, or contained gaseous material" specifically referenced, $CO_2$ streams sequestered for purposes of GS are "other discarded material" from industrial and commercial operations and, therefore, are of a similar kind to the other types of wastes specifically referenced by the definition. They are, therefore, RCRA statutory solid wastes.

79 Fed. Reg. 350-01, 355 (Jan. 3, 2014) (citation and footnote omitted). Indeed, rather than supporting the City's position, this statement reaffirms the Agency's position that uncontained gases are not solid waste for the purposes of RCRA.

Evanston also looks for support in legislative history and EPA rules and administrative orders regulating potentially explosive methane under RCRA. But the methane discussed in those sources is a byproduct of RCRA solid waste—not solid waste itself. *See, e.g.*, *Solid Waste Disposal Facility Criteria*, 56 Fed. Reg. 50978-01, 51020 (Oct. 9, 1991); *In re Mallard Lake Landfill*, USEPA Docket No. RCRA 7003-5-08-001, *available at* http://www3.epa.gov/region5/cleanup/mallard/pdfs/aoc_200712.pdf (accessed Jan. 4, 2016) (requiring monitoring of methane produced by landfill waste); H.R. Rep. 94-1491(I), 11, 37 (Sept. 9, 1976).[3]

The EPA's interpretation in 1989 of the definition of "solid waste" has the force of law and speaks directly to the question in this case. Furthermore, the

---

[3]     The references to gases in this House Report, the only legislative history Evanston cites, are to gases produced by traditional solid waste in landfills. The one exception is a reference to "propane gas" that was discharged into a river, *see* H.R. Rep. 94-1491(I), 23 (Sept. 9, 1976), but that single reference says much less about Congressional intent than does a statement near the beginning of the same report: "Not only solid wastes, but also liquid and contained gaseous wastes, semi-solid wastes and sludges are the subjects of this legislation." *Id.* at 2. If anything, that statement (which does not contemplate any wastes other than those expressly mentioned) excludes uncontained gases more clearly than the statutory language.

Agency's understanding that uncontained gases are excluded from the definition is a reasonable interpretation of Section 6903(27) and is consistent with the most natural reading of that provision.

That said, even assuming, for the sake of argument, that the EPA's 1989 interpretation is not entitled to *Chevron* deference, the Court believes the interpretation to be persuasive, and agency interpretations without the force of law are to be given deference to the extent they are persuasive. *Mead*, 533 U.S. at 221. In fact, even in the absence of the two rulemakings, the EPA repeatedly has stated its view that uncontained gases are not solid wastes. *See* White House Office Mgmt. & Budget, *Longstanding EPA Precedent that Uncontained Gas Is Not a Solid Waste* at 3–5 (Nov. 16, 2011) (summarizing statements), *available at* https://www.whitehouse.gov/sites/default/files/omb/assets/oira_2060/2060_11162011 -3.pdf (accessed 1/21/16).

Indeed, just last year, the Agency again explained its position in *Carbon Sequestration Council v. E.P.A.*, 787 F.3d 1129 (D.C. Cir. 2015). In that case, the petition challenged the Agency's 2014 classification of $CO_2$ supercritical fluid as a hazardous waste.[4] In its brief to the court, the EPA argued that a supercritical fluid can be a solid waste because the list in the definition is instructive and not exhaustive, but the Agency was careful to explain that,

> [b]y specifically including "contained gases" within the illustrative list,
> Congress evinced its intent to exclude "uncontained gases." In that
> term only, the maxim of *expressio unius est exclusio alterius* applies to
> indicate the intentional use of one form over the exclusion of another.

---

[4]     The case was ultimately dismissed for lack of standing. *See Carbon Sequestration Council*, 787 F.3d at 1133.

In this respect, the reference to "contained" gases is unique among the physical forms listed.

Resp'ts' Br. at 21, 57–58, *Carbon Sequestration Council v. E.P.A.*, 787 F.3d 1129 (D.C. Cir. 2015) (Nos. 14-1046, 14-1048), ECF 1521146 (filed Nov. 6, 2014). Both Evanston and the companies cite to this brief, *see* Resp. Br at 14–15, Nicor's Reply Br. at 3 (ECF 37), but in the end the Agency's statements support the latter.

Finally, for good measure, the Court also notes that numerous courts have concluded that uncontained gases are not RCRA solid wastes. *See, e.g.*, *United States v. Sims Bros. Constr., Inc.*, 277 F.3d 734, 740 (5th Cir. 2001) (observing that "[f]or gaseous material to be 'solid waste' it must be 'contained.'"); *Helter v. AK Steel Corp.*, No. C-1-96-527, 1997 WL 34703718, at *12 (S.D. Ohio Mar. 31, 1997) ("[T]he Court concludes that the plain language of 42 U.S.C. § 9603(27) excludes the leaked COG [coke oven gas], in its gaseous form, from the definition of 'solid waste' and, thus, from RCRA's coverage.").

In rebuttal, Evanston relies heavily on *Ctr. for Cmty. Action & Envtl. Justice v. BNSF Ry. Co.*, 764 F.3d 1019 (9th Cir. 2014), but that case dealt with whether "particulate matter" in exhaust gases could be classified as a solid waste. It did not involve purely gaseous matter, like methane gas. And the court did not even reach this question. *Id.* at 1030 n. 10 ("Because we conclude that Defendants do not 'dispose' of solid waste in violation of RCRA, we need not reach the parties' arguments about whether diesel particulate matter is indeed 'solid waste' under 42 U.S.C. § 6903(27).").

Like *BNSF*, the other cases upon which Evanston relies involved particulate or other materials transported in a gas, and not the gas itself, with perhaps one exception. In *Citizens Against Pollution v. Ohio Power Co.*, No. C2-04-CV-371, 2006 WL 6870564 (S.D. Ohio July 13, 2006), the court did conclude that "flue gas" that touched the ground was a RCRA solid waste. *Id.* at *5. But the court in that case did not have occasion to consider the EPA's position on uncontained gases, greatly undermining its persuasiveness.

Because the Court concludes that methane gas does not meet the definition of RCRA solid waste, Evanston cannot base a RCRA claim on the release of methane gas from natural gas pipelines. The next question is whether Evanston's RCRA claim can go forward to the extent that it is based on the release of Lowe Process waste oil.

### B. Lowe Process Waste Oil

Although Evanston cannot base a RCRA claim on the release of an uncontained gas, there is no reason—assuming proper notice—that Evanston may not base a claim on the discharge of a RCRA solid waste that breaks down into methane gas, thereby endangering public health or the environment. Nicor and ComEd concede as much. *See* Mem. Supp. at 7 n.6.

By identifying Lowe Process waste oil as a potential source of the methane detected in the James Park area, Evanston seeks to do just that. To recap, Evanston alleges that Lowe Process waste oil leaked from above ground storage tanks at the Skokie MGP and migrated to the James Park area. It also moved through gas

pipelines into the James Park area. Some of this oil has reached bedrock and is biodegrading into methane, and some of it is in the soil and coating the Dodge Avenue water pipeline with a black crust.

ComEd and Nicor argue that Evanston's RCRA claim, to the extent it is premised on the release of Lowe Process waste oil, must be dismissed because Evanston's notice failed to notify them of any endangerment relating to Lowe Process waste oil. *See* Mem. Supp. at 6–8. According to the companies, the notice did not even mention Lowe Process waste oil and did not ascribe the presence of methane at James Park to any cause other than the leakage of natural gas from active pipelines.

The applicable notice requirement provides that "[n]o action may be commenced under subsection (a)(1)(B) of this section prior to ninety days after the plaintiff has given notice of the endangerment" to the potential defendants, the EPA Administrator, and the state. 42 U.S.C. § 6972(b)(2)(A). Additionally, no action may be commenced if the EPA decides to address the endangerment itself. 42 U.S.C. § 6972(b)(2)(B). The "endangerment" notice provision corresponds to the notice provision for RCRA "violations," except that that the delay period for a violation claim is only sixty days. *Id.* § 6972(b)(1)(A).

The Supreme Court has explained that RCRA's notice and delay requirements are designed to reduce the need for citizen suits in two ways. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989) (concerning notice under RCRA's "violation" provision). "First, notice allows Government agencies to take

responsibility for enforcing environmental regulations." *Id.* "Second, notice gives the alleged violator an opportunity to bring itself into complete compliance with the Act." *Id.* (internal quotation marks omitted). Although *Hallstrom* did not decide whether RCRA's notice requirement is jurisdictional,[5] the case did hold that notice is a prerequisite to suit and that lack of notice requires dismissal. *Id.* at 31. *Hallstrom*, however, did not address what content is required in a RCRA notice.

Evanston responds that its notice was sufficient because it (1) alerted the companies to the presence of high levels of methane in the vicinity of James Park and (2) alerted them that "coal tar" from the Skokie MGP was coating a municipal water pipe and threatening to penetrate it. Resp. Br. at 15–17. Using the term "coal tar" in the notice, Evanston says, was a way of referring to Lowe Process waste oil. *Id.* at 15 ("[T]he City did provide notice of the wide-spread release of Lowe Process waste oil, referred to as 'Coal Tar' in the [notice].""). Evanston further contends that the companies were on notice that the methane detected could be produced by coal tar because methane is a natural metabolite of coal tar. *Id.* at 16. Nicor and ComEd disagree, arguing that a RCRA notice must identify the specific pollutant at issue and that "coal tar" and Lowe Process waste oil are not the same substance.

In *Brod v. Omya, Inc.*, 653 F.3d 156 (2d Cir. 2011), the Second Circuit upheld the district court's dismissal of a RCRA endangerment claim for lack of notice. The court explained that the complaint in that case alleged "that Omya's practice of dumping its processing waste into unlined pits presents 'an imminent and

---

[5]     In *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 492 n.3 (7th Cir. 2011), the Seventh Circuit explained in dicta that RCRA's notice requirement is not jurisdictional.

substantial endangerment' in violation of § 6972(a)(1)(B) because AEEA, a toxic chemical in the waste, is seeping into groundwater." The pre-suit notice, however, "did not identify AEEA and arsenic as contaminants in Omya's waste." *Id.* at 68. Under those circumstances, the court concluded, the notice "did not give Omya adequate notice of the endangerment." *Id.* at 168. In reaching its decision, the *Brod* court relied in part on a regulation that fleshes out what information a RCRA notice must contain. That regulation states:

> Notice regarding an alleged violation of a permit, standard, regulation, condition, requirement, or order which has become effective under this Act shall include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 254.3(a).[6]

A nearly identical regulatory notice provision was at play in *Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997), a case in which the Seventh Circuit considered what constitutes sufficient pre-suit notice under the Clean Water Act ("CWA"), concluding that not every source of pollution must be identified. Because of the similarities between the notice provisions of the CWA and RCRA, courts sometimes rely on cases from one context to decide cases in the other. *See, e.g.*, *Brod*, 653 F.3d at 166; *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 401 (4th Cir. 2011) (citing

---

[6]     Although, by its terms, this regulation seems to be confined to notices under RCRA's "violation" provision, cases like *Brod* and *Evco Associates, Inc. v. C.J. Saporito Plating Co.*, No. 93 C 2038, 1995 WL 571438, at *1 (N.D. Ill. Sept. 25, 1995), make no distinction, nor does Evanston argue that the regulation is inapplicable here.

*Hallstrom* in a Clean Water Act case because the CWA's notice requirement is "identical" to RCRA's). So, although the Seventh Circuit has not considered what information must be contained in a RCRA notice, *Atlantic States* is applicable to this case.

The upshot of *Atlantic States* is that, "[i]n practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit." 116 F.3d at 819. Considering this relatively generous understanding of notice in the Seventh Circuit, the mere absence of the term "Lowe Process waste oil" in Evanston's notice would not render that notice insufficient if the notice otherwise provided "sufficient information to permit the recipient to identify" the endangerment alleged in the complaint.

But the Court concludes that Evanston's notice did not apprise Nicor and ComEd of the endangerment posed by Lowe Process waste oil. The allegations in the notice about "coal tar" emanating from a gas pipeline onto a municipal water pipeline would not have alerted the companies to the widespread release of Lowe Process waste oil alleged in the complaint. The notice said nothing about leakage of anything from above ground storage tanks, and it said nothing about migration of a pollutant down to bedrock. Moreover, the two substances are not, in fact, the same, which may explain why Evanston stops short of affirmatively stating that they are and why it left the term "coal tar" entirely out of its complaint.[7]

---

[7] Coal tar, as its name suggests, is made from coal, *see* Cosmetic Ingredient Review Expert Panel, *Final Safety Assessment of Coal Tar as Used in Cosmetics*, 27 Intl. J.

More importantly—even if "coal tar" and "Lowe Process waste oil" were to refer to the same substance and the substance is commonly known to break down into methane—Nicor and ComEd are correct that nowhere in Evanston's notice is the presence of coal tar connected to the increased levels of methane gas detected in the James Park area.

In response, Evanston argues that it did not have to identify every possible source of the methane in its notice, citing *The Newark Group, Inc. v. Dopaco, Inc.*, No. 08-cv-02623, 2012 Wl 899250 (E.D. Cal. Mar. 15, 2012). But, here, Evanston's notice, in an effort to rebut any argument that the nearby landfill was the source of the methane, goes to great lengths to affirmatively attribute the release of methane gas to the underground pipelines in the area. *See* Resp. Br., Ex. B, Notice of Intent to Sue, at ¶¶ 21–31 (citing radiocarbon dating of the methane and other evidence). Given this, neither Nicor nor ComEd would have had any reason to believe from the notice that the coal tar was a potential source of the methane.

In short, the City's notice to Nicor and ComEd failed to satisfy the purposes of a RCRA notice explained in *Hallstrom* and the standard set in *Atlantic States*. The only element linking the notice to the extensive allegations about Lowe Process waste oil in the counterclaim—that is, the "black crust" found on the municipal water line and attributed to the Skokie MGP—is simply too tenuous a connection to apprise Nicor and ComEd of the Lowe Process waste oil problem. To be clear, the

---

Toxicology 2008, abstract *available at* http://www.ncbi.nlm.nih.gov/pubmed/18830861 ("Coal Tar is a semisolid by-product obtained in the destructive distillation of bituminous coal."), while Lowe Process waste oil, as the City acknowledges, is a petroleum product, *see* Compl. ¶ 73.

Court is by no means suggesting that a RCRA notice must identify all aspects of an endangerment and the full extent of the endangerment, but the City's notice directed the companies' attention to the pipelines in the vicinity of James Park as the source of the methane gas and did not attribute any of the methane to the coal tar. This is very different from the City's present theory that the coal tar itself was a source of the methane gas. For this reason, the portion of Evanston's RCRA claim premised on Lowe Process waste oil must be dismissed. Evanston may refile its claim after providing proper notice to Nicor and ComEd, assuming that the other requirements are satisfied.

### III. CONCLUSION

For the reasons stated above, Evanston's RCRA claim is dismissed. To the extent that the City's claim is based on alleged endangerments caused by the disposal of Lowe Process waste oil, the dismissal is without prejudice. To the extent that the claim is based upon the classification of methane gas in and of itself as a RCRA solid waste, it is dismissed with prejudice. Because Evanston's only federal claim is dismissed, the Court declines to retain supplemental jurisdiction over the remaining state claims. Furthermore, because the City's claims against Nicor have been dismissed, Nicor's complaint for declaratory relief is dismissed as moot.

**IT IS SO ORDERED**     **ENTER:** 2/10/16

            _____

          **JOHN Z. LEE**
          **United States District Judge**